**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MINNESOTA**

In re:

Petters Company, Inc., et al.,

Debtors.

(includes:
Petters Group Worldwide, LLC;
PC Funding, LLC;
Thousand Lakes, LLC;
SPF Funding, LLC;
PL Ltd., Inc.;
Edge One LLC;
MGC Finance, Inc.;
PAC Funding, LLC;
Palm Beach Finance Holdings, Inc.)

Jointly Administered under
Case No. 08-45257

Court File No. 08-45257

Court Files No.'s:
08-45258 (GFK)
08-45326 (GFK)
08-45327 (GFK)
08-45328 (GFK)
08-45329 (GFK)
08-45330 (GFK)
08-45331 (GFK)
08-45371 (GFK)
08-45392 (GFK)

Chapter 11 Cases
Judge Gregory F. Kishel

In re:

Petters Capital, LLC,

Debtor.

Case No. 09-43847

Chapter 7 Case
Judge Gregory F. Kishel

**DISCLOSURE STATEMENT IN SUPPORT OF**
**CHAPTER 11 PLAN OF LIQUIDATION**

LINDQUIST & VENNUM LLP
Daryle L. Uphoff
James A. Lodoen
George H. Singer
4200 IDS Center
80 S 8th Street
Minneapolis, MN 55402
Telephone: 612-371-3211
Facsimile: 612-371-3207

Attorneys for Douglas A. Kelley, as
Chapter 11 Trustee of Petters Company,
Inc., Petters Group Worldwide, LLC, PC
Funding, LLC, Thousand Lakes, LLC, SPF
Funding, LLC, PL Ltd., Inc., Edge One
LLC, MGC Finance, Inc., PAC Funding,
LLC and Palm Beach Finance Holdings,
Inc.

Dated: January 15, 2016

I.      Introduction ............................................................................................................ 1

    A.   Executive Summary of Primary Plan Provisions............................................ 3
    B.   Summary of Classification and Treatment Under the Plan ............................ 6
    C.   The Plan Confirmation Process ................................................................... 12
    D.   Voting Procedures ....................................................................................... 15
    E.   Questions About Voting Procedures ............................................................ 16
    F.   Confirmation Hearing .................................................................................. 17
    G.   Recommendation of Plan Proponents .......................................................... 17
II.     EVENTS LEADING TO BANKRUPTCY FILING ............................................ 17

    A.   Pre-Petition Corporate Structure of the Debtors ......................................... 17
    B.   The Debtors' Pre-Petition Fraud ................................................................. 18
    C.   Convictions and Guilty Pleas of the Debtors' Pre-Petition Principals ........ 19
    D.   Chapter 11 Debtors' Prepetition Capital Structure ..................................... 20
    E.   Petters Capital Debtor's Prepetition Capital Structure ............................... 25
III.    THE DEBTOR'S CHAPTER 11 CASES ........................................................... 26

    A.   Commencement of the Chapter 11 Cases .................................................... 26
    B.   Commencement of Petters Capital Case ...................................................... 26
    C.   Appointment of Chapter 11 Trustee ............................................................ 26
    D.   Appointment of an Official Committee of Unsecured Creditors.................. 27
    E.   The Chapter 11 Trustee's Retention of Professionals.................................. 27
    F.   The Petters Capital Chapter 7 Trustee's Retention of Professionals ........... 28
    G.   Significant Events During Bankruptcy Cases .............................................. 28
    H.   Creditor Claims............................................................................................ 42
IV.     SUMMARY OF MATERIAL PLAN PROVISIONS ........................................... 45

    A.   Introduction ................................................................................................. 45
    B.   Classification of Claims and Equity Interests .............................................. 46
V.      Treatment of Administrative Claims, Priority Tax Claims, and Professional Fee
        Claims ................................................................................................................. 46

    A.   Administrative and Priority Tax Claims in General .................................... 46
    B.   Treatment of Administrative Claims ............................................................ 47
    C.   Treatment of Priority Tax Claims ................................................................ 47
    D.   Bar Date for Administrative Claims ............................................................ 47
    **E.   BAR DATE FOR TRUSTEE FEE CLAIMS AND PROFESSIONAL FEE
          CLAIMS**........................................................................................................... 48
VI.     Treatment of Claims and Equity Interests ........................................................... 49

    A.   Class 1—Other Priority Claims ................................................................... 49
    B.   Class 2—Secured Claims............................................................................. 49
    C.   Class 3—General Unsecured Claims............................................................ 50
    D.   Class 4—Intercompany Claims .................................................................... 51
    E.   Class 5—Subordinated Claims ..................................................................... 51
    F.   Class 6--Equity Interests .............................................................................. 51
VII.    COMPROMISES AND SETTLEMENTS .......................................................... 51

i

|  | A. | Compromises and Settlements | 51 |
|  | B. | The Palm Beach and Lancelot Claims Settlements | 52 |
|  | C. | The Interlachen Claims Settlement | 57 |
| VIII. |  | SUBSTANTIVE CONSOLIDATION | 58 |
|  | A. | Consolidation for Certain Purposes | 58 |
|  | B. | Substantive Consolidation | 59 |
| IX. |  | UNEXPIRED LEASES AND EXECUTORY CONTRACTS | 59 |
|  | A. | Rejection of Prepetition Unexpired Leases and Executory Contracts. | 59 |
|  | B. | Bar Date for Rejection Damage Claims | 60 |
|  | C. | Insurance. | 60 |
| X. |  | IMPLEMENTATION OF THE PLAN | 60 |
|  | A. | PCI Liquidating Trust Agreement | 60 |
|  | B. | BMO Litigation Trust Agreement | 69 |
| XI. |  | PROVISIONS REGARDING VOTING AND DISTRIBUTIONS UNDER THE PLAN | 77 |
|  | A. | Nonconsensual Confirmation | 77 |
|  | B. | Disallowance of Claims | 78 |
|  | C. | Deadline to Object to Claims | 78 |
|  | D. | Litigation of Claims | 78 |
|  | E. | Distributions for Claims Allowed as of the Effective Date | 78 |
|  | F. | Distribution of Disputed Claims | 78 |
|  | G. | Disputed Claims Reserve | 79 |
|  | H. | Distribution Record Date | 79 |
|  | I. | Means of Cash Payments | 79 |
|  | J. | Reserve for Professional Fee Claims | 80 |
|  | K. | Estimation of Claims | 80 |
|  | L. | Delivery of Distributions | 80 |
|  | M. | Unclaimed Distributions | 80 |
|  | N. | Withholding Taxes | 81 |
|  | O. | Fractional Cents | 82 |
|  | P. | De Minimis Distributions | 82 |
|  | Q. | Setoffs | 82 |
| XII. |  | CONFIRMATION AND EFFECTIVENESS OF THE PLAN | 83 |
|  | A. | Confirmation of the Plan | 83 |
|  | B. | Conditions to Confirmation | 83 |
|  | C. | Conditions to the Effective Date | 83 |
|  | D. | Waiver of Conditions | 83 |
|  | E. | Effect of Failure of Conditions | 83 |
|  | F. | Limitation of Rights; Injunction | 84 |
|  | G. | Binding Effect | 84 |
|  | H. | Substantial Consummation | 84 |
|  | I. | Notice of Effective Date | 85 |
|  | J. | Request for Waiver of Stay of Confirmation Order | 85 |

XIII.    RETENTION OF JURISDICTION .......................................................................... 85

XIV.    MISCELLANEOUS PROVISIONS ...................................................................... 87

A.    Dissolution of Creditors' Committee ........................................................ 87
B.    Termination of Trustees' Service ............................................................. 87
C.    Fee Claims of the Chapter 11 Trustee, the Chapter 7 Trustee, and Professionals
       Retained by Either of Them ..................................................................... 88
D.    Pre-Confirmation Modification ................................................................ 88
E.    Post-Confirmation Immaterial Modification ............................................ 88
F.    Post-Confirmation Material Modification ................................................ 88
G.    Modifications Generally .......................................................................... 89
H.    Withdrawal or Revocation of the Plan ..................................................... 89
I.    Payment of Statutory Fees ....................................................................... 89
J.    Successors and Assigns ........................................................................... 89
K.    Term of Injunctions or Stays ................................................................... 89
L.    Termination of Cases .............................................................................. 90
M.    Exculpation ............................................................................................ 90
N.    Releases by the Estates ........................................................................... 90
O.    Preservation of Rights ............................................................................ 91
P.    Extinguishment of Liens ......................................................................... 91
Q.    Substantial Contribution ......................................................................... 91
R.    Consent to Transfer ................................................................................ 91
S.    Governing Law ....................................................................................... 91
T.    Notices ................................................................................................... 92
U.    Saturday, Sunday or Legal Holiday ......................................................... 94
V.    Section 1146 Exemption ......................................................................... 94
W.    Severability ............................................................................................ 94
X.    Service of Certain Exhibits ..................................................................... 94

XV.    ALTERNATIVES TO THE PLAN ...................................................................... 94

A.    Conversion to Chapter 7 of the Bankruptcy Code .................................... 94
B.    Alternative Chapter 11 Plan .................................................................... 95
C.    Dismissal of Chapter 11 Cases. ............................................................... 95
D.    Certain Risk Factors ............................................................................... 95
E.    Certain Federal Income Tax Consequences of the Plan ............................ 97

XVI.    RECOMMENDATION AND CONCLUSION ...................................................... 102

DOCS-#4870937-v21

# I.      INTRODUCTION

This Disclosure Statement is submitted by Douglas A. Kelley, solely in his capacity as the Chapter 11 Trustee ("Chapter 11 Trustee") of Petters Company, Inc. ("PCI"), Petters Group Worldwide, LLC ("PGW"), PC Funding, LLC ("PC Funding"), Thousand Lakes, LLC ("Thousand Lakes"), SPF Funding, LLC ("SPF Funding"), PL Ltd., Inc. ("PL Ltd."), Edge One LLC ("Edge One"), MGC Finance, Inc. ("MGC Finance"), PAC Funding, LLC ("PAC Funding") and Palm Beach Finance Holdings, Inc. ("PBFH"), in connection with the solicitation of votes on the Chapter 11 Plan of Liquidation (the "Plan") filed on January 15, 2016 with the United States Bankruptcy Court for the District of Minnesota (the "Bankruptcy Court") in connection with the above-captioned Chapter 11 Bankruptcy Cases proposed by (i) the Chapter 11 Trustee, (ii) Greenpond South, LLC ("Greenpond"), and, subject to the approval of their respective bankruptcy courts, (iii) Randall L. Seaver (the "Petters Capital Chapter 7 Trustee"), solely in his capacity as the Chapter 7 Trustee of Petters Capital, LLC, (iv) Ronald R. Peterson (the "Lancelot Trustee"), solely in his capacity as the Chapter 7 Trustee of Lancelot Investors Fund, L.P., *et al.*, and (v) Barry E. Mukamal (the "Palm Beach Trustee"), solely in his capacity as the Liquidating Trustee of the Palm Beach Finance Partners Liquidating Trust and the Palm Beach Finance II Liquidating Trust[1] (collectively, the "Plan Proponents") pursuant to section 1125 of Title 11 of the United States Code (the "Bankruptcy Code").

A copy of the Plan, including any exhibits and schedules, is attached to this Disclosure Statement as Exhibit A. Capitalized terms used in this Disclosure Statement and not defined herein shall have their respective meanings set forth in the Plan or, if not defined in the Plan, as defined in section 101 of the Bankruptcy Code.

The purpose of this Disclosure Statement is to provide adequate information about the Debtors and about the treatment of Claims and Equity Securities under the Plan. Section 1125 of the Bankruptcy Code requires that a disclosure statement provide information sufficient to enable a hypothetical and reasonable investor, typical of the Debtors' Creditors, to make an informed judgment whether to vote to accept or reject the Plan. This Disclosure Statement may not be relied upon for any other purpose.

The factual statements, financial information, and other information contained in this Disclosure Statement have been taken from documents prepared by the Chapter 11 Trustee and his professionals, the Plan Proponents and their professionals, pleadings filed with the Bankruptcy Court in the Bankruptcy Cases, and information obtained during the Bankruptcy Cases. This Disclosure Statement shall not be construed or deemed to constitute an acceptance of fact or an admission with respect to any of the statements made herein, and all rights and remedies of the Plan Proponents are expressly reserved in this regard.

---

[1] The Palm Beach Trustee and the Lancelot Trustee promptly after the filing of this Disclosure Statement and the Plan will file motions in the Palm Beach Finance and Lancelot bankruptcy cases seeking approval for the Palm Beach Trustee and the Lancelot Trustee to be proponents of the proposed Plan, the various agreements referenced in the Plan that may impact the Palm Beach Finance and Lancelot bankruptcy cases, and to take all actions necessary to proceed with confirmation of the Plan and for related relief.

On February ___, 2016, after notice and hearing, the Bankruptcy Court approved this Disclosure Statement as containing adequate information of a kind and in sufficient detail to enable a hypothetical, reasonable investor typical of the Debtors' Creditors to make an informed judgment whether to accept or reject the Plan. Approval of this Disclosure Statement does not, however, constitute a determination by the Bankruptcy Court as to the fairness or merits of the Plan.

**THIS DISCLOSURE STATEMENT AND THE PLAN ARE AN INTEGRAL PACKAGE, AND THEY MUST BE CONSIDERED TOGETHER FOR THE READER TO BE ADEQUATELY INFORMED. THIS INTRODUCTION IS QUALIFIED IN ITS ENTIRETY BY THE REMAINING PORTIONS OF THIS DISCLOSURE STATEMENT, AND THIS DISCLOSURE STATEMENT IN TURN IS QUALIFIED, IN ITS ENTIRETY, BY THE PLAN.**

**NO REPRESENTATIONS CONCERNING THE DEBTORS AND THE BANKRUPTCY ESTATES (PARTICULARLY AS TO THE VALUE OF THEIR PROPERTY) ARE AUTHORIZED BY THE PLAN PROPONENTS OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT AND ITS EXHIBITS. ANY REPRESENTATIONS OR INDUCEMENTS MADE TO SECURE YOUR ACCEPTANCE OF THE PLAN OTHER THAN AS CONTAINED IN THIS DISCLOSURE STATEMENT AND ITS EXHIBITS SHOULD NOT BE RELIED UPON BY YOU IN ARRIVING AT YOUR DECISION, AND SUCH ADDITIONAL REPRESENTATIONS AND INDUCEMENTS SHOULD BE REPORTED TO COUNSEL FOR THE PLAN PROPONENTS, WHO WILL IN TURN DELIVER SUCH INFORMATION TO THE BANKRUPTCY COURT FOR SUCH ACTION AS MAY BE APPROPRIATE.**

**THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT, INCLUDING ANY EXHIBITS CONCERNING THE FINANCIAL CONDITION OF THE DEBTORS AND THE OTHER INFORMATION CONTAINED HEREIN, HAS NOT BEEN SUBJECT TO AN AUDIT OR INDEPENDENT REVIEW EXCEPT AS EXPRESSLY SET FORTH HEREIN. ACCORDINGLY, THE CHAPTER 11 TRUSTEE IS UNABLE TO WARRANT OR REPRESENT THAT THE INFORMATION CONCERNING THE DEBTORS OR THEIR FINANCIAL CONDITION IS ACCURATE OR COMPLETE.**

**INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PRESENTED FOR ILLUSTRATIVE PURPOSES ONLY. THEREFORE THE CHAPTER 11 TRUSTEE DOES NOT WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AND ITS EXHIBITS IS CORRECT. THIS DISCLOSURE STATEMENT CONTAINS ONLY A SUMMARY OF THE PLAN. EACH CREDITOR IS STRONGLY URGED TO REVIEW THE PLAN PRIOR TO VOTING ON IT AND SHOULD INDEPENDENTLY VERIFY AND CONSULT ITS INDIVIDUAL ATTORNEY AND ACCOUNTANT AS TO THE EFFECT OF THE PLAN ON SUCH CREDITOR'S CLAIM.**

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE OF THIS DISCLOSURE STATEMENT UNLESS ANOTHER TIME IS SPECIFIED. THE DELIVERY OF THIS DISCLOSURE STATEMENT WILL NOT, UNDER ANY CIRCUMSTANCES, CREATE AN IMPLICATION THAT THERE HAS NOT BEEN ANY CHANGE IN THE FACTS SET FORTH SINCE THE DATE OF THIS DISCLOSURE STATEMENT.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND NOT IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER APPLICABLE NON-BANKRUPTCY LAW. ENTITIES HOLDING OR TRADING IN OR OTHERWISE PURCHASING, SELLING OR TRANSFERRING CLAIMS AGAINST, INTERESTS IN OR SECURITIES OF, THE DEBTORS SHOULD EVALUATE THIS DISCLOSURE STATEMENT ONLY IN LIGHT OF THE PURPOSE FOR WHICH IT WAS PREPARED.

THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION NOR HAS SUCH COMMISSION PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN. THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE EITHER A GUARANTEE OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN OR AN ENDORSEMENT OF ANY OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT OR THE PLAN.

THIS DISCLOSURE STATEMENT SHOULD NOT BE CONSTRUED TO BE ADVICE ON THE TAX, SECURITIES OR OTHER LEGAL EFFECTS OF THE PLAN. EACH CREDITOR SHOULD, THEREFORE, CONSULT WITH ITS OWN LEGAL, BUSINESS, FINANCIAL AND TAX ADVISERS AS TO ANY SUCH MATTERS CONCERNING THE SOLICITATION, THE PLAN OR THE TRANSACTIONS CONTEMPLATED BY THE PLAN.

A.    Executive Summary of Primary Plan Provisions.

THE FOLLOWING IS A SUMMARY OF THE TREATMENT OF CLAIMS AND EQUITY SECURITIES UNDER THE PLAN. THE DESCRIPTION OF THE PLAN SET FORTH BELOW CONSTITUTES A SUMMARY ONLY AND IS QUALIFIED IN ITS ENTIRETY BY THE PLAN, THE LIQUIDATING TRUST AGREEMENTS, AND THE OTHER PLAN DOCUMENTS. CREDITORS AND OTHER PARTIES IN INTEREST ARE URGED TO REVIEW THE MORE DETAILED DESCRIPTION OF THE PLAN CONTAINED IN SECTIONS V AND VI OF THIS DISCLOSURE STATEMENT AND THE PLAN ITSELF. IN THE EVENT OF ANY INCONSISTENCY BETWEEN THIS DISCLOSURE STATEMENT AND THE PLAN, THE PLAN WILL CONTROL.

These Bankruptcy Cases were filed following the September 2008 collapse of a fraudulent scheme (the "Ponzi Scheme") orchestrated by Thomas J. Petters ("Petters") and others to defraud lenders and operated through the Debtors. When the Ponzi Scheme collapsed, lenders

asserted numerous claims for losses, as well as claims based in fraud and civil conspiracy. There are also numerous claims between and among the Debtors and other Creditors who assert liens, that include, among other things, disputes as to the validity of these lien claims and the value and relative priority of the liens asserted against property of the Estates.

The Bankruptcy Code's avoidance powers permit, among other things, a bankruptcy trustee to avoid obligations and to avoid and recover payments or other transfers of property made by the Debtors. During the Bankruptcy Cases, the Chapter 11 Trustee and Petters Capital Chapter 7 Trustee (collectively, the "Trustees") have sought, among other things, the disallowance of claims, the avoidance of liens, and recovery of transfers of principal, interest, "false profits", bonuses, commissions, gifts, preferences and other property transferred by the Debtors prior to the Petition Dates as preferential and fraudulent transfers under Chapter 5 of the Bankruptcy Code and other applicable state and federal laws.

The Chapter 11 plan process provides an opportunity to resolve disputes globally and in a manner that is open and fair to all constituents. Global resolution of litigation is particularly important in these Bankruptcy Cases because the Plan Proponents believe that further litigation of individual Claims would take years to resolve and would unnecessarily deplete assets of the Estates, serving no party's interests. The Plan (i) creates two Liquidating Trusts, for the commencement of Causes of Action and continuation of pending Avoidance Actions, and (ii) distributes the current value of the Estates as well as future Liquidating Trust Assets to Creditors Holding Allowed Claims. The Plan Proponents believe that the proposed compromises embedded in the Plan are appropriate in light of the applicable law and the circumstances presented and are in the Estates' best interests.

The Plan is predicated on the following fundamental principles and assumptions: (1) each of the Debtors was operated fraudulently prepetition and operated as part of and in furtherance of the Ponzi Scheme; (2) as a result of the Debtors' participation in the Ponzi Scheme, it will be cost prohibitive and perhaps futile to attempt to disentangle the assets and liabilities of each of the Debtors, and thus it inures to the benefit of all Creditors to treat the Debtors on a consolidated basis and make distributions to Holders of Allowed Claims from a common asset pool; and (3) most of the remaining available assets of the Debtors are legal claims, which include loan and receivable collection claims, preferential and fraudulent transfer claims against Promissory Note Lenders and others that received transfers of money or other property from the Debtors, their subsequent transferees, and the proceeds of any such claims.

During the Bankruptcy Cases, the Trustees commenced over 200 Avoidance Actions against more than 380 defendants seeking, among other things, the disallowance of claims, the avoidance of liens, and recovery of false profits, bonuses, commissions, gifts, preferences and other property transferred by the Debtors prior to the Petition Dates. The Chapter 11 Trustee has also commenced and will be commencing Avoidance Actions against subsequent transferees. Court-approved settlements have been reached with several defendants, including settlements in which the defendants agreed to return 100% of transfers each received in excess of principal loaned as "false profits." These settlements were reached after successfully defeating motions to dismiss filed by more than 100 defendants. In addition, the Chapter 11 Trustee has sold various assets of the Debtors, with each of these asset sales approved by the Bankruptcy Court.

4

As of November 30, 2015, the Debtors had Cash in the aggregate amount of $161,538,602 as a result of the recoveries from the Avoidance Actions and asset sales. Of this amount, $26,608,126 is the putative property of the PCI Estate, $133,356,797 is the putative property of the PGW Estate and $1,573,679 is the putative property of the Petters Capital Estate (these cash allocations are based on title ownership of assets as of the Petition Dates and do not account for any potential inter-Debtor ownership disputes, Claims or Causes of Action). Additionally, the Debtors are owed additional payments on settlements, approved and pending, and asset sales of approximately $3,006,249. Other than Cash and outstanding receivables, the Debtors' only remaining assets are pending legal claims. The total amount of money to be distributed to Holders of Allowed Claims will depend on the outcome of these pending legal claims.

The Plan contains a series of settlements and compromises of disputes which otherwise would result in protracted and expensive litigation to the detriment of all Creditors. Pursuant to Section 1123 of the Bankruptcy Code, the cornerstone features of the Plan include:

1.      The substantive consolidation of (A) the previously substantively consolidated debtors and estates of PCI and PC Funding; Thousand Lakes; SPF Funding; PL Ltd.; Edge One; MGC Finance; PAC Funding; and PBFH, with (B) PGW, and (C) Petters Capital, PCI and the PCI SPEs, PGW and Petters Capital are collectively hereafter referred to as the "Consolidated Debtors";

2.      The creation of Liquidating Trusts to administer all of the Estates' Property and to provide for the commencement, continued prosecution and resolution of Claims and Causes of Action for the benefit of the Consolidated Debtors' creditors;

3.      The settlement of the Palm Beach Avoidance Action and the Lancelot Avoidance Action and the Palm Beach Claim and the Lancelot Claim. Lancelot and Palm Beach were the Estates' two largest Promissory Note Lenders and have asserted the two largest claims against the Estates. Pursuant to the settlements, the Lancelot Trustee and Palm Beach Trustee will pay a total amount of $15.6 million to the Estates either by cash payments or withholding such amounts from the first distributions to be made to them from the PCI Liquidating Trust on account of the Palm Beach Claim and the Lancelot Claim. Palm Beach and Lancelot will each receive an Allowed General Unsecured Claim for the amount of its respective Net Invested Capital loss as of the PCI/PGW Petition Date plus the amount each pays to the Estates ; and

4.      The allowance of the Interlachen Claim at $60 million, an amount consensually determined by Interlachen and all of the Plan Proponents.

The Plan Proponents believe the Plan and the compromises contained therein provide a fair, equitable and reasonable treatment to all Creditors while seeking to minimize risks and the resulting fees and expenses associated with further litigation that would be incurred.

Any Property of the Estates to be distributed under the Plan is entirely separate and independent from any distribution that may be made by the United States of America as

restitution for Petters' crimes to victims of Petters' fraud. In connection with the criminal prosecutions of the Debtors' pre-petition officers and directors, the United States Department of Justice has forfeited certain assets from Petters and other individuals convicted of crimes in connection with their roles in the Ponzi Scheme. The Chapter 11 Trustee's present understanding is that the United States intends to distribute assets obtained pursuant to orders of forfeiture in the criminal cases through the Remission Program administered by the Department of Justice. The Plan Proponents are not responsible for, and have no control over, the forfeited assets administered by the Department of Justice, including the amount, timing, or procedure for distribution or determination of the recipients of those assets. Nothing in the Plan will preclude a Creditor from seeking and recovering funds through the Department of Justice.

The Plan Proponents believe that the Plan provides a superior outcome to the alternative of conversion of the Chapter 11 Cases to Chapter 7 cases, which would result in (i) further delay in distributions to Creditors entitled to receive a distribution under the Plan and (ii) diminished recoveries for Holders of Allowed Claims due to an increase in administrative expenses of a Chapter 7 case compared to the Liquidating Trusts under the Plan. If the Bankruptcy Cases were dismissed, Creditors would be free to pursue non-bankruptcy remedies in their attempts to satisfy Claims against the Debtors. However, in that instance, the pending Avoidance Actions would likely be dismissed, and Creditors would bear the costs and difficulties of attempting, each on their own, to collect on asserted Claims, which undoubtedly would result in a morass of litigation among competing stakeholders.

### B.    Summary of Classification and Treatment Under the Plan

The Plan classifies Claims against, and Equity Securities in, the Debtors for all purposes, including voting, confirmation, and distribution. A summary of the classification and treatment of Claims and Equity Securities under the Plan is set forth below. Reference should be made to the entire Disclosure Statement, the Plan, and the Exhibits thereto in their entirety for a complete description of each classification and treatment. For certain Classes of Claims, the Chapter 11 Trustee's estimated percentage recoveries are set forth below and do not constitute an admission by the Chapter 11 Trustee as the Allowance, validity or amount of any particular Claim. The Chapter 11 Trustee reserves all rights to dispute the Allowance, validity or amount of any Claim that has not already been established by the Bankruptcy Court. The estimated aggregate amounts of all Classes of Claims are based on the Chapter 11 Trustee's good faith estimates of the aggregate amount of such Claims upon resolution of all such Claims that are Disputed Claims, based on all currently known information. Certain of those Disputed Claims are material, and the total amount of all such Claims, including Disputed Claims, is materially in excess of the total amount of Allowed Claims assumed in the estimates listed below. The actual amounts of Claims ultimately Allowed by the Bankruptcy Court, however, could materially exceed or could be materially less than the estimated amounts of Allowed Claims shown below. For these reasons, no representation can be or is being made with respect to whether the estimated amount of Allowed Claims in each Class will be accurate or the estimated percentage recoveries shown in the table below will be realized by the Holder of an Allowed Claim in any particular Class.

6

| Class Number | Description | Estimated Amount of Allowed Claims in Class | Treatment Under the Plan |
|---|---|---|---|
| Unclassified | Administrative Claims | $68 to $70 million of which $8 to $10 million remains unpaid | Estimated Recovery: 100%<br><br>Unimpaired and not entitled to Vote.<br><br>Except to the extent the Holder of an Allowed Administrative Claim agrees otherwise, each Holder of an Allowed Administrative Claim shall be paid in respect of such Allowed Claim (a) the full amount thereof in Cash, as soon as practicable after the later of (i) the Effective Date and (ii) the date on which such Claim becomes an Allowed Claim, or upon other agreed terms, or (b) such lesser amount as the Holder of an Allowed Administrative Claim and the Chapter 11 Trustee or the PCI Liquidating Trustee, as applicable, with the prior consent of the Creditors' Committee or the PCI Liquidating Trust Committee, as applicable, might otherwise agree; provided, however, that any Allowed Administrative Claim representing obligations incurred in the ordinary course during the pendency of these Bankruptcy Cases, if any, shall be paid in accordance with the terms and conditions of the particular transactions and any agreements related thereto. |
| Unclassified | Priority Tax Claims | $0.00 | Estimated Recovery: 100%<br><br>Unimpaired and not entitled to Vote.<br><br>Each Holder of an Allowed Priority Tax Claim, if any, shall be paid in respect of such Allowed Claim either (a) the full amount thereof, without post-petition interest or penalty, in Cash, as soon as practicable after the later of (i) the Effective Date and (ii) the date on which such Claim becomes an Allowed Claim, or upon other agreed terms, or (b) such lesser amount as the Holder of an Allowed Priority Tax Claim and the Chapter 11 Trustee or the PCI Liquidating Trustee, as applicable, with the consent of the Creditors' Committee or the PCI Liquidating Trust Committee, as applicable, might otherwise agree. |
| Class 1 | Other Priority Claims | $25,000 | Estimated Recovery: 100%<br><br>Unimpaired and not entitled to Vote.<br><br>Except to the extent that the Chapter 11 Trustee or the PCI Liquidating Trustee, as applicable (following consultation with the Creditors' Committee or the PCI Liquidating Trust |

| | | | Committee, as applicable), and a Holder of an Allowed Other Priority Claim agree to a different treatment, each Holder of an Allowed Other Priority Claim shall receive, in full and final satisfaction, settlement and release of such Claim, payment in full in Cash in an amount equal to such Allowed Other Priority Claim on the later of (i) the Initial Distribution Date or (ii) the date when such Other Priority Claim becomes an Allowed Other Priority Claim, or as soon thereafter as is practicable. All Allowed Other Priority Claims that are not due and payable on or before the Effective Date shall be paid by the PCI Liquidating Trustee in the ordinary course of business in accordance with the terms thereof. |
|---|---|---|---|
| Class 2 | Secured Claims | $0.00 | **Direct Promissory Note Lender Secured Claims**<br><br>In connection with the loan agreements entered into by the Debtors, a number of security agreements were entered that purportedly granted security interests in certain assets of the Debtors, including accounts, inventory, goods, instruments, and obligations. A number of such Promissory Note Lenders filed UCC-1 financing statements with the respective office of the Secretary of State to perfect such interests, with many such filings indicating an interest in specific goods, purchase orders or inventory. However, as a result of the Debtors' participation in the Ponzi Scheme, such goods, purchase orders and inventory purportedly serving as collateral were fabricated or fictitious and did not, and do not, exist. To the extent such Creditors assert additional Claims based in tort, such Claims are not subject to prepetition security agreements or secured by assets of the Debtors. In addition, Debtor PGW purportedly conveyed to Opportunity Finance, LLC an interest in the proceeds of stock issued by Fingerhut Direct Marketing, Inc. now known as Bluestem Brands, Inc. Pursuant to cash collateral orders issued in the Chapter 11 Cases, Opportunity Finance, LLC has been granted replacement Liens to the extent such Property has been used postpetition, with such Liens subject to any and all defenses of the Chapter 11 Trustee. The Chapter 11 Trustee has sought to avoid such pledge as a fraudulent transfer. |
| | | $0.00 | **Indirect Promissory Note Lenders Secured Claims**<br><br>A number of parties that invested in the funds that loaned money into the Debtors have asserted secured Claims. There is no security agreement between the Debtor and these claimants. Such indirect Claims are duplicative of, and derivative of, Claims asserted by direct Promissory Note Lenders. None of these Creditors are party to a security agreement with the Debtors. To the extent goods, purchase orders and inventory purportedly serving as collateral for the direct Promissory Note Lenders' Claims were |

8

|  |  |  | fabricated or fictitious and did not, and do not, exist, the same would be the case for indirect Promissory Note Lender Claims as well. To the extent such Creditors assert additional Claims based in tort, such Claims are not subject to prepetition security agreements or secured by assets of the Debtors . |
|---|---|---|---|
|  |  | $0.00 | **Inter-Company Secured Claims** |
|  |  |  | Debtor PGW has executed promissory notes and security agreements granting PCI and Petters Capital a security interest in essentially all assets, including any proceeds of stock issued by Fingerhut Direct Marketing, Inc. now known as Bluestem Brands, Inc. PCI and Petters Capital have been granted replacement Liens to the extent such Property has been used postpetition. |
|  |  | $0.00 | **Trade Vendor Secured Claims** |
|  |  |  | Prior to the Petition Dates, the Debtors entered into one or more leases for copiers and other equipment, with such lessors filing UCC-1 Financing Statements. Since the Petition Dates, the Debtors have provided such lessors with notice of rejection of such leases, and surrendered the equipment subject to such leases. |
|  |  |  | Estimated Recovery: 100% |
|  |  |  | Unimpaired and not entitled to Vote. |
|  |  |  | Except to the extent that the Chapter 11 Trustee or the PCI Liquidating Trustee, as applicable (following consultation with the Creditors' Committee or the PCI Liquidating Trust Committee, as applicable), and a Holder of an Allowed Secured Claim agree to a different treatment, in full and final satisfaction, settlement and release of such Claim, in the Chapter 11 Trustee's or the PCI Liquidating Trustee's discretion, as applicable (following consultation with the Creditors' Committee or the PCI Liquidating Trust Committee, as applicable), (i) each Holder of an Allowed Secured Claim shall receive Cash in an amount equal to such Allowed Secured Claim in full and complete satisfaction, settlement and release of such Allowed Secured Claim on the later of the Initial Distribution Date or the date such Secured Claim becomes an Allowed Secured Claim, or as soon thereafter as is practicable, or (ii) each Holder of an Allowed Secured Claim shall receive the Collateral securing its Allowed Secured Claim or the proceeds of such Collateral in full and complete satisfaction, settlement and release of such Allowed Secured Claim on the later of the Initial Distribution Date and the date such Secured Claim becomes an Allowed Secured |

9

| | | | |
|---|---|---|---|
| | | | Claim, or as soon thereafter as is practicable.<br><br>With respect to any asserted Secured Claim, if and to the extent that the Holder of such asserted Secured Claim is determined, by a Final Order, to hold an Allowed Secured Claim not subject to subordination, then such Allowed Secured Claim shall receive distributions as an Allowed Secured Claim in accordance with this subsection (a) of Section 4.2 of the Plan. To the extent that it is determined that all or any portion of such asserted Secured Claim is unsecured or is to be subordinated, then the portion that is unsecured or subordinated, to the extent Allowed, shall receive the treatment accorded to Claims in Class 3 (General Unsecured Claims), or Class 5 (Subordinated Claims), as applicable.<br><br>Any Claim of any Holder with negative Net Invested Capital shall be disallowed and any Lien purportedly securing such Claim shall be terminated and void. |
| Class 3 | General Unsecured Claims | $1.9 billion | Estimated Recovery: 10-14%<br><br>Class 3 Claims are Impaired and Entitled to Vote.<br><br>A Holder of an Allowed Class 3 General Unsecured Claim shall be entitled to (i) a Pro Rata distribution on the Initial Distribution Date of Cash from Trust Assets net after payment or reserve for all Administrative Expenses, Priority Tax Claims, and Class 1 and Class 2 Claims; (ii) subsequent Pro Rata distributions of Trust Assets net after payment or appropriate reserve for all PCI Liquidating Trust Expenses and Disputed Claims; provided, that distributions made to the Lancelot Trustee and the Palm Beach Trustee shall be subject to the Lancelot Settlement and the PBF Settlement and PBF II Settlement, respectively; and (iii) Pro Rata distributions of BMO Litigation Trust Proceeds net after payment or reserve for all BMO Litigation Trust Expenses and Disputed Claims.<br><br>In lieu of the treatment described above, a Holder of an Allowed Class 3 General Unsecured Claim may elect to receive a distribution on the Initial Distribution Date of Cash in an amount equal to twenty percent (20%) of its Allowed Claim up to a limit of $20,000, waiving any entitlement to any further distribution under the Plan.<br><br>Any Claim with negative Net Invested Capital shall be a Disallowed Claim upon entry of the Confirmation Order, and the Holder of such Claim shall not be eligible to vote to accept or reject the Plan or receive |

10

| | | | any distributions under the Plan. |
|---|---|---|---|
| Class 4 | Intercompany Claims | $0.00 | Estimated Recovery: 0% <br><br> Impaired and Not Entitled to Vote (Deemed to Reject Plan) <br><br> Intercompany Claims, solely for the purpose of administering the Consolidated Estates and making distributions under this Plan, shall each be collapsed and disregarded such that no distributions shall be made on account of such Claims. Intercompany Claims may be cancelled, reinstated, or capitalized at the discretion of the PCI Liquidating Trustee in his capacity as the Debtors' chief executive officer in accordance with Section 8.3 of the Plan.. |
| Class 5 | Subordinated Claims | $0.00 | Estimated Recovery: 0% <br><br> Impaired and Not Entitled to Vote (Deemed to Reject Plan) <br><br> Holders of Subordinated Claims shall not be entitled to retain or receive any Property on account of such Subordinated Claims and no distributions shall be made on account of such Claims. |
| Class 6 | Equity Securities | $0.00 | Estimated Recovery: 0% <br><br> Impaired and Not Entitled to Vote (Deemed to Reject Plan) <br><br> Common shares shall be cancelled if and when the Debtors are dissolved in accordance with Section 8.3, provided, however, that any options or warrants to purchase any Equity Securities, or obligating the Debtors to issue, transfer or sell Equity Securities or any other capital stock of the Debtors, shall be canceled or extinguished. Holders of Class 6 Equity Securities are Impaired and shall be deemed to have rejected the Plan. |

DOCS-#4870937-v21

### C.        The Plan Confirmation Process

What follows in this section is a general discussion of the rules governing who may vote to accept or reject a chapter 11 plan of reorganization, the votes necessary to confirm a chapter 11 plan, and the circumstances under which a plan may be confirmed, even if a particular class of creditors or equity securities does not vote to accept a plan.

### 1.        Who May Vote to Accept or Reject a Plan

To vote to accept or reject a chapter 11 plan of reorganization or liquidation, a claim or equity interest must be "allowed" and "impaired," and a plan must provide that the holder of such claim or equity interest will receive or retain some value. Holders of unimpaired claims are deemed to have accepted the plan and do not vote, though they may object to confirmation of the plan to the extent they otherwise have standing to do so. Holders of claims or equity securities that do not receive or retain any value under a plan are deemed to have rejected the plan. As defined under the Bankruptcy Code, a claim generally includes all rights to payment from a debtor, while an equity securities generally represents any ownership stake in a debtor.

### (a)        Allowed Claims and Interests

With the exceptions explained below, under the Bankruptcy Code, a claim or equity interest is generally allowed only if a proof of the claim or equity interest is properly filed before the bar date for doing so, and either no party in interest has objected or the court has entered an order allowing the claim or equity interest. Under certain circumstances provided in the Bankruptcy Code, a creditor may have an allowed claim even if a proof of claim or equity interest was not filed and the bar date for filing a proof of claim or interest has passed. For example, a claim may be deemed allowed if the claim is listed on the debtor's schedules of liabilities filed with the court and is not scheduled as disputed, contingent, or unliquidated.

A holder's claim must be an allowed claim, or must be allowed for purposes of voting, for the holder of such claim to have the right to vote on a plan. Generally, for voting purposes only, a claim is deemed allowed to the extent that: (1) either (a) a proof of claim was timely filed or (b) a proof of claim was deemed timely filed either under Bankruptcy Rule 3003(b)(1)-(2) or by a final order; and (2) (a) the claim is not a claim subject to an objection or (b) the claim is allowed either by a final order or under the plan.

Under a plan, a creditor whose claim is not an allowed claim nevertheless may be entitled to vote to accept or reject a plan if the creditor has timely filed a proof of claim that is not the subject of an objection filed before the plan confirmation hearing or a Bankruptcy Court order disallowing the claim entered before the confirmation hearing. An entity whose claim is subject to an objection is not eligible to vote on the plan unless and until (1) that objection is resolved in such entity's favor or (2) after notice and a hearing under Bankruptcy Rule 3018(a), the Bankruptcy Court temporarily allows the entity's claim for the purpose of voting to accept or reject the plan. Any entity that seeks temporary allowance of its claim for voting purposes must promptly take steps necessary to arrange for an appropriate and timely hearing with the Bankruptcy Court.

12

### (b)      Impaired Claims and Interests

Generally speaking, under the Bankruptcy Code, a class of claims or equity securities is "impaired" if a plan alters the legal, equitable, or contractual rights of the members of the class, even if the alteration is beneficial to the creditors or equity securities. More specifically, section 1124 of the Bankruptcy Code provides that a claim or equity security is impaired for purposes of Chapter 11 <u>unless</u> a plan:

A.    leaves unaltered the legal, equitable and contractual rights of the holder of such claim or equity security; or

B.    notwithstanding any contractual provision or applicable law that entitles the holder of a claim or equity security to receive accelerated payment of its claim or equity security after the occurrence of a default:

1)    cures any such default that occurred before or after the commencement of the case under the Bankruptcy Code, other than a default that consists of a breach of any provision relating to the insolvency or financial condition of the debtor at any time before the closing of the case, the commencement of a case under the Bankruptcy Code, or the appointment of or taking possession by a trustee in a case under the Bankruptcy Code.

2)    reinstates the maturity of such claim or equity security as it existed prior to the default;

3)    compensates the holder of such claim or equity security for damages incurred as a result of reasonable reliance on such contractual provision or applicable law;

4)    if such claim or equity security arises from any failure to perform a nonmonetary obligation, other than a default arising from failure to operate a nonresidential real property lease subject to section 365(b)(i)(A) of the Bankruptcy Code, compensates the holder of such claim or equity securities (other than the debtor or an insider of the debtor) for any actual pecuniary loss incurred by such holder as a result of such failure; and

5)    does not otherwise alter the legal, equitable or contractual rights to which such claim or equity securities entitled the holder of such claim or equity security.

### 2.      Classification of Claims and Votes Necessary to Confirm a Plan

The Bankruptcy Code provides that creditors and equity security holders are to be grouped into classes under a plan and that they are to vote to accept or reject a plan by class. Generally, creditors with similar legal rights and interests are placed together in the same class and equity securities with similar legal rights and interests are placed together in the same class. Under the Bankruptcy Code, impaired claims or equity securities are placed in classes under a plan, and it is the class that must accept that plan. There also are some types of claims that are

13

unclassified because the Bankruptcy Code requires that they be treated a certain way. These claims are considered unimpaired, and holders of such claims cannot vote.

The Bankruptcy Code does not require that each claimant or holder of an equity security vote in favor of a plan in order for a court to confirm a plan. Rather, a plan must be accepted by each class of claims and equity securities (subject to the "cramdown" exception discussed below). A class of claims accepts a plan if, of the claimants in the class who actually vote on the plan, such claimants holding at least two-thirds in dollar amount and more than one-half in number of allowed claims vote to accept the plan. For example, if a hypothetical class has twenty-five creditors that vote and the total dollar amount of those creditors' claims is $1,000,000, then for such class to have accepted a plan, thirteen or more of those creditors must have voted to accept the plan (a simple majority) *and* the claims of the creditors voting to accept the plan must total at least $666,667 (a two-thirds majority of voting creditors). A class of equity security holders accepts a plan if, of the holders in such class who actually vote on such plan, at least two-thirds in amount vote to accept the Plan.

Under the Bankruptcy Code, a bankruptcy court may confirm a plan if at least one class of impaired claims has voted to accept that plan (without counting the votes of any insiders whose claims are classified within that class) and if certain statutory requirements are met both as to non-consenting members within a consenting class and as to rejecting classes.

### 3.     Confirmation Hearing

Following the voting, the Bankruptcy Court will hold a hearing on confirmation of a plan. Even if a plan receives the requisite votes, a plan will not become binding on all creditors and equity securities unless and until, among other things, the Bankruptcy Court makes an independent determination that the plan satisfies the various confirmation requirements set forth in section 1129 of the Bankruptcy Code. This determination will be made at the confirmation hearing. As discussed in Section II.F of this Disclosure Statement, any Holder of an Allowed Claim or Equity Security that objects to Confirmation of the Plan must File and serve its objection and must appear at the Confirmation Hearing.

### 4.     Cramdown; Treatment of Non-Consenting Classes

Even if all classes do not consent to the proposed treatment of their claims under a plan, a plan nonetheless may be confirmed by the Bankruptcy Court if the dissenting classes are treated in the manner prescribed by the Bankruptcy Code. The process by which a plan is confirmed, notwithstanding the existence of a dissenting class, is commonly referred to as "cramdown." Even if all impaired classes of claims and equity securities under the plan do not vote to accept the plan, plan proponents are entitled to request that a court confirm a plan pursuant to section 1129(b) of the Bankruptcy Code, which permits a plan to be confirmed over the dissenting votes of classes of claims and equity securities if at least one impaired class of claims votes to accept the plan, the court determines that the plan does not discriminate unfairly and the plan is fair and equitable with respect to each impaired, dissenting class of claims and equity securities.

The Bankruptcy Code does not define unfair discrimination, but it does set forth certain minimum requirements for "fair and equitable" treatment. For a class of secured claims, "fair and

14

equitable" can mean that the secured claimants retain their liens and receive deferred cash payments, the present value of which equals the value of the secured claimant's interest in collateral. For a class of unsecured claims, a plan is fair and equitable if the claims in that class receive value equal to the allowed amount of the claims, or, if the unsecured claims are not fully satisfied, no claim or interest that is junior to such claims receives or retains anything under the plan.

### D.    Voting Procedures

The Bankruptcy Code entitles only Holders of Impaired Claims or Equity Securities who will receive some distribution under the Plan to vote to accept or reject the Plan. Holders of Claims or Equity Securities that are Unimpaired under the Plan are conclusively presumed to accept the Plan and, therefore, are not entitled to vote on it. Holders of Claims or Equity Securities that will receive no distributions under the Plan are conclusively presumed to reject the Plan and, therefore, are not entitled to vote on it. Accordingly:

1.    Holders of Claims in Class 1 and Class 2 are Unimpaired under the Plan, are conclusively deemed to have accepted the Plan, and are not entitled to vote on the Plan.

2.    Holders of Claims in Class 3 are Impaired under the Plan and are entitled to vote to accept or reject the Plan. Holders of Claims to be allowed under the Plan, including the Lancelot Trustee, the Palm Beach Trustee, and Interlachen, are entitled to vote their Claims in the amount to be allowed under the Plan.

3.    Holders of Claims in Class 4 and Class 5 and Equity Securities in Class 6 are Impaired under the Plan; however because the Holders of Claims in Class 4 and Class 5 and Equity Securities in Class 6 will neither receive nor retain value on account of those Claims or Equity Securities, these Classes are conclusively deemed to have rejected the Plan, and are not entitled to vote on the Plan.

In voting to accept or reject the Plan, please use only the Ballot (if any) sent to you with this Disclosure Statement, and please carefully read the voting instructions on the Ballot for an explanation of the applicable voting procedures and deadlines. If you have received this Disclosure Statement without a Ballot, the Plan Proponents believe that you are: (i) a Holder of a Claim that will retain or receive the value of your Claim under the Plan and that you, therefore, are deemed to accept the Plan, (ii) a Holder of a Claim that will not retain or receive value under the Plan and that you, therefore, are deemed to reject the Plan; (iii) a Holder of an Equity Security that will not retain or receive value under the Plan and that you, therefore, are deemed to reject the Plan, or (iv) otherwise not the Holder of a Claim that is entitled to vote to accept or reject the Plan.

**A BALLOT TO VOTE TO ACCEPT OR REJECT THE PLAN IS BEING PROVIDED ONLY TO HOLDERS OF CLAIMS IN CLASS 3. BEFORE VOTING, SUCH HOLDERS SHOULD READ THIS DISCLOSURE STATEMENT AND ITS EXHIBITS, INCLUDING THE PLAN AND THE PLAN DOCUMENTS, IN THEIR ENTIRETY.**

15

You may vote on the Plan by completing the enclosed Ballot and mailing it or sending via courier to the Clerk of the Court at the following address:

Clerk of Court, U.S. Bankruptcy Court

Warren E Berger Federal Building and
United States Courthouse, Courtroom 2A,
316 North Robert Street,
St. Paul, Minnesota

**In order for your Ballot to be considered by the Bankruptcy Court, it must be received at the above address by 5:00 p.m. (prevailing Central Time) on April ____, 2016 (no facsimiles or e-mails containing a PDF of your ballot will be accepted).**

**BALLOTS RECEIVED AFTER THE VOTING DEADLINE WILL NOT BE COUNTED**.

All votes to accept or reject the Plan must be cast by using the appropriate form of Ballot enclosed with this Disclosure Statement. No votes other than ones using the Ballots will be counted, except to the extent the Bankruptcy Court orders otherwise.

Only Holders of Allowed Claims or Equity Securities in Impaired Classes of Claims or Equity Securities are entitled to vote on the Plan. Any Ballot executed by the Holder of an Allowed Claim or Equity Security, but which does not indicate acceptance or rejection of the Plan, will be deemed a vote to accept the Plan. Any Ballot not executed by the Holder of an Allowed Claim or Equity Security will not be counted as a vote to accept or reject the Plan.

If you are the Holder of a Claim entitled to vote on the Plan but there is a pending objection with respect to your Claim, you will be required to seek temporary allowance by the Bankruptcy Court of your Claim for voting purposes. Rule 3018 of the Federal Rules of Bankruptcy Procedure provides that the Bankruptcy Court may, after notice and hearing, temporarily allow a Claim in an amount that the Bankruptcy Court deems proper for the purpose of accepting or rejecting the Plan. If the Debtor has filed an objection with respect to your Claim, you are urged to seek the assistance of your own attorney.

E.      **Questions About Voting Procedures**

If (i) you have any questions about (a) the procedures for voting, (b) the packet of materials that you have received, or (c) the amount of your Claim, (ii) you wish to obtain an additional copy of the Plan, this Disclosure Statement, or any exhibits to such documents, or (iii) if you are the Holder of a Claim in Class 3, and you did not receive a Ballot with this Disclosure Statement, please contact counsel for the Chapter 11 Trustee at:

16

Lindquist & Vennum LLP
Attention: James A. Lodoen or Jeffrey D. Smith
4200 IDS Center
80 South 8th Street
Minneapolis, MN 55402
T: 612-371-3234; 612-752-6982
jlodoen@lindquist.com; jsmith@lindquist.com

**F.      Confirmation Hearing**

The Bankruptcy Court will hold a hearing on Confirmation of the Plan beginning at _____
_.m. (prevailing Central Time) on April ___, 2016, or as soon thereafter as the parties may be heard, before the Honorable Gregory F. Kishel, Chief United States Bankruptcy Judge, at the following location:

Warren E Berger Federal Building and
United States Courthouse, Courtroom 2A,
316 North Robert Street,
St. Paul, Minnesota

. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice, except for an announcement of such adjourned hearing date by the Bankruptcy Court in open court at such hearing.

**Any objection to Confirmation of the Plan must be in writing, must comply with the Bankruptcy Rules, and must be Filed and served by delivery not later than _____ __, 2016 at 5:00 p.m. (prevailing Central Time). Failure to properly and timely File and serve an objection to Confirmation of the Plan and appear at the Confirmation Hearing will be deemed to be consent to the Plan's Confirmation.**

**G.      Recommendation of Plan Proponents**

The Plan Proponents believe that the Plan satisfies each of the confirmation requirements of section 1129(a), and if necessary, section 1129(b), of the Bankruptcy Code, and that acceptance of the Plan is in the best interests of all Holders of Claims and Equity Securities and, consequently, urge all Holders of Impaired Claims entitled to vote to vote to accept the Plan.

## II.      EVENTS LEADING TO BANKRUPTCY FILING[2]

**A.      Pre-Petition Corporate Structure of the Debtors**

The Chapter 11 bankruptcy cases involve business entities owned and controlled by Petters. PCI is a Minnesota corporation, the shares of which are 100% owned and, prior to October 6, 2008, were 100% controlled by Petters. PCI, in turn, to the extent corporate

---

[2] Section II of this Disclosure Statement has been prepared by the Chapter 11 Trustee and not by any of the other Plan Proponents.

17

separateness was effective, is the sole member or shareholder, as applicable, and owns 100% of the membership interests or shares, as applicable, of Debtors PC Funding, Thousand Lakes, SPF Funding, PL Ltd., Edge One, MGC Finance, and PAC Funding (the "PCI SPEs"). PBFH is also wholly-owned by Petters and prior to the PCI/PGW Petition Date was operated as one of the PCI SPEs. The operational and managerial decisions of PCI, the PCI SPEs and their affiliates were inextricably intertwined and principally made by Petters and certain key employees.

PGW is a privately held Delaware limited liability company that was also 100% owned and, prior to October 6, 2008, was 100% controlled by Petters. The operational and managerial decisions of PGW and its subsidiary entities were also made by Petters and certain key employees.

PCI obtained capital for the Petters enterprises, on its own account and also utilized the PCI SPEs to obtain billions of dollars of funding, purportedly to acquire merchandise for sale to wholesalers and retailers nationwide. The purchase and sale business, however, did not exist. PGW was a holding company that provided certain accounting, legal and human resource services to Petters' business entities, but had no independent operations. PGW was funded mostly by funds obtained from PCI, funds that PCI obtained as part of the Ponzi Scheme.

Petters Capital is Delaware limited liability company that was, as of the Petition Dates, a wholly-owned subsidiary of PGW. The operational and managerial decisions of Petters Capital were also made by Petters and certain key employees.

### B.    The Debtors' Pre-Petition Fraud

Petters operated the Ponzi Scheme from approximately 1993 through September 24, 2008. In connection with the Ponzi Scheme, Petters laundered what is estimated to be an amount in excess of $40 billion in, out, and through PCI, PGW and various other entities that he controlled, including Petters Capital.

Petters fraudulently induced Promissory Note Lenders into financing the ostensible purchase of electronic equipment and other goods purportedly secured by fabricated purchase orders. To attract lenders to PCI, Petters portrayed PCI as a "diverter" or "middleman" that purchased consumer electronic goods from wholesalers and resold the goods to large retailers. Petters and his Co-conspirators, as defined below, however, intentionally fabricated and forged purchase order documents in order to recruit lenders into the Ponzi Scheme and to cause existing lenders to continue to lend into the Ponzi Scheme. While the fabricated or forged purchase orders and the related documents identified certain inventory, that inventory did not exist. Instead, Promissory Note Lenders were not repaid with the earnings from legitimate transactions, but with funds fraudulently obtained from other Promissory Note Lenders.

The Debtors obtained funding from many different Promissory Note Lenders between 1994 and 2008, nearly all of whom were provided with fabricated or forged purchase orders. Nearly all financing for Petters' Ponzi Scheme was conducted through the Debtors. Initially, PCI borrowed from individuals and other small entities. Later, around 2000, while continuing to obtain funds from its existing lenders, PCI began obtaining its financing from hedge fund lenders. The hedge funds required PCI to form special purpose entities through which they

18

would provide their financing. Debtors PC Funding, Thousand Lakes, SPF Funding, PL Ltd., Edge One, MGC Finance, PAC Funding, and Palm Beach were created to serve as special purpose entities for PCI. The special purpose entities have been substantively consolidated with PCI. *See Order Granting Trustee's Motion for Substantive Consolidation*, Dkt. No. 2098, which ruling was affirmed by the United States District Court.  The District Court's ruling is currently on appeal to the Eighth Circuit Court of Appeals.

At various times prior to the Petition Dates, certain Promissory Note Lenders were repaid all or part of their loans to the Debtors. At the time, the Debtors reported that these payments included interest in addition to the principal amount loaned ("<u>False Profits</u>").

Due to the returns promised and paid to Promissory Note Lenders, the siphoning of additional funds to pay salaries and bonuses, and to fund other Petters' business, virtually all of which were losing money, as well as the funding of Petters' and other Co-conspirators' lavish lifestyles, the Debtors' funds were continually being depleted. Accordingly, the Debtors aggressively pursued new lenders, and used the new funds to continue operations and repay Promissory Note Lenders. The Debtors were able to stay afloat only by using the new money loaned to repay existing Promissory Note Lenders. In this way, the Debtors operated as a Ponzi Scheme.

On September 24, 2008, multiple federal agencies executed search warrants at the headquarters of PCI and PGW. On October 2, 2008, the United States obtained an asset freeze and receivership under the Anti-Fraud Injunction Act, 18 U.S.C. § 1345, for the victims of the Ponzi Scheme. *United States v. Thomas Joseph Petters, et al.*, Case No. 08-cv-05348 (ADM/JSM) (D. Minn.) (the "<u>Civil Fraud Case</u>"). On October 6, 2008, the Honorable Ann D. Montgomery, United States District Judge, appointed Douglas A. Kelley (the "<u>Receiver</u>") as Receiver for, among others, Petters, PCI, and PGW, as well as all entities owned or controlled by them, including Petters Capital. *See Order for Entry of Preliminary Injunction, Order Appointing Receiver and Other Equitable Relief, Id.* at Dkt. No. 12, as subsequently amended on December 8, 2008, Dkt. No. 127 (collectively, the "<u>Petters Receivership Order</u>" and the "<u>Petters Receivership Proceeding</u>").

## C.     Convictions and Guilty Pleas of the Debtors' Pre-Petition Principals

On October 3, 2008, Petters was arrested on charges of mail and wire fraud, money laundering, and conspiracy for orchestrating the Ponzi Scheme. Other executives and individuals were also arrested on various charges and either plead guilty to, or were convicted of, certain crimes as a result of their involvement in the Ponzi Scheme.

On December 1, 2008, and through a Superseding Indictment returned June 3, 2009, Petters was indicted by a federal grand jury on charges of (i) mail fraud, (ii) wire fraud, (iii) conspiracy to commit mail fraud and wire fraud, and (iv) conspiracy to commit money laundering in violation of 18 U.S.C. §§ 371, 1343, 1956 and 1957. *See* Indictment, [Dkt. No. 79], and Superseding Indictment, [Dkt. No. 196], *United States v. Petters et al.*, Case No. 08-cr-00364 (RHK-AJB) (D. Minn.) (the "<u>Criminal Fraud Case</u>"). On December 2, 2009, Petters was found guilty of all 20 counts charged in the Superseding Indictment and was sentenced to 50 years in prison for his crimes, which conviction and sentence have been upheld on appeal. *See*

19

*United States v. Petters, et al.*, 663 F.3d 375 (8th Cir. 2011), *cert. denied*, 132 S. Ct. 2417 (2012).

At various times during the course of the Ponzi Scheme, Petters was assisted in its operation by numerous individuals and conspirators, including, but not limited to, Deanna Coleman ("Coleman"), Robert White ("White"), Larry Reynolds ("Reynolds") and Michael Catain ("Catain") (collectively, the "Co-conspirators"). Each of the Co-conspirators was charged by Information with various criminal offenses relating to their respective roles in the Ponzi Scheme and pled guilty to certain crimes, admitted their involvement in the fraud at their plea hearing, and has been sentenced for their roles in perpetrating the Ponzi Scheme. Coleman pled guilty to a single count of conspiracy to commit mail fraud and was sentenced to one year and a day of imprisonment for her crime. *See* Criminal Case No. 08-00304, [Dkt. No. 38]. White pled guilty to a single count of mail fraud and was sentenced to five years imprisonment for his crime. *See* Criminal Case No. 08-00299, [Dkt. No. 37]. Reynolds pled guilty to a single count of conspiracy to commit money laundering and was sentenced to ten years and ten months of imprisonment for his crime. *See* Criminal Case No. 08-00320, [Dkt. No. 53]. Catain pled guilty to a single count of conspiracy to commit money laundering and was sentenced to seven years and six months of imprisonment for his crime. *See* Criminal Case No. 08-00302, [Dkt. No. 49].

### D.    Chapter 11 Debtors' Prepetition Capital Structure

The prepetition consolidated capital structure of the Debtors principally consisted of (a) promissory notes and security agreements entered into by the Debtors in connection with the Ponzi Scheme; (b) inter-company indebtedness (e.g. inter-company promissory notes, security agreements and other obligations), (c) certain other indebtedness, and (d) Equity Securities. The information below reflects outstanding notes and other accounting entries of record as of the PCI/PGW Petition Date.

### 1.    Promissory Note Lenders

In connection with the operation of the Ponzi Scheme, the Debtors entered into various master loan agreements, loan agreements, promissory notes, security agreements and other agreements through which more than $36 billion was obtained from numerous Promissory Note Lenders primarily to fund a purchase order financing business that did not exist. When the Ponzi Scheme collapsed in 2008, the net accounting losses (the aggregate of the outstanding principal and accrued interest balance for each lender as of the PCI/PGW Petition Date) totaled approximately $3.8 billion. The net cash losses (reducing the aggregate cash loaned by lenders by the amount of cash repaid by the Debtors, i.e. cash in versus cash out) as of the PCI/PGW Petition Date was in excess of $1.9 billion.

### (a)    Lancelot Investors Fund, L.P.

Prior to the PCI/PGW Petition Date, Lancelot Investment Management, LLC ("Lancelot") served as the investment manager for five hedge funds that loaned funds to PCI and Thousand Lakes. Those funds are Colossus Capital Fund, LP, Colossus Capital Fund, Ltd., Lancelot Investor Fund LP, Lancelot Investors Fund II LP and Lancelot Investors Fund Ltd. Debtor Thousand Lakes was a party to various loan agreements, promissory notes, security

agreements and other documents, as amended, between Thousand Lakes, as borrower, and RWB Services, LLC as Administrative Agent. In total, 496 notes were executed between the parties, with 73 notes open as of the PCI/PGW Petition Date. In aggregate, Lancelot loaned approximately $8.8 billion and was paid approximately $8.0 billion, resulting in a net cash position of $764.6 million in cash basis losses as of the PCI/PGW Petition Date. Shortly after the filing of the Petitions in these cases, Lancelot and several of the hedge funds which made loans to Thousand Lakes and PCI filed Chapter 7 petitions under the Bankruptcy Code in the Northern District of Illinois.

**(b)    Palm Beach Finance Partners Holdings**

Prior to the PCI/PGW Petition Date, Debtor PBFH was party to various loan agreements, promissory notes, security agreements and other documents, including Deposit Account Management Agreements and issued promissory notes, as borrower. In aggregate, Palm Beach Finance Partners, L.P. and Palm Beach Finance II, L.P. loaned approximately $8.6 billion and were paid approximately $8.0 billion, resulting in a net cash position of approximately $651 million in cash basis losses as of the PCI/PGW Petition Date, comprised of over $85 million by Palm Beach Finance Partners, L.P. and over $565 million by Palm Beach Finance II, L.P. After the filing of the petitions in these cases, Palm Beach Finance Partners, L.P. and Palm Beach Finance II, L.P. filed Chapter 11 petitions under the Bankruptcy Code in the Southern District of Florida.

**(c)    Opportunity Finance, LLC**

As of the PCI/PGW Petition Date, Debtor PC Funding was party to various loan agreements, promissory notes, security agreements and other documents, as amended, between PC Funding, as borrower, and Opportunity Finance, LLC as lender. In total, 546 notes were executed between the parties, with 4 notes open as of the PCI/PGW Petition Date. In aggregate, PC Funding lenders loaned  approximately $1.95 billion and were paid approximately $2.04 billion, resulting in a net cash position of $90.5 million in cash basis gains. Opportunity Finance, LLC and related individuals and entities also loaned money to PCI and SPF Funding. Collectively, in the aggregate, Opportunity Finance, LLC and related individuals and entities had been repaid all of the principal loaned in its entirety as well as additional amounts paid as interest on those loans in the aggregate amount of more than approximately $123 million as of the PCI/PGW Petition Date.

In June 2008, a forbearance agreement was entered into between PC Funding, Opportunity Finance, LLC and Petters as a result of the failure to repay the outstanding notes. In connection with the forbearance agreement, PGW executed a collateral assignment of stock proceeds in which PGW purportedly granted Opportunity Finance a security interest in the proceeds of its shares of stock in Fingerhut Direct Marketing, Inc. n/k/a Bluestem Brands, Inc. PGW received no value for the grant of the security interest.

**(d)    Elistone Fund**

Prior to the PCI/PGW Petition Date, Debtor PL Ltd., Inc. was a party to various loan agreements, promissory notes, security agreements and other documents, including a Collateral

Account Agreement, with Elistone Fund. Through the lending period, promissory notes specify PL Ltd. as borrower, and Elistone as holder. In total, 21 notes were executed between the parties, with 12 notes open as of the PCI/PGW Petition Date. In aggregate, PL Ltd.'s lenders loaned approximately $60 million and were paid approximately $26.7 million of principal and interest, resulting in a net cash position of $33.7 million in cash basis losses as of the PCI/PGW Petition Date.

### (e)    Ark Discovery II, LP

Ark Discovery II was a hedge fund that loaned money to PCI through Debtor Edge One, the SPE created by PCI for Ark's lending. Prior to the Petition Date, Edge One was a party to various loan agreements, promissory notes, security agreements and other documents between Edge One, as borrower, Ark Discovery II, LP, as lender, and AWB Services, LLC as Administrative Agent. In total, 29 notes were executed between the parties, with 23 notes open as of the PCI/PGW Petition Date. In aggregate, Edge One lenders loaned approximately $159 million and were paid approximately $36.3 million, resulting in a net cash position of $122.7 million in cash basis losses as of the PCI/PGW Petition Date. Ark Discovery also entered into two promissory notes in the amount of $3 million each with PGW, and no payments were made on either note. Ark Discovery sold a participation interest in certain of its notes from Edge One to Ark Royal Capital, LLC.

### (f)    Metro Gem Capital, LLC

Prior to the PCI/PGW Petition Date, Debtor MGC Finance was party to various loan agreements, promissory notes, security agreements and other documents with Arrowhead Capital Management Corp and other entities, including a Collateral Account Agreement and issued promissory notes with MGC Finance, as borrower, and Metro Gem Capital, LLC, Metro Gem Capital II, LLC, Metro I, LLC, Metro II, LLC or Arrowhead Capital Finance, Ltd. as "holder." In total, 1,240 promissory notes were executed between the parties, with 28 notes open as of the PCI/PGW Petition Date. In aggregate, MGC Finance lenders loaned approximately $4.6 billion and were paid approximately $4.7 billion of principal and interest, resulting in a net cash position of $105.4 million in cash basis gains.

### (g)    Acorn Capital Group, LLC

Prior to the PCI/PGW Petition Date, Acorn Capital Group, LLC ("Acorn") was a party to various loan agreements, promissory notes, security agreements and other documents, as amended, between PCI and PAC Funding, as borrower, and Acorn Capital Group, LLC as lender. In aggregate, Acorn loaned approximately $2.5 billion and was paid approximately $2.4 billion, resulting in a net cash position of approximately $138 million in cash basis losses as of the PCI/PGW Petition Date.

### (h)    Ritchie Capital Management, LLC, et al.

Prior to the PCI/PGW Petition Date, Ritchie Capital Management, LLC and affiliated entities, collectively, "Ritchie") was a party to various loan agreements, promissory notes, security agreements and other documents between PCI and PGW, as borrower, and various

Ritchie funds, as lender. In total, 13 promissory notes were executed between the parties with 12 notes open as of the PCI/PGW Petition Date.  In aggregate, Ritchie loaned approximately $189 million, had assigned two notes to a third-party, and received partial payments on two additional notes, which resulted in a net cash position of approximately $157 million in cash basis losses as of the PCI/PGW Petition Date.

### (i)        Interlachen Harriet Investment Limited

Prior to the PCI/PGW Petition Date, Interlachen was a party to various loan agreements, promissory notes and other documents with PCI as borrower and Interlachen as lender.  In total, two promissory notes were executed between the parties which remained open as of the petition date. In total, Interlachen loaned approximately $60 million, and received no payments from the Debtors, resulting in a net cash position of $60 million in cash basis losses as of the PCI/PGW Petition Date.

### (j)        Ark Royal Capital, LLC

Prior to the PCI/PGW Petition Date, Ark Royal Capital, LLC was a party to various loan agreements, promissory notes, and other documents with PGW as borrower and Ark Royal Capital, LLC as Lender. In total, Ark Royal Capital loaned approximately $6 million, and was paid approximately $1.2 million, resulting in a net cash position of $4.8 million in cash basis losses as of the PCI/PGW Petition Date.

### (k)        Theodore Deikel ("Deikel")

Prior to the PCI/PGW Petition Date, Deikel was a party to various loan agreements, promissory notes, and other documents with Petters and PCI as borrower and Deikel as Lender. In aggregate, Deikel loaned approximately $13 million, and was paid approximately $5.9 million, resulting in a net cash position of $7 million in cash basis losses as of the PCI/PGW Petition Date.

### (l)        Apriven Partners, LP ("Apriven")

Prior to the PCI/PGW Petition Date, Apriven was a party to various loan agreements and promissory notes with PCI as borrower and Apriven as Lender. In total, Apriven Partners loaned approximately $265 million, and was paid approximately $232 million, resulting in a net cash position of $32 million in cash basis losses as of the PCI/PGW Petition Date.

### (m)       True North Funding, LLC ("True North") /C&C Capital, LLC ("C&C Capital")

Prior to the PCI/PGW Petition Date, True North and C&C Capital were each a party to loan agreements and promissory notes with PCI as borrower and True North and C&C Capital as Lender. In total, True North Funding and C&C Capital collectively loaned $5.1 million and received no payments from the Debtors, resulting in a net cash position of $5.1 million in cash basis losses as of the PCI/PGW Petition Date.

23

### 2.    Intra-company Indebtedness

In connection with the Ponzi Scheme, the Debtors entered into various loan agreements, promissory notes, security agreements and other agreements between them, and advanced funds among themselves, a summary of which is provided below.

### (a)    PCI Transactions with PGW

Prior to the PCI/PGW, PGW was a party to a $30,000,000 Secured Revolving Credit Note dated January 1, 2004, as amended, between PCI, as lender, and PGW, as borrower (the "PCI Note"). Interest accrued at a rate of fifteen percent (15%) per annum. To secure PGW's obligations under the PCI Note, PGW granted PCI a security interest in essentially all of its assets. On March 15, 2005, and October 31, 2005, respectively, PGW executed two additional revolving promissory notes in favor of PCI in the amounts of $500,000 and $250,000. These additional revolving promissory notes are also secured by security agreements. As of the PCI/PGW Petition Date, PGW's books and records reflect a secured note payable obligation to PCI in excess of $67.6 million. A proof of claim based on PCI's books and records was filed on behalf of PCI in the PGW Bankruptcy Case, as Claim No. 59-1, asserting a secured claim in the amount of $16,623,899 based on the PCI Note. In addition, on or about December 31, 2007, PCI purportedly transferred (i) approximately 338.7 million preferred shares of Bluestem stock, and (ii) one-hundred percent (100%) of the membership units of Petters Capital, LLC, which transfers were recorded on PGW's books as an approximately $230 million payable obligations (based on title ownership, these transfers, and resulting proceeds, if any, are included in the PGW Debtor's Estate as of the PCI/PGW Petition Date, and do not account for any potential inter-debtor ownership disputes, Claims or Causes of Action).

### (b)    Petters Capital, LLC Transactions with PGW

Prior to the Petition Dates, PGW was a party to a $131,000,000 Secured Revolving Credit Note dated February 1, 2005, as amended between Petters Capital, as lender and PGW, as borrower (the "Petters Capital Note"). Interest accrued at a rate of fifteen percent (15%) per annum. To secure PGW's obligations under the Petters Capital Note, PGW granted Petters Capital a security interest in essentially all of its assets. As of the Petition Dates, PGW's books and records reflect the balance of the Petters Capital Note in the amount of approximately $258.9 million. Petters Capital filed a proof of claim, Claim No. 47-1, in the amount of $259 million based on the secured Petters Capital Note. In addition, PGW filed a claim in the Petters Capital Bankruptcy Case in the amount of approximately $3 million  for unreimbursed shared services and other expenses.

### (c)    PCI Transactions with Petters Capital

Prior to the Petition Dates, PCI was a party to a $75 million  Promissory Note dated April 27, 2005, as amended, between PCI, as Lender, and Petters Capital, as borrower. Interest accrued at a rate of fifteen percent (15%) per annum. PCI was a party to two additional promissory notes, each in the principal amount of $5 million, dated November 5, 2007 and November 13, 2007. The notes were unsecured. As of the Petters Capital Chapter 7 Petition Date, Petters Capital's books and records reflect the balance owing PCI on the notes in the amount of approximately

24

$106.4 million. PCI filed a proof of claim, Claim No. 2-1, in the amount of $107.8 million based on the promissory notes.

### 3. Other Indebtedness

As of the PCI/PGW Petition Date, the Chapter 11 Debtors were parties to various third-party financing arrangements, including leases for equipment. As of the PCI/PGW Petition Date, the Chapter 11 Debtors had trade payables estimated to be approximately $3.6 million.

### 4. Equity Securities

Prior to the PCI/PGW Petition Date, the Equity Securities of the Chapter 11 Debtors was owned and controlled, either directly or indirectly, by Petters.

### E. Petters Capital Debtor's Prepetition Capital Structure

### 1. Promissory Note Lenders

#### (a) Lancelot

Prior to the Petters Capital Chapter 7 Petition Date, Petters Capital was a party to various loan agreements, promissory notes, security agreements and other documents, as amended, between Petters Capital, as borrower, and RWB Services, LLC as Administrative Agent. Lancelot's net cash position as to Petters Capital is in an undetermined amount as of the Petters Capital Chapter 7 Petition Date.

#### (b) Private Lenders

Prior to the Petters Capital Chapter 7 Petition Date, Petters Capital was a party to various loan agreements, promissory notes, and other documents, as amended, between Petters Capital, as borrower, and lenders Merri Ville Holdings, REE Enterprises, Inc. and LAI Capital, Ltd. as lender. In total, these lenders made limited loans to Petters Capital and were scheduled by Petters Capital as potential creditors, however none of these lenders filed proofs of claim in the Petters Capital bankruptcy case.

### 2. Intra-company Indebtedness

Prior to the Petters Capital Chapter 7 Petition Date, Petters Capital was a party to a $75 million Promissory Note dated April 27, 2005, as amended, between PCI, as Lender, and Petters Capital, as borrower. Interest accrued at a rate of fifteen percent (15%) per annum. Petters Capital was a party to two additional promissory notes, each in the principal amount of $5 million, dated November 5, 2007 and November 13, 2007. The notes were unsecured. As of the Petters Capital Chapter 7 Petition Date, Petters Capital's books and records reflect the balance owing PCI on the notes in the amount of approximately $106.4 million. PCI filed a proof of claim, Claim No. 2-1, in the amount of $107.8 million based on the promissory notes.

DOCS-#4870937-v21

### 3.    Equity Securities

Prior to the Petters Capital Chapter 7 Petition Date, the Equity Securities of Petters Capital was held by PGW and controlled, either directly or indirectly, by Petters.

## III.    THE DEBTOR'S CHAPTER 11 CASES

### A.    Commencement of the Chapter 11 Cases

Shortly after Petters' arrest, Douglas A. Kelley was appointed as Receiver over the Debtors and other entities and individuals by the District Court. The Receiver filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code in the Bankruptcy Court for PCI and PGW on October 11, 2008; for PC Funding, Thousand Lakes, SPF Funding, PL Ltd., Edge One and MGC Finance on October 15, 2008; for PAC Funding on October 17, 2008; and for PBFH on October 19, 2008.

As of the PCI/PGW Petition Date, the Debtors did not have any significant cash-on-hand and the Debtors' other property was illiquid. The Debtors' substantial assets consisted primarily of a minority membership interest in Bluestem Brands, Inc. f/k/a Fingerhut Direct Marketing, Inc., legal claims against third parties and obligations owed to the Debtors from affiliated entities.

Upon commencement of the Bankruptcy Cases, the automatic stay of section 362 of the Bankruptcy Code enjoined the commencement or continuation of (a) collection efforts by creditors against the Debtors or to recover a claim against the Debtors by seeking to avoid a transfer of the Debtor's property, (b) enforcement of liens, if any, against assets of the Debtors, and (c) continued and additional claims against the Debtors. The imposition of the automatic stay, the ability to bring avoidance actions under Chapter 5 the Bankruptcy Code and state law, the efficiency of the Chapter 11 claims administration process, the transparency of Chapter 11 proceedings, and the benefits of making distributions under a Chapter 11 Plan were deemed by the Receiver to be in the best interests of all parties.

### B.    Commencement of Petters Capital Case

The Receiver filed a voluntary petition for relief under Chapter 7 of the Bankruptcy Code in the Bankruptcy Court for Petters Capital, LLC on June 12, 2009, Case No. 09-43847. Randall L. Seaver (the "Petters Capital Chapter 7 Trustee") was appointed the Chapter 7 Trustee for the Petters Capital Debtor and the Petters Capital bankruptcy estate.

### C.    Appointment of Chapter 11 Trustee

On December 24, 2008, the Office of the U.S. Trustee for this District appointed Douglas A. Kelley as Chapter 11 Trustee of the Debtors and the Debtors' Bankruptcy Estates. On February 26, 2009, the Bankruptcy Court entered an order approving the Chapter 11 Trustee's appointment [Dkt. No. 153], which order was affirmed. *See Ritchie Special Credit Investments, Ltd. v. U.S. Trustee*, 620 F.3d 847 (8th Cir. 2010).

### D.      Appointment of an Official Committee of Unsecured Creditors

On November 21, 2008, the Office of the U.S. Trustee for this District appointed an Official Committee of Unsecured Creditors (the "Committee") in the Bankruptcy Cases pursuant to 11 U.S.C. § 1102 (a) and (b). The Committee currently consists of the following members: Ronald R. Peterson, as the Chapter 7 Trustee of Lancelot (Chairman), Barry E. Mukamal, as the Palm Beach Trustee, Interlachen Harriet Investments Limited, (Lance Breiland), and ex officio member, Greenpond.

The Committee retained Fafinski Mark & Johnson, P.A. ("Fafinski") as its bankruptcy counsel. On December 3, 2008, the Committee filed an application to employ Fafinski as bankruptcy counsel pursuant to 11 U.S.C. §§ 328 and 1103, and Rules 2014 and 2016 of the Federal Rules of Bankruptcy Procedure. The Bankruptcy Court entered its order approving the Committee's application on December 11, 2008 [Dkt. No. 98].

The Committee retained Huron Consulting Group Inc.("Huron") as its financial advisor. On January 6, 2009, the Committee filed an application to employ Huron as financial advisor pursuant to 11 U.S.C. §§ 328 and 1103, and Rules 2014 and 2016 of the Federal Rules of Bankruptcy Procedure. The Bankruptcy Court entered its order approving the Committee's application on January 14, 2009 [Dkt. No. 123].

### E.      The Chapter 11 Trustee's Retention of Professionals

### 1.      The Chapter 11 Trustee's Bankruptcy Counsel

The Chapter 11 Trustee retained Lindquist & Vennum LLP ("Lindquist") as his bankruptcy counsel. On January 12, 2009, the Chapter 11 Trustee filed an application to employ Lindquist as general bankruptcy counsel effective December 24, 2008 pursuant to 11 U.S.C. §§ 327(a), 328, 329 & 330, and Rules 2014 and 2016 of the Federal Rules of Bankruptcy Procedure. The Bankruptcy Court entered its order approving the Chapter 11 Trustee's application on March 18, 2009 [Dkt. No. 169].

### 2.      The Chapter 11 Trustee's Forensic Accountants

The Chapter 11 Trustee retained PricewaterhouseCoopers LLP ("PwC") as forensic accountants and for tax compliance services. On November 1, 2010, the Chapter 11 Trustee filed an application to employ PwC pursuant to 11 U.S.C. §§ 327(a), 328 & 330, and Rules 2014 and 2016 of the Federal Rules of Bankruptcy Procedure and Local Rule 2014. The Bankruptcy Court entered its order approving the Chapter 11 Trustee's application on November 23, 2010 [Dkt. No. 768]. PwC now provides forensic advisory services through PwC Advisory Services, LLC

The Chapter 11 Trustee has retained additional professionals identified on Exhibit B.

### F.        The Petters Capital Chapter 7 Trustee's Retention of Professionals

#### 1.        Petters Capital Chapter 7 Trustee's Bankruptcy Counsel

The Petters Capital Chapter 7 Trustee retained Maschka Riedy & Ries ("MR&R") as bankruptcy counsel. On June 19, 2009, the Petters Capital Chapter 7 Trustee filed an application to employ MR&R as general bankruptcy counsel pursuant to 11 U.S.C. §§ 327 and 328 and, Rule 2014 of the Federal Rules of Bankruptcy Procedure and Local Rule 2014. The Bankruptcy Court entered its order approving the Petters Capital Chapter 7 Trustee's application on July 6, 2009 [Dkt. No. 18].

The Petters Capital Chapter 7 Trustee retained Lurken Law, LLC as bankruptcy counsel. On August 13, 2015, the Petters Capital Chapter 7 Trustee filed an application to employ Lurken Law as general bankruptcy counsel pursuant to 11 U.S.C. §§ 327 and 328 and, Rule 2014 of the Bankruptcy Rules. The Bankruptcy Court entered its order approving the Petters Capital Chapter 7 Trustee's application on August 19, 2015 [Dkt. No. 298].

The Petters Capital Chapter 7 Trustee subsequently has retained Gislason & Hunter LLP ("Gislason") as bankruptcy counsel. On November 11, 2015, the Petters Capital Chapter 7 Trustee filed an application to employ Gislason as general bankruptcy counsel pursuant to 11 U.S.C. §§ 327 and 328 and, Rule 2014 of the Bankruptcy Rules. The Bankruptcy Court entered its order approving the Petters Capital Chapter 7 Trustee's application on November 17, 2015 [Dkt. No. 301]. A notice of withdrawal and substitution of counsel was filed with the court, indicating that Gislason replaced MR&R as attorney to the Petters Capital Chapter 7 Trustee [ Dkt. No. 302].

#### 2.        The Petters Capital Chapter 7 Trustee's Forensic Accountants

The Petters Capital Chapter 7 Trustee retained PwC as forensic accountants and for tax compliance services. On December 14, 2010, the Petters Capital Chapter 7 Trustee filed an application to employ PwC pursuant to 11 U.S.C. §§ 327, 328, Rule 2014 of the Federal Rules of Bankruptcy Procedure and Local Rule 2014. The Bankruptcy Court entered its rder approving the Petters Capital Chapter 7 Trustee's application on January 4, 2011 [Dkt. No. 95].

The Petters Capital Chapter 7 Trustee has retained additional professionals identified on Exhibit C.

### G.        Significant Events During Bankruptcy Cases

#### 1.        First Day Motions in Chapter 11 Cases

In order to administer the Debtors' bankruptcy estates, the Receiver filed the following with the Bankruptcy Court on or shortly after the PCI/PGW Petition Date:

(1)        A Motion for Order Directing Joint Administration of These Bankruptcy Estates.

(2)        A Motion for Order Authorizing Payment of Pre-petition Wages, Salaries, Payroll Taxes and Employee Benefits.

28

(3)     A Motion for Order Authorizing Maintenance of Existing Bank Accounts and Check Stock and Authorizing Continued Use of Accounting System.

(4)     A Motion for Order Approving Debtor's Method of Furnishing Adequate Assurance of Payment for Postpetition Utility Services.

### 2.     Cash Collateral Motions

Prior to the PCI/PGW Petition Date, PCI and Petters Capital asserted liens in all the assets of PGW and proceeds thereof. Other parties asserted an interest in specific assets of PGW. In connection with the fraudulent scheme, PCI and the SPEs granted numerous Promissory Note Lenders security interests, however the security agreement and financing statements identified specific Collateral that did not exist.

In December 2010, the Chapter 11 Trustee and the Creditor's Committee filed a Joint Motion for Authority to Use Cash Collateral (the "Cash Collateral Motion") [Dkt. No. 17]. On December 22, 2010, the Bankruptcy Court entered an Order Granting Motion for Authority to Use Cash Collateral (the "Cash Collateral Order") [Dkt. No. 817]. Upon the Cash Collateral Motion, and the Chapter 11 Trustee's and Creditor's Committee's subsequent motions, the Court has entered a series of cash collateral orders authorizing the Chapter 11 Trustee to use cash collateral of PGW. Pursuant to the cash collateral orders, parties that have asserted liens in the PGW Debtor's assets, if any, have been granted replacement liens to the extent such property has been used postpetition and such liens are subject to any and all defenses of the Chapter 11 Trustee which are preserved.

### 3.     PwC Conducts Forensic Investigation and Issues Interim Report

PwC conducted a forensic investigation of the Debtors' books and records, bank transaction data, transactions, and other information, prepared numerous analyses regarding loan and repayment transaction activity related to the Ponzi Scheme perpetrated through the Debtors. On December 15, 2010, PwC filed an Interim Report with numerous exhibits with the Bankruptcy Court [Dkt. Nos. 808 and 809] which summarized its findings relative to the nature of the Ponzi Scheme, analyzed the lending and repayment transactions with Promissory Note Lenders, and provided other information regarding the Debtors and the Ponzi Scheme.

### 4.     Coordination Agreement

On September 14, 2010, the District Court and the Bankruptcy Court entered orders approving a Coordination Agreement by and among the Chapter 11 Trustee, the Receiver, John R. Stoebner (the "Polaroid Trustee"), as the Chapter 7 Trustee of Polaroid Co. and its nine affiliated debtors, and the United States (the "Coordination Agreement"). The Coordination Agreement provides a framework for the parties to the agreement to resolve competing claims to common assets, but also provides a framework to recover distinct claims against common defendants. The Coordination Agreement attempts to maximize recoveries for the benefit of Creditors and victims by minimizing unnecessary costs that would be incurred if the Chapter 11 Trustee, the Polaroid Trustee, the Receiver, and the United States were to litigate their respective interests in such assets and causes of action vis-a-vis each other.

29

5. **Guilty Pleas of PCI and PGW for its Participation in Ponzi Scheme**

Through the Superseding Indictment returned in the Criminal Fraud Case, PCI and PGW were indicted by a federal grand jury on charges of (i) mail fraud, (ii) wire fraud, (iii) conspiracy to commit mail fraud and wire fraud, and (iv) conspiracy to commit money laundering in violation of 18 U.S.C. §§ 371, 1343, 1956 and 1957. Pursuant to the Coordination Agreement, the Chapter 11 Trustee entered guilty pleas on behalf of PCI and PGW to certain charges of the Superseding Indictment. On September 24, 2010, the Bankruptcy Court authorized the Chapter 11 Trustee to enter plea agreements to resolve pending criminal charges against PCI and PGW. *See Order Granting Expedited Hearing and Authorizing Trustee to Enter Plea Agreements and Conduct Transactions Outside the Ordinary Course of Business*, [Dkt. No. 519]. Both PCI and PGW pled guilty to (i) wire fraud; (ii) conspiracy to commit mail and wire fraud; and (iii) conspiracy to commit money laundering, and remaining counts were dismissed. *See* PCI Criminal Case No. 08-00364, [Dkt. No. 485]; PGW Criminal Case No. 08-00364, [No. 486].

6. **Substantive Consolidation of PCI and the PCI SPEs**

On November 22, 2013, after a three-day evidentiary hearing, the Bankruptcy Court entered an order granting the Chapter 11 Trustee's motion to substantively consolidate the Bankruptcy Estates of PCI, PC Funding, Thousand Lakes, SPF, PL Ltd., Edge One, MGC, PAC Funding and Palm Beach. *See Order Granting Trustee's Motion for Substantive Consolidation* (the "Substantive Consolidation Order*"*) [Dkt. No. 2098]. The Substantive Consolidation Order did not provide for the substantive consolidation of PGW or Petters Capital.

Certain adversary defendants who loaned money into the Ponzi Scheme and were fully repaid and have negative Net Invested Capital balance have appealed the Bankruptcy Court's order. The Substantive Consolidation Order was appealed to the District Court. On April 23, 2015, the District Court dismissed the appeal, determining that the appellants lacked standing to appeal as they were neither Creditors nor a party aggrieved by the Substantive Consolidation Order. The District Court's order was not stayed and a judgment dismissing the appeals was entered. The District Court's order has been appealed to the Eighth Circuit Court of Appeals. The appeal before the Eighth Circuit Court of Appeals has been briefed and argued, and is currently under advisement.

7. **Debtors' Schedules and Statements**

On December 10, 2008, Schedules and Statements were filed for each of the Chapter 11 Debtors. Schedules and Statements were filed for Petters Capital on June 12, 2009. The Debtors' schedules were based on information compiled from various sources, including the Debtors' books and records. Because the Receiver did not have access to all of the Debtors books and records, and because of the Ponzi Scheme the accuracy and validity of the Debtors' books and records was in question, so the Receiver scheduled every known Promissory Note Lender as contingent, disputed and unliquidated in each of these Bankruptcy Cases.

### 8.    Bar Date Orders

#### (a)    Chapter 11 Cases

On October 9, 2009, the Chapter 11 Trustee filed a motion seeking an order fixing a bar date for the filing of proofs of claim against the Chapter 11 Debtors' Estates [Dkt. No. 295]. By order dated October 29, 2009 [Dkt. No. 304], the Bankruptcy Court set December 29, 2009 as the last day ("General Bar Date") for Creditors to file proofs of Claim in the Chapter 11 Case and January 28, 2010, as the last day for governmental units to file proofs of claim against the Debtor. The Bankruptcy Court provided Creditors notice of the General Bar Date in the Chapter 11 Case on November 3, 2009 [Dkt. 306].

#### (b)    Petters Capital Chapter 7 Case

On July 8, 2009, the Bankruptcy Court issued a notice to file claims that set October 13, 2009 as the last day ("Petters Capital Bar Date") for Creditors to timely file proofs of Claim in the Petters Capital Bankruptcy Case. Governmental units were able to timely file claims until the later of (i) the Petters Capital Bar Date or (ii) 180 days after the order for relief. [Dkt. No. 19]. The Bankruptcy Court provided Creditors notice of the Petters Capital Bar Date on July 10, 2009 [Dkt. 21].

### 9.    Tolling Agreements Among Debtors

On October 10, 2010, the Chapter 11 Trustee, on behalf of each of the Chapter 11 Debtors, executed a tolling agreement, including two amendments, which has tolled the running of any statutes of limitations, or other time limitations, whether arising under federal or state law, including, but not limited to 11 U.S.C. § 546(a), that have not already run, applicable to any legal or equitable action to avoid or recover any transfer of property between or among the Chapter 11 Debtors, through and including October 11, 2017.

On October 7, 2010, the Chapter 11 Trustee executed a separate tolling agreement on behalf of the Chapter 11 Debtors with the Petters Capital Chapter 7 Trustee, including subsequent amendments, which has similarly tolled the running of any applicable statutes of limitations through and including October 11, 2017.

### 10.    Avoidance Actions

#### (a)    Preferential Transfers Generally

Payments made by the Debtors within 90 days and one-year before the petition date may be recoverable under section 547 of the Bankruptcy Code as preferential transfers. Preferences are often the most commonly prosecuted avoidance actions. A trustee may recover a payment or other transfer of property made prior to the bankruptcy filing as preferential if the transfer: (a) was made to or for the benefit of a creditor, (b) on account of a debt owed prior to the payment, (c) at a time when the debtor was insolvent, (d) that allowed the transferee to receive more than it would have received had the transfer not been made and the debtor had been liquidated under Chapter 7 of the Bankruptcy Code; and (e) was made during the 90 days immediately prior to its bankruptcy filing (or, if the transferee was an insider, during the one year immediately prior to

31

the bankruptcy filing). A debtor is presumed to be insolvent within the 90 days preceding a bankruptcy filing. If a transfer is recovered by a trustee, the transferee may have a general unsecured claim against the bankruptcy estate to the extent of the amount of the recovery.

There are certain defenses to preference actions. For example, a transfer made in the ordinary course of the debtor's and transferee's business or according to ordinary business terms may not be recoverable. Transfers made in connection with a Ponzi Scheme, however, may not be made according to ordinary business terms. Another potential defense is if the transferee gave, subsequent to the transfer, new value to the debtor (and for which the transferee was not paid), then the new value may constitute an offset against the amount of any recovery.

### (b)     Fraudulent Transfers Generally

In addition to preferences, there may be other potential avoidance actions a trustee may bring, including actions to avoid and recover transfers arising under Bankruptcy Code sections 544 and 548 and applicable state law as fraudulent transfers, plus prejudgment interest. A transfer may be avoided as fraudulent if the transfer was made or an obligation incurred by the debtor with the actual intent to hinder, delay or defraud creditors. The Trustee may avoid and recover the entirety of any transfer made with the "actual intent to hinder, delay or defraud" present or future creditors if the transfers was made within two years prior to the petition date under the Bankruptcy Code, or if discovery of the claim accrued within six years prior to the petition date under Minnesota law. Once the trustee establishes a prima facie case of actual fraud, the burden shifts to each defendant to prove any of its affirmative defenses and commonly include whether it received the transfer in good faith and provided the debtor "value".

A trustee may also avoid a transfer deemed constructively fraudulent if the debtor received less than a reasonably equivalent value in exchange for the transfer or obligation and the debtor (i) was insolvent when the transfer was made or obligation incurred, or became insolvent as a result of such transfer or obligation; (ii) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining was an unreasonably small capital; (iii) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtors ability to pay as such debts matured, (iv) or made such transfer to or for the benefit of an insider, or incurred such obligation to or for the benefit of an insider, under an employment contract and not in the ordinary course of business.

### 11.     Avoidance Actions Against Promissory Note Lenders

Between September 10, 2010 and October 11, 2010, the Chapter 11 Trustee timely commenced and asserted over 200 Avoidance Actions against more than 380 defendants seeking, among other things, the disallowance of claims, the avoidance and/or recovery of false profits, bonuses, commissions, gifts, preferences and other sums transferred by the Debtors prior to the Petition Date. These Avoidance Actions include claims against defendants who received transfers within two years of the Petition Date as well as defendants who received transfers prior to two years before the PCI/PGW Petition Date.

Certain notable aspects of the Avoidance Actions are described below:

(a)    **Defendants' Motions to Dismiss**

Defendants in more than 100 Avoidance Actions moved to dismiss the Chapter 11 Trustee's complaints (the "Motions to Dismiss"). The Motions to Dismiss were fully briefed by the parties, and the Bankruptcy Court heard oral argument over several days on common issues of law and fact raised by various defendants. By Memoranda dated June 19, 2013 [Dkt. No. 1951], August 30, 2013 [Dkt. No. 2005], and September 30, 2013 [Dkt. No. 2044], the Bankruptcy Court addressed the common issues and in an order dated December 19, 2013, granted in part and denied in part the motions to dismiss of the defendants identified in the order [Dkt. No. 2158]. The Bankrutpcy Court concluded that the complaints in the Avoidance Actions adequately pled both actual and constructive fraudulent transfer claims under both the Bankruptcy Code and Minnesota law. The Bankruptcy Court ruled that the complaints failed to identify at least one unsecured Creditor with a Claim allowable against the Estates, a predicate creditor, whose standing the Chapter 11 Trustee could use to sue the defendants. The Chapter 11 Trustee timely amended his complaints to identify multiple predicate Creditors holding such Claims.

(b)    **Chapter 11 Trustee's Motions for Summary Judgment**

In October and December 2014, the Chapter 11 Trustee filed motions for partial summary judgment in more than 60 Avoidance Actions involving note lenders other than special purpose entities. The Chapter 11 Trustee's motions for partial summary judgment are based on the Trustee's actual fraudulent transfer claims and seek an award of all interest or false profits paid to the defendants plus pre-judgment interest at the rate of 10% per annum since the date of the filing of the complaints at the latest. Since the filing of the motions, two Avoidance Actions have settled, with the defendants paying all of the false profits they received. The period for discovery has closed and defendants in the remaining pending motions for partial summary judgment were required to respond to the Chapter 11 Trustee's motions by September 30, 2015. The Chapter 11 Trustee has filed reply memoranda in further support of his motions. A status conference with the court will be held on these motions after the court issues a ruling on whether a recent Minnesota Supreme Court case affects the court's previous rulings. The Chapter 11 Trustee seeks approximately $71.9 million in false profits in the 62 pending motions for partial summary judgment.

The Chapter 11 Trustee has not yet filed motions for partial summary judgment in 13 Avoidance Actions involving note lenders other than special purpose entities. Of these 13 Avoidance Actions, 2 involve proceedings in which settlement discussions are on-going, 2 involve proceedings in which defendants have not appeared, and the remainder involve proceedings in which the Chapter 11 Trustee determined discovery was needed before moving for summary judgment.

(c)    **Status of Certain Pending Avoidance Actions**

Among other reasons, the Liquidating Trusts (discussed below) are being created to continue already commenced Claims of the Debtors, which include, among other things, the Causes of Action or potential Causes of Action, against the following parties:

33

i)  <u>Kelley v. JP Morgan Chase et al, Adv. No. 10-04443</u>

On October 10, 2010, the Chapter 11 Trustee, together with the Petters Capital Chapter 7 Trustee and Polaroid Trustee, filed a complaint in the Bankruptcy Court against JPMorgan Chase seeking to recover as a fraudulent transfer, funds in the amount of approximately $250 million received by JPMorgan and related defendants from the sale in 2005 of Polaroid Corporation by defendant One Equity Partners LLC, an entity controlled by JP Morgan Chase, to PGW and its subsidiaries and certain other payments relating to credit facilities in connection with Polaroid and the Polaroid acquisition financing. The claims asserted against JPMorgan Chase and related parties are based on both federal and state fraudulent transfer laws. The defendants in this proceeding have filed a Motion to Dismiss, which was heard by the Bankruptcy Court in 2014. No decision has been issued by the Bankruptcy Court on that Motion, and no formal discovery has been commenced pending the Bankruptcy Court's decision.

ii)  <u>Kelley v. Westford Special Situations Master Fund, L.P. et al., Adv. No. 10-04396</u>

On October 10, 2008, the Chapter 11 Trustee filed an avoidance action against Steven Stevanovich ("<u>Stevanovich</u>") and a number of master and feeder funds controlled and operated by him. The funds began lending to PCI through PL Ltd., the SPE created for the Stevanovich-controlled lending, in April 2001. During the next 5½ years, these hedge funds loaned approximately $2.5 billion to PCI in 344 separate note transactions. The funds ceased lending in November 2006, and by early 2007 all the principal loaned by these funds had been returned together with an additional amount of approximately $323 million that the parties denominated as interest. The Chapter 11 Trustee asserted claims to avoid the transfers to Stevanovich and the funds as fraudulent under both relevant federal bankruptcy law and state fraudulent transfer laws.

Among the several funds that Stevanovich controlled, the Chapter 11 Trustee asserted fraudulent transfer claims against Capital Strategies Fund Ltd., a British Virgin Islands company, which dissolved and was struck from the register of companies in the British Virgin Islands shortly after the Chapter 11 Trustee's complaint was served. The Chapter 11 Trustee sought and obtained an order from the British Virgin Islands' Court restoring Capital Strategies Fund to the register of companies and sought the appointment of a liquidator. Liquidation proceedings are now underway in the British Virgin Islands regarding Capital Strategies. The Chapter 11 Trustee is the sole claimant in that proceeding with a claim of approximately $398 million.

The Chapter 11 Trustee engaged in extensive informal discovery with Stevanovich and the funds which he controlled. It became apparent during that investigation that nearly all of the funds that loaned funds to PCI are now dormant, and that they had distributed the profits from these transactions to their respective investors more than a year prior to the filing of the petitions in these cases. The Chapter 11 Trustee's discovery also revealed that a significant portion of the investors in these funds were located in foreign countries. The Chapter 11 Trustee entered into a tentative settlement agreement with the funds and Stevanovich that was contingent upon the satisfactory completion of due diligence by the Chapter 11 Trustee. The Chapter 11 Trustee's efforts in that regard were never satisfied, and the tentative settlement agreement was not consummated. The claims asserted in this adversary proceeding remain pending. During the course of the informal and formal discovery efforts by the Chapter 11 Trustee, the Chapter 11

34

Trustee was provided substantial information regarding the identity of the domestic investors in these funds and the amounts of their investments and intends to pursue claims against them in separate litigation. *See* Section vii, "Subsequent Transferee Litigation" below

### iii)     Kelley v. Opportunity Finance et al., Adv. No. 10-04301

On September 30, 2010, the Chapter 11 Trustee commenced an avoidance action against Opportunity Finance, LLC and related entities, all of which were owned or controlled by Robert Sabes, Jon Sabes, and Steven Sabes, the Sabes Family Foundation, their lenders Deutsche Zentralgenossenschalfbank AG and West Landesbank AG, and the Minneapolis Foundation (collectively the "Opportunity Finance Defendants").   Prior to the Petition Date, all of the funds loaned by the Opportunity Finance Defendants in the aggregate had been repaid including all of the principal loaned in its entirety as well additional amounts paid as interest on those loans in the aggregate amount of more than approximately $123 million. The Chapter 11 Trustee asserted claims against Opportunity Finance, the Sabes Family, the Sabes Family Foundation, the lenders that financed these loans and the Minneapolis Foundation in Adv. No. 10-04301 seeking to recover all of the transfers received by them as interest in the amount of more than approximately $123 million as well as the principal amount received by these defendants.

### iv)     Kelley v. Opportunity Finance, LLC, Adv. No. 04375

On October 7, 2010, the Chapter 11 Trustee (as trustee of PGW) commenced an avoidance action against Opportunity Finance, LLC At or near in time to the collapse of the Ponzi Scheme, however, five promissory notes issued by debtor PC Funding remained unpaid in the approximate sum of $21,600,000. The unpaid notes resulted in Petters executing a forbearance agreement on behalf of PC Funding to Opportunity Finance as well as a purported conveyance by PGW to Opportunity Finance of an interest in the proceeds of stock issued by Fingerhut Direct Marketing, Inc. now known as Bluestem Brands, Inc. and PGW received nothing in return for the transfer.  The Chapter 11 Trustee seeks to avoid PGW's pledge of the interest in the Bluestem stock proceeds as a fraudulent transfer.

### v)     Kelley v. Metro I, LLC, et al., Adv. No. 10-04328

On October 5, 2008, the Chapter 11 Trustee filed an avoidance action against Metro I, LLC and related entities, which were controlled and/or managed by James N. Fry. Two hedge funds, Arrowhead Capital Partners II, L.P. ("ACP II") (a domestic entity) and Arrowhead Capital Finance, Ltd. ("ACF"), an offshore fund, are among the defendants. The Chapter 11 Trustee similarly named a second offshore entity, Elistone Fund, as a defendant in this action and since has entered into a settlement agreement with Elistone that has been approved by the Bankruptcy Court. From 1999 through the collapse of the Ponzi Scheme in 2008, ACP II and ACF loaned more than $4.6 billion into PCI pursuant to 1,240 separate note transactions with MGC Finance, the SPE created by PCI for these funds. Both ACP II and ACF were repaid in the aggregate the entire principal amount lent as well as additional amounts as interest on those loans in the aggregate amount of approximately $105 million. At the time of the collapse of the Ponzi Scheme, however, several notes payable to ACF remained outstanding, resulting in ACF filing a proof of claim against PCI in the sum of approximately $74 million. ACP II currently is subject to a clerk's default pursuant to Federal Rule of Bankruptcy Procedure 55(a). ACF has been

dormant since late 2008 and is the subject of a liquidation proceeding pending in Bermuda. The Chapter 11 Trustee's claims against ACF remain pending. The Chapter 11 Trustee anticipates that ACF will be unable to repay the funds fraudulently transferred to it because its claim is for loss of false profits, which will result in a disallowance of its claim. The Chapter 11 Trustee intends to pursue claims against the investors in ACP II and ACF in separate litigation. *See* Section III.G.11.viii, "Subsequent Transferee Litigation" below.

### vi)    Kelley v. Metro Gem, Inc., et al., Adv. No. 10-04352

On October 6, 2010, the Chapter 11 Trustee filed an avoidance action against Metro Gem, Inc. ("MGI"), Metro Gem, LLC, Frank E. Vennes ("Vennes") and Northwestern Foundation. Vennes controlled MGI. MGI engaged in at least 748 separate note transactions with PCI in a principal sum of approximately $2.5 billion, and was paid a net profit of approximately $90 million. The Chapter 11 Trustee seeks to avoid the transfers to MGI and to Vennes. The Chapter 11 Trustee has determined that MGI and Vennes transferred nearly all of the funds they received from PCI to lenders and that MGI is dormant. MGI and Vennes also were paid commissions of approximately $113 million based upon arranging loans into PCI by the Opportunity Finance and Arrowhead hedge funds, and by Palm Beach Finance Partners, L.P. and Palm Beach Finance II, L.P.. MGI and Vennes were the subject of a receivership proceeding and funds recovered or to be recovered from them are discussed at Section III.H.8 below. The Chapter 11 Trustee's $5.6 million fraudulent transfer claims against Northwestern Foundation arises from notes they received from Vennes as gifts and remains pending. This claim was initially mediated in October 2015 and discussions are ongoing.

### vii)   Kelley v. BMO Harris Bank N.A., as successor to M&I
Marshall and Isley Bank, Adv. No. 12-04288

On November 14, 2012, the Chapter 11 Trustee commenced an adversary proceeding against BMO Harris Bank as successor to M&I Marshall and Isley Bank ("M&I") alleging claims for aiding and abetting fraud, aiding and abetting breach of fiduciary duty and civil conspiracy. PCI opened a depository account with an M&I predecessor in December 1999, which account became PCI's primary depository account. From that time until the FBI raid of Petters' corporate headquarters in September 2008, over $40 billion flowed into the account and over $40 billion flowed out of the account. The Chapter 11 Trustee has alleged that M&I was familiar with the business model that Petters was portraying to PCI's lenders and was also aware that money coming into the PCI account did not come from the retailers as represented by Petters to lenders in the PCI business model. Despite this knowledge, M&I continued to assist Petters by permitting him and PCI to utilize the M&I depository account for the transfer of funds, thereby perpetuating the fraud. In 2008, M&I entered into several deposit control agreements with PCI and/or its lenders to ensure that retailer payments flowed directly to the appropriate lender to PCI. Despite entering into these agreements, the flow of funds did not change in any way, and M&I did not attempt to perform any portion of those agreements. On October 15, 2013, M&I filed a Motion to Dismiss the Chapter 11 Trustee's Complaint. The Bankruptcy Court has not scheduled a hearing for that motion. The Chapter 11 Trustee will seek to amend the existing complaint.

36

viii)    Subsequent Transferee Claims

The Chapter 11 Trustee intends to commence or has commenced Avoidance Actions under Section 550 against investors in Arrowhead Capital Partners II, LP—a hedge fund that loaned money to PCI through MGC Finance, a SPE formed by PCI for this purpose. The claims against these investors arise under Section 550 of the Bankruptcy Code providing, in part, the basis for recovery against subsequent transferees of the initial transferee of an avoidable transfer. These actions will assert claims seeking recovery of false profits transferred from Arrowhead Capital Partners II to its investors. Similarly, the Chapter 11 Trustee intends to commence or has commenced additional Avoidance Actions under Section 550 of the Bankruptcy Code against investors in the Westford/Epsilon funds, hedge funds managed by Steven Stevanovich that loaned money to PCI through PL Ltd., a SPE formed by PCI for this purpose. These actions assert claims seeking recovery of false profits transferred from the Westford/Epsilon funds to their investors..

The Chapter 11 Trustee remains confident in the asserted legal positions in the Avoidance Actions, but is cognizant of the issues in dispute and that resolution of the legal issues as well as the fact-intensive inquiry that will be necessary to resolve all of the claims and defenses asserted by the defendants. There is no guarantee that continued litigation, after the expenditure of additional funds and the delay of time associated with further litigation, may either be successful in favor of the Bankruptcy Estates or that the opposite result could occur, were litigation to proceed to judgment. There is also a risk that any judgment obtained against any particular defendant may not be collectible in the full amount of the judgment. As a result, the Plan Proponents cannot estimate the recoveries in the Avoidance Actions described above with any precision.

## 12.    Court-Approved Settlements

The Chapter 11 Trustee has entered into a number of court-approved settlements resolving numerous Avoidance Actions in their entirety, as well as with additional individual defendants in Avoidance Actions. A summary of certain settlements are described below:[3]

### (a)    Employee/Strategic Partner Settlements

The Chapter 11 Trustee asserted numerous claims and causes of action against former officers, employees, consultants and strategic partners (collectively, "Employee Defendants") to recover bonuses, commissions, gifts and other payments made by the Debtors to such individuals which the Chapter 11 Trustee asserted were made as part of Petters' Ponzi Scheme or were otherwise excessive or fraudulent. Many of the Employee Defendants received transfers not only from the Debtors, but also from Polaroid, Petters Capital, Petters individually, or a Receivership Entity. The Employee Defendants, among other things, claimed they were entitled to coverage under the Debtors' insurance policies or indemnification and reimbursement from the Debtors related to the defense of claims asserted by the Trustees and the Receiver.

---

[3] The summary below is a general summary and qualified in its entirety by the settlement agreements and court pleadings and orders related to such settlements.

Sixty-eight Employee Defendants, two insurers, and three bankruptcy trustees participated in mediation. Ultimately, settlement was reached in Phase I with thirty-four Employee Defendants (eighteen of which were in the PCI/PGW cases) that involved a payment by the insurance companies toward a global settlement. A number of additional employees settled claims in the second phase of settlements, which were not on a global basis, but resolved individually with each Employee Defendant. In each case, the funds recovered were allocated among the PCI/PGW bankruptcy Estate, the Polaroid estates, the Petters Capital estate and the Receivership in relation to the source of payment. The settlements were approved by the Bankruptcy Court in each bankruptcy case, and by the District Court in the Receivership, as applicable.

### (b)     Acorn Capital

Commencing in 2001, Acorn made loans to several Petters entities, including RedTagBiz, Inc. (which was subsequently merged into PGW), PCI and PAC Funding, the SPE created by PCI to receive Acorn funds, Petters Aviation, and Petters Aircraft Leasing.  In June 2009, Asset Based Resource Group, LLC ("ABRG") succeeded Acorn as servicer to the Petters loans. After the collapse of the Ponzi Scheme, ABRG asserted secured claims in the Polaroid bankruptcy cases, which secured claims arose out of certain loans Acorn made to PAC Funding in the amount of $290 million. In addition, ABRG asserted additional claims against PAC Funding, PCI, Petters Aviation, and Petters Aircraft Leasing. The Chapter 11 Trustee asserted claims to avoid Acorn's secured claims as well as to avoid and recover prepetition payments the Debtors made to them. The Polaroid Trustee, the Receiver and the Petters Aviation debtor in possession asserted additional claims.

A global resolution was reached among the parties and approved by the Bankruptcy Court in the Chapter 11 Cases and Polaroid bankruptcy cases, by the District Court in the Receivership Proceeding, by the Bankruptcy Court approving the Third Modified Joint Plan of Liquidation of Petters Aviation and Elite Landings which incorporated the terms of the settlement, as well as the Court of Bermuda with respect to certain off-shore investor funds of Acorn that were in liquidation. The settlement resolved objections to the allowance of PCI's and PGW's claims in the Petters Aviation bankruptcy case, which claims were allowed as general unsecured claims. The Polaroid Trustee made a settlement payment to both ABRG and also to PCI and PGW. Acorn also is the Holder of an Allowed General Unsecured Claim against PCI and PAC Funding in the amount of $141,290,116.00. ABRG later assigned for consideration all of its right, title and interest in the Acorn Settlement Agreement and claim to Greenpond.

### (c)     Theodore Deikel

Theodore Deikel ("Deikel") loaned $10 million to PCI in June 2008 on a short-term note. Deikel timely filed Claim No. 40 in the PCI Bankruptcy Case in the amount of $7.4 million. In the weeks prior to the Bankruptcy Cases, however, Deikel was partially repaid by PGW. The Chapter 11 Trustee commenced two Avoidance Actions, one to avoid and recover the payment made by PGW, and the other to avoid and recover transfers based on earlier loan activity between the Debtors and Deikel. As a result of the settlement reached resolving both Avoidance Actions, approved by the Bankruptcy Court in December 2010 [Dkt. No. 818], Deikel returned $2.1 million to the PGW Estate and is the Holder of an Allowed General Unsecured Claim in the

38

PGW Case in the same amount. Additionally, the settlement provided for an Allowed General Unsecured Claim in the PCI Case of $6,122,543.

### (d) Elistone Fund

Prior to the PCI/PGW Petition Date, Elistone Fund loaned more than $60,397,000 into Petters' Ponzi Scheme. Elistone Fund is one of the defendants in the adversary proceeding captioned *Kelley, Trustee v. Metro I, LLC*, Adv. No. 10-04328, in which the Chapter 11 Trustee seeks to recover payments and other transfers made by the Debtors to or for the benefit of the Elistone Fund. The net amount of transfers retained by the Defendant was approximately $26 million. Elistone filed proofs of claim asserting secured claims against each of the Debtors in the amount of $35 million. A settlement was reached after mediation, which was approved by the Bankruptcy Court, [Dkt. No. 2468], that provides for an Allowed General Unsecured Claim of $10 million in the PCI and PL Ltd. Estates, with a minimum distribution of $1 million. Elistone also stipulated to the dismissal of its appeal of the Substantive Consolidation Order.

### (e) Fredrikson & Byron

Prior to the Petition Date, Fredrikson & Byron, P.A. served as legal counsel to Petters, the Debtors and numerous companies owned and controlled by Petters. The Chapter 11 Trustee asserted various claims, and engaged in pre-complaint mediation where a settlement was reached. The Bankruptcy Court approved the settlement which provided for payment of approximately $12.8 million to the Chapter 11 Estates, [Dkt. No. 1705].

### (f) General Electric Capital Corporation

General Electric Capital Corporation ("GECC") provided financing to PCI and PBFH for the purported purchase and sale of goods from 1998 through 2001. The GECC credit facility was terminated and GECC was fully repaid its principal, plus additional amounts including interest and profit sharing. The Chapter 11 Trustee asserted a number of claims seeking to avoid and recover transfers made by the Debtors to GECC. A settlement was reached after mediation, which was approved by the Bankruptcy Court in the Chapter 11 Cases that provided for the payment of $19 million to the Chapter 11 Estates, Dkt. No. [1703].

### (g) Vennes Asset Distribution Plan and Tax Refund Settlement

Palm Beach Finance Partners, L.P. and Palm Beach Finance II, L.P. filed for protection under the Bankruptcy Code on or about November 30, 2009 in Case Nos. 09-36379 and 09-36396 in the Southern District of Florida. The Palm Beach Trustee is a claimant in the PCI bankruptcy proceeding. In 2012, the Chapter 11 Trustee entered into a sharing arrangement with the Palm Beach Trustee with respect to subsequent transferee claims related to Vennes and MGI. Pursuant to that sharing arrangement, approximately $4.5 million has been received by the Chapter 11 Trustee based upon the settlement of fraudulent transfer claims against transferees of Vennes or MGI. A number of claims remain unresolved that the Chapter 11 Trustee anticipates will result in additional funds paid to the PCI Estate.

Additionally, the Chapter 11 Trustee has realized approximately $2.3 million from receivership proceedings commenced in the District Court for the District of Minnesota

39

regarding Vennes and MGI. In the receivership proceeding, the District Court approved an asset distribution plan pursuant to which assets of Vennes and MGI have been, and will be distributed to their creditors. *See* Asset Distribution Plan, Receivership Case 08-5348, [Dkt. No. 1762]. On September 24, 2015, Bankruptcy Court approved the Chapter 11 Trustee's settlement with Vennes and MGI whereby a substantial majority of any tax refunds due them will be paid instead to the Bankruptcy Estates and the Liquidating Trustee for the Palm Beach funds.

### (h)    WestLB

Prior to the Petition Date, Opportunity Finance, LLC and Opportunity Finance Securitization III, LLC, among others, loaned and received funds from PCI and PC Funding. Between March 2005 and December 2007, WestLB financed promissory notes payable to Opportunity Finance, LLC by extending credit to its affiliated entity Opportunity Finance Securitization III, LLC pursuant to that certain Receivables Loan and Security Agreement dated March 16, 2005. Opportunity Finance, LLC transferred to or for the benefit of WestLB a sum exceeding $140,000,000 funded with transfers from PC Funding to Opportunity Finance, LLC. The Chapter 11 Trustee commenced an adversary proceeding captioned *Kelley v. Opportunity Finance, LLC et. al*, Adv. No. 10-04301, in which the Chapter 11 Trustee sought to avoid and recover transfers of the Debtors' property made by Opportunity Finance, LLC and Opportunity Finance Securitization III, LLC to WestLB. A settlement was reached after mediation, which was presented for approval by the Bankruptcy Court in the Chapter 11 Cases on December 29, 2015, and provides for the payment of $15 million to the Chapter 11 Estates.

### 13.    Asset Sales and Recoveries

During the pendency of the Bankruptcy Cases, the Chapter 11 Trustee entered into agreements for the sale of various assets of the Debtors. Each of these agreements has been approved by the Bankruptcy Court after notice and a hearing. A summary of notable asset sales are described below, each of which was approved by the Bankruptcy Court.

### (a)    Bluestem Brands, Inc.

Prior to the Petition Date, in 2004, PCI converted its interest in FAC Acquisition, LLC to acquire 338,731,641 Series A preferred shares of Bluestem Brands, Inc. ("Bluestem" f/k/a Fingerhut Direct Marketing, Inc.), a marketing firm selling consumer products through catalog sales and via e-commerce. These shares represented approximately 20% of the equity securities in Bluestem. The cost of this investment was approximately $35.6 million. In 2007, these shares were transferred by PCI to PGW in an amount recorded on PGW's books as a $30.7 million obligation to PCI. In December 2013, Bluestem's Board of Directors declared a special dividend to holders of the preferred shares of Bluestem, and PGW received a dividend in the amount of $78.6 million. In November 2014, Bluestem's Board of Directors approved the sale of Bluestem and PGW received approximately $52.2 million from the sale of its Series A preferred stock. As a minority shareholder, PGW's consent to the sale was not required. An escrow account was established by the purchase agreement whereby PGW could receive additional sale proceeds (up to an estimated $7 million) if certain contingencies in the purchase agreement were satisfied. PGW has received approximately $3.8 million from escrow since the closing of the sale in 2014.

40

The remaining distributions, if any, from that escrow will likely not be determined for another year.

### (b)  Sale of Zink Imaging, Inc. Promissory Note

In August 2007, PCI agreed to loan Zink Imaging, Inc. ("Zink") $10 million in return for a secured promissory note (the "Zink Note") bearing interest at the rate of 12% per annum and a maturity date of June 30, 2009. The security provided to PCI was a security interest in substantially all of Zink's personal property, including its intellectual property assets, and a second deed of trust granting PCI a lien on Zink's real property located in North Carolina. The Zink Note was amended and modified, with Bankruptcy Court approval, three separate times by the Chapter 11 Trustee during these Chapter 11 Cases. The Chapter 11 Trustee also entered into two separate forbearance agreements with Zink, again with Bankruptcy Court approval. The Chapter 11 Trustee determined that it was in the best interests of the PCI Estate to sell the Zink Note and, pursuant to a Motion filed in the Bankruptcy Court on March 19, 2015, the Chapter 11 Trustee requested approval from the Bankruptcy Court to sell the Zink Note. On March 31, 2015, the Bankruptcy Court entered its order approving the Chapter 11 Trustee's sale of the Zink Note for $8 million [Dkt. No. 2779]. Of this amount, $7 million was paid in cash and the remaining $1 million was in the form of a promissory note with an interest rate of 5% per annum and a maturity date of March 31, 2017.

### (c)  Sale of Interest in Minnesota Airlines Holdings, Inc., d/b/a Sun Country Airlines

In July 2011, the Board of Directors of Minnesota Airlines Holdings, Inc., d/b/a/ Sun Country Airlines, approved the sale of the company. Both PGW and PCI had a small equity interest in Minnesota Airlines Holdings and received distributions from that sale in the approximate amount of $800,000 for PGW and $1.4 million for PCI.

### (d)  Inter-Company Claims

#### i)  Aviation Entities

Prior to the Petition Date, the Debtors advanced funds to entities owned and controlled by Petters, including MN Airlines, LLC, d/b/a Sun Country Airlines and its parent company MN Airline Holdings, Inc. and Petters Aviation, LLC. Each of these entities sought relief under Chapter 11 of the Bankruptcy Code and the Debtors filed proofs of claim for amounts advanced to the respective Debtors. The respective airline entity debtors objected to the Debtors' claims. Ultimately, agreements were reached in which the Debtors' claims were allowed, and both PCI and PGW received distributions on the allowed claims.

#### ii)  Claims in In re Polaroid Corporation, et al.

Prior to the Petition Date, the Debtors advanced funds for Petters' acquisition of Polaroid Corporation n/k/a PBE Corporation and its affiliated companies ("Polaroid"), as well as for later funding, pursuant to secured and unsecured promissory notes. Polaroid is a wholly-owned subsidiary of PGW. Polaroid sought relief under Chapter 11 of the Bankruptcy Code in December 2008. After Polaroid sold substantially all of its assets in a court-approved section-363

41

sale, the case was converted to Chapter 7. The Debtors have filed Claims for amounts owing under the secured and unsecured promissory notes issued by Polaroid. The Polaroid Trustee has sought to disallow, recharacterize or otherwise subordinate the Debtors' Claims. A mediation on these Claims is in the process of being coordinated and scheduled.

## H.    Creditor Claims

### 1.    The Claims Process

The Bankruptcy Code provides a procedure for each Creditor who believes it has a Claim against one of the Debtors to assert such Claim, so that such Creditor can receive distributions from the Debtors' Estates. The Bankruptcy Court established a Bar Date, – a date by which Creditors must have filed their Claims, or else such Claims will not participate in the Bankruptcy Cases or receive any distribution from the Bankruptcy Cases.

### 2.    Summary of Secured Claims

A number of parties assert Secured Claims against Property of the Debtors. Pursuant to section 506(a) of the Bankruptcy Code, a Claim secured by a Lien is a Secured Claim to the extent of the value of such Creditor's interest in the Estate's interest in such Property, and is an unsecured Claim to the extent that the value of such Creditor's interest in the Estate's interest in such Property is less than the amount of such claim. The Plan Proponents believe a significant number of the asserted Secured Claims are likely not secured by Property of the Debtors.

#### (a)    Direct Promissory Note Lender Secured Claims

In connection with the loan agreements entered into by the Debtors, a number of security agreements were entered that purportedly granted security interests in certain assets of the Debtors, including accounts, inventory, goods, instruments, and obligations. A number of such Promissory Note Lenders filed UCC-1 financing statements with the respective office of the Secretary of State to perfect such interest, with many indicating an interest in specific goods, purchase orders or inventory. However, as a result of the Debtors' participation in the fraudulent Ponzi Scheme, such goods, purchase orders and inventory purportedly serving as Collateral were fabricated or fictitious and did not, and do not, exist. To the extent such Creditors assert additional Claims based in tort, such Claims are not subject to prepetition security agreements or secured by assets of the Debtors.

#### (b)    Indirect Promissory Note Lender Secured Claims

A number of parties that invested in the funds that made loans to the Debtors have asserted Secured Claims. There is no security agreement between the Debtor and these claimants. Regardless of secured status, such indirect Promissory Note Lender Claims are duplicative of, and derivative of, Claims asserted by the direct Promissory Note Lenders. To the extent goods, purchase orders and inventory purportedly serving as collateral for the direct Promissory Note Lenders' Claims were fabricated or fictitious and did not, and do not, exist, the same would be the case for indirect Promissory Note Lenders' Claims as well. To the extent such Creditors assert additional Claims based in tort, such Claims are not subject to prepetition security agreements or secured by assets of the Debtors.

42

### (c)      Inter-Company Secured Claims

Debtor PGW has executed promissory notes and security agreements granting PCI and Petters Capital a security interest in essentially all assets of Debtor PGW.

### (d)      Trade Vendor Secured Claims

Prior to the Petition Date, the Debtors entered into one or more leases for copiers and other equipment, with such lessors filing UCC-1 Financing Statements with the appropriate office of the Secretary of State. Since the Petition Date, the Debtors have provided such lessors with notice of rejection of such leases, and surrendered the equipment subject to such leases.

### 3.      Summary of Significant Unsecured Claims

### (a)      Lancelot Claim

On behalf of Lancelot and the associated funds, the Lancelot Trustee filed claims in both the PCI and PGW estates for $1,570,530,006. This amount represents the accounting loss suffered by those funds, that is the lost principal as well as the accrued but unpaid interest on that principal. By the Plan and the associated settlement with Lancelot and the Lancelot Trustee on their claims, the Chapter 11 Trustee is stipulating to an Allowed General Unsecured Claim in the amount of $764,620,000, which amount represents Lancelot's actual cash loss of record as of the Petition Date, plus the amount of the Lancelot Payment of $10,495,000.

### (b)      Palm Beach Claim

The  trustee in the Palm Beach bankruptcy cases filed amended claims in  the PCI,  PGW estates and other Debtors' estates on behalf of both Palm Beach Finance Partners, L.P. and Palm Beach Finance II, L.P. totaling $1,088,311,353. This amount reflects the accounting loss (principal plus accrued but unpaid interest) incurred by these funds.  By the Plan and the associated settlement with the Palm Beach Trustee as to the PBF and PBF II Claims, the Chapter 11 Trustee is stipulating to an Allowed General Unsecured Claim in the total amount of $651,959,930, which amount represents the actual cash loss of record as of the Petition Date of Palm Beach Finance Partners, L.P. and Palm Beach Finance II, L.P., plus the amount of the PBF Payment of $8,100.00 and the PBF II Payment of $5,095,000.00.

### (c)      Acorn

ABRG, as successor servicer, filed a proof of claim against the Chapter 11 Debtors in excess of $300 million. The Chapter 11 Trustee asserted a number of claims against Acorn, which claims were compromised in a settlement agreement with Acorn, which agreement was approved by the Bankruptcy Court [Dkt. No. 999]. As part of that settlement (described in Section III.G.12.(b) of this Disclosure Statement), Acorn is the Holder of an Allowed General Unsecured Claim in PCI in the amount of $141,290,116 which amount represents Acorn's actual cash loss of record as of the Petition Date plus repayment of preferential transfers in the amount of $3 million.  During the pendency of these proceedings, the Holder of the Acorn Claim assigned its Allowed Claim to Greenpond. An affiliate of Greenpond also owns claims against PBF II.

43

### (d)   Ritchie

Ritchie has asserted claims against the Debtors in excess of $209 million.  Ritchie also was granted pledges and other interests in certain note receivables of the Debtors. The Chapter 11 Trustee asserted a number of claims against Ritchie attempting to avoid and recover some of the payments made to Ritchie, and to void, subordinate, re-characterize and disallow the obligations owing to it.

### (e)   Ark Discovery II, L.P.

Frances Gecker ("Gecker") was appointed the Chapter 7 trustee of Ark Discovery II, L.P. and on behalf of Ark Discovery II, Gecker filed proofs of claim in the amount of approximately $107.2 million in the PCI and PGW Estates. The Chapter 11 Trustee has asserted claims against Ark Discovery II to avoid and recover a portion of the funds received by Ark Discovery II prior to the Petition Date.

### (f)   Interlachen

In April 2008, Interlachen loaned PCI a total of $60 million in two separate transactions. Interlachen never received any payments on either of the promissory notes it received from PCI. Interlachen has filed claims in the PCI and PGW estates for $60 million. This amount represents Interlachen's Net Invested Capital loss as of the Petition Date. By the Plan, the Chapter 11 Trustee does not object to the proof of claim filed by Interlachen and to Interlachen having an Allowed General Unsecured Claim in Class 3 in the amount of $60 million as described in Section VII.B.10 of the Disclosure Statement.

The six claimants described above represent approximately 93% of the General Unsecured Claims in these Estates. The Chapter 11 Trustee estimates that the total Allowed Claims in Class 3 will be approximately $1.9 billion with approximately 99% of this amount held by institutional lenders.

**ALL RIGHTS ARE RESERVED ON BEHALF OF THE CHAPTER 11 TRUSTEE, THE DEBTORS, THEIR ESTATES, THE PLAN PROPONENTS OR ANY OTHER PARTY IN INTEREST (TO THE EXTENT SUCH PARTY HAS STANDING TO OBJECT TO CLAIMS) WITH RESPECT TO THE ALLOWANCE OR DISALLOWANCE OF ANY AND ALL CLAIMS, INCLUDING CLAIMS NOT REFERENCED IN THE DISCLOSURE STATEMENT.**

**THEREFORE, IN VOTING ON THE PLAN, NO CREDITOR MAY RELY ON THE ABSENCE OF AN OBJECTION TO ITS PROOF OF CLAIM AS ANY INDICATION THAT THE CHAPTER 11 TRUSTEE, THE DEBTORS, THEIR ESTATES, PLAN PROPONENTS, THE LIQUIDATING TRUSTS, OR OTHER PARTIES IN INTEREST ULTIMATELY WILL NOT OBJECT TO THE AMOUNT, PRIORITY, SECURITY, OR ALLOWABILITY OF SUCH CLAIM, OR SEEK TO SUBORDINATE SUCH CLAIM. CREDITORS SHOULD ASSUME INSTEAD THAT ANY SUCH PARTY THAT IS ENTITLED TO DO SO: (1) MAY FILE AN OBJECTION TO ANY PROOF OF CLAIM THAT IS NOT LISTED IN THE APPLICABLE**

44

**DEBTORS' SCHEDULES, DIFFERS IN AMOUNT OR PRIORITY FROM THE AMOUNT OR PRIORITY OF SUCH CREDITOR'S CLAIM AS LISTED IN THE SCHEDULES, OR IF SUCH CREDITOR'S CLAIM IS LISTED IN THE SCHEDULES AS DISPUTED, CONTINGENT, OR UNLIQUIDATED, (II) MAY PROSECUTE, ALL OBJECTIONS TO CLAIMS AND COUNTERCLAIMS THEY MAY HAVE WITH RESPECT TO CLAIMS ASSERTED, AND (III) EXCEPT AS SPECIFICALLY SET FORTH IN THE PLAN, MAY PROSECUTE CLAIMS OF THE DEBTORS OR THE ESTATES (INCLUDING RIGHTS TO AFFIRMATIVE RECOVERY, RIGHTS TO SUBORDINATE CLAIMS, AND RIGHTS TO AVOID TRANSFERS)**.

### IV.    SUMMARY OF MATERIAL PLAN PROVISIONS

**THIS SECTION PROVIDES A SUMMARY OF THE STRUCTURE, CLASSIFICATION, TREATMENT AND IMPLEMENTATION OF THE PLAN AND IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE FULL TEXT OF THE PLAN, WHICH ACCOMPANIES THIS DISCLOSURE STATEMENT AS EXHIBIT "A" CONSIDERATION OF THIS SUMMARY WILL NOT, NOR IS IT INTENDED TO, YIELD A THOROUGH UNDERSTANDING OF THE PLAN. SUCH CONSIDERATION IS NOT A SUBSTITUTE FOR A FULL AND COMPLETE READING OF THE PLAN. ALL HOLDERS OF CLAIMS AND INTERESTS ARE URGED TO REVIEW THE PLAN CAREFULLY. THE PLAN ITSELF AND THE DOCUMENTS REFERENCED THEREIN WILL CONTROL THE TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN AND WILL, UPON THE EFFECTIVE DATE, BE BINDING UPON ALL HOLDERS OF CLAIMS AGAINST, AND EQUITY SECURITIES IN, THE DEBTOR.**

#### A.    Introduction

The Bankruptcy Code requires that a chapter 11 plan divide the different claims against, and equity securities in, a debtor into separate classes based upon their legal nature. Claims of a substantially similar legal nature are usually classified together, as are equity securities of a substantially similar legal nature. The Bankruptcy Code does not require the classification of administrative claims and certain priority claims, and they are typically denominated "unclassified claims."

A chapter 11 plan must designate each separate class of claims and equity securities either as "impaired" (affected by the plan) or "unimpaired" (unaffected by the plan). If a class of claims is "impaired" under the Bankruptcy Code, the holders of claims in that class are entitled to vote on the plan (unless the plan provides for no distribution to the class, in which case the class is not entitled to vote to accept or reject the plan and is deemed to reject the plan), and to receive, under the plan, property with a value at least equal to the value that the holder would receive if the debtor were liquidated under chapter 7 of the Bankruptcy Code. If a class of claims is unimpaired, the holders of claims in that class are not entitled to vote to accept or reject the plan and are deemed to accept the plan.

45

## B.      Classification of Claims and Equity Securities

All Claims and Equity Securities, except for Administrative Claims, Priority Tax Claims and Professional Fee Claims, are placed in the Classes set forth below. In accordance with Section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims have not been classified.

A Claim or Equity Security is placed in a particular Class only to the extent that the Claim or Equity Security falls within the description of that Class, and is classified in other Classes to the extent that any portion of the Claim or Equity Security falls within the description of such other Classes. A Claim is also placed in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim is an Allowed Claim in that Class and such Claim has not been paid, released, or otherwise settled prior to the Effective Date.

A summary of the Classes is shown below.

| Class | Description | Status | Voting Rights |
|-------|-------------|--------|---------------|
| Unclassified | Administrative Claims | Unimpaired | Not Entitled to Vote |
| Unclassified | Statutory Fees | Unimpaired | Not Entitled to Vote |
| Unclassified | Priority Tax Claims | Unimpaired | Not Entitled to Vote |
| Class 1 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 2 | Secured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 3 | General Unsecured Claims | Impaired | Entitled to Vote |
| Class 4 | Intercompany Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class 5 | Subordinated Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class 6 | Equity Securities | Impaired | Not Entitled to Vote (Deemed to Reject) |

## V.      TREATMENT OF ADMINISTRATIVE CLAIMS, PRIORITY TAX CLAIMS, AND PROFESSIONAL FEE CLAIMS

### A.      Administrative and Priority Tax Claims in General

Administrative Claims and Priority Tax Claims are not classified in the Plan.  The treatment of and consideration to be received by Holders of Allowed Administrative Claims or Allowed Priority Tax Claims pursuant to Article III of the Plan shall be in full and complete satisfaction, settlement, release and discharge of such Claims.  The Debtors' obligations in respect of such Allowed Administrative and Priority Tax Claims shall be satisfied in accordance with the terms of the Plan.

46

### B.    Treatment of Administrative Claims

Except to the extent the Holder of an Allowed Administrative Claim agrees otherwise, each Holder of an Allowed Administrative Claim shall be paid in respect of such Allowed Claim (a) the full amount thereof in Cash, as soon as practicable after the later of (i) the Effective Date and (ii) the date on which such Claim becomes an Allowed Claim, or upon other agreed terms, or (b) such lesser amount as the Holder of an Allowed Administrative Claim and the Chapter 11 Trustee or the PCI Liquidating Trustee, as applicable, with the prior consent of the Creditors' Committee or the PCI Liquidating Trust Committee, as applicable, might otherwise agree; provided, however, that any Allowed Administrative Claim representing obligations incurred in the ordinary course during the pendency of the Chapter 11 Cases, if any, shall be paid in accordance with the terms and conditions of the particular transactions and agreements related thereto.

### C.    Treatment of Priority Tax Claims

Each Holder of an Allowed Priority Tax Claim, if any, shall be paid in respect of such Allowed Claim either (a) the full amount thereof, without post-petition interest or penalty, in Cash, as soon as practicable after the later of (i) the Effective Date and (ii) the date on which such Claim becomes an Allowed Claim, or upon other agreed terms, or (b) such lesser amount as the Holder of an Allowed Priority Tax Claim and the Chapter 11 Trustee or the PCI Liquidating Trustee, as applicable, with the consent of the Creditors' Committee or the PCI Liquidating Trust Committee, as applicable, might otherwise agree.

### D.    Bar Date for Administrative Claims

Unless otherwise ordered by the Bankruptcy Court, requests for payment of unpaid Administrative Claims (except for Professional Fee Claims), must be Filed and served on the Chapter 11 Trustee or the PCI Liquidating Trustee, as applicable, and its counsel, the Creditors' Committee or the PCI Liquidating Trust Committee, as applicable, and its counsel and the other notice parties set forth in the Administrative Compensation Order, no later than (i) ten (10) days prior to the Voting Deadline for Administrative Claims accrued through the date of the Procedures Order and (ii) thirty (30) days after the Effective Date for all other Administrative Claims (the "Administrative Claims Bar Date"). ***Any Person that is required to File and serve a request for payment of an Administrative Claim as a condition to allowance of the Administrative Claim who fails to timely File and serve such request shall be forever barred, estopped, and enjoined from asserting such Claim against the Debtors, the Estates, the Liquidating Trusts or their respective property and from participating in distributions under the Plan on account thereof, and any such Claim shall be deemed discharged as of the Effective Date.*** Objections to requests for payment of Administrative Claims (except for Professional Fee Claims) must be Filed and served on the Chapter 11 Trustee or the PCI Liquidating Trustee, as applicable, and its counsel, the Creditors' Committee or the PCI Liquidating Trust Committee, as applicable, and its counsel, and the other notice parties set forth in the Administrative Compensation Order and the requesting party within thirty (30) days after the applicable Administrative Claims Bar Date or within such additional time as the Bankruptcy Court orders, after notice to the parties before expiration of the time to file an objection.

47

### E.    BAR DATE FOR TRUSTEE FEE CLAIMS AND PROFESSIONAL FEE CLAIMS

All requests for compensation or reimbursement of Professional Fee Claims for services rendered on or after the Petition Date and prior to the Effective Date shall be Filed and served on the Chapter 11 Trustee or the PCI Liquidating Trustee, as applicable, and its counsel, the Creditors' Committee or the PCI Liquidating Trust Committee, as applicable, and its counsel, and such other Entities who are designated by the Bankruptcy Rules, the Confirmation Order or any other order(s) of the Bankruptcy Court, no later than sixty (60) days after the Effective Date ("Professional Fee Claims Bar Date"). ***Any Holder of a Professional Fee Claim that is required to File and serve an application for final allowance of its Professional Fee Claims as a condition to allowance of such Professional Fee Claim and who fails to timely File and serve such application by the required deadline shall be forever barred from asserting such Professional Fee Claim against the Debtors, the Estates, the Liquidating Trusts or their respective property and from participating in distributions under the Plan on account thereof, and any such Professional Fee Claims shall be deemed discharged as of the Effective Date***. Objections to any Professional Fee Claims must be Filed and served on the requesting Professional, the Chapter 11 Trustee or the PCI Liquidating Trustee, as applicable, and its counsel, the Creditors' Committee or the Trust Committee, as applicable, and its counsel, and the other notice parties set forth in the Administrative Compensation Order no later than thirty (30) days after the Professional Fee Claims Bar Date or within such additional time as the Bankruptcy Court orders, after notice to the parties before expiration of the time to File an objection; provided, however, that the Creditor Proponents and Interlachen will not object to or contest, or join or encourage any other Entity to object to or contest, any final fee applications of Professionals to the extent any such application includes applications or requests for the allowance of Professional Fee Claims that have been previously approved by the Bankruptcy Court as a final compensation or reimbursement of expenses.

Except to the extent that a Holder of a Professional Fee Claim fails to File and serve an appropriate fee application in a timely manner or the Bankruptcy Court disallows a Professional Fee Claim, Holders of Professional Fee Claims shall receive Cash in an amount equal to the Allowed amount of their respective Bankruptcy Court approved Professional Fee Claims.

### F.    Allowed Administrative Claim

The Petters Capital Chapter 7 Trustee shall have an Allowed Administrative Expense Claim under section 326 of the Bankruptcy Code in the amount of $350,000. The Plan shall serve as, and shall be deemed to be, a motion for the allowance of such Administrative Expense Claim and the Petters Capital Chapter 7 Trustee shall not be required to File any further request therefor. In connection with the substantive consolidation provided by the Plan, the Allowed Administrative Expense Claim of the Petters Capital Chapter 7 Trustee represents the Petters Capital Chapter 7 Trustee's contribution to the Consolidated Estates. The Holder of such Allowed Administrative Expense Claim shall be paid upon the Effective Date in full satisfaction, settlement, release and in exchange for such Allowed Administrative Claim. Entry of the Confirmation Order shall constitute approval by the Bankruptcy court of the Allowed Administrative Expense Claim.

## VI.    TREATMENT OF CLAIMS AND EQUITY SECURITIES

### A.    Class 1—Other Priority Claims

Class 1 consists of Other Priority Claims.

#### 1.    Distributions.

Except to the extent that the Chapter 11 Trustee or the PCI Liquidating Trustee, as applicable (following consultation with the Creditors' Committee or the PCI Liquidating Trust Committee, as applicable), and a Holder of an Allowed Other Priority Claim agree to a different treatment, each Holder of an Allowed Other Priority Claim shall receive, in full and final satisfaction, settlement and release of such Claim, payment in full in Cash in an amount equal to such Allowed Other Priority Claim on the later of (i) the Initial Distribution Date or (ii) the date when such Other Priority Claim becomes an Allowed Other Priority Claim, or as soon thereafter as is practicable. All Allowed Other Priority Claims that are not due and payable on or before the Effective Date shall be paid by the PCI Liquidating Trustee in the ordinary course of business in accordance with the terms thereof.

#### 2.    Impairment and Voting.

Class 1 is Unimpaired under the Plan and shall be deemed to accept the Plan. Holders of Allowed Other Priority Claims are not entitled to vote to accept or reject the Plan.

### B.    Class 2—Secured Claims

Class 2 consists of Secured Claims, if any.

#### 1.    Distributions.

Except to the extent that the Chapter 11 Trustee or the PCI Liquidating Trustee, as applicable (following consultation with the Creditors' Committee or the PCI Liquidating Trust Committee, as applicable), and a Holder of an Allowed Secured Claim agree to a different treatment, in full and final satisfaction, settlement and release of such Claim, in the Chapter 11 Trustee's or the PCI Liquidating Trustee's discretion, as applicable (following consultation with the Creditors' Committee or the PCI Liquidating Trust Committee, as applicable), (i) each Holder of an Allowed Secured Claim shall receive Cash in an amount equal to such Allowed Secured Claim in full and complete satisfaction, settlement and release of such Allowed Secured Claim on the later of the Initial Distribution Date or the date such Secured Claim becomes an Allowed Secured Claim, or as soon thereafter as is practicable, or (ii) each Holder of an Allowed Secured Claim shall receive the Collateral securing its Allowed Secured Claim or the proceeds of such Collateral in full and complete satisfaction, settlement and release of such Allowed Secured Claim on the later of the Initial Distribution Date and the date such Secured Claim becomes an Allowed Secured Claim, or as soon thereafter as is practicable.

With respect to any asserted Secured Claim, if and to the extent that the Holder of such asserted Secured Claim is determined, by a Final Order, to hold an Allowed Secured Claim not subject to subordination, then such Allowed Secured Claim shall receive distributions as an

DOCS-#4870937-v21

Allowed Secured Claim in accordance with subsection (a) of Section 4.2 of the Plan. To the extent that it is determined that all or any portion of such asserted Secured Claim is unsecured or is to be subordinated, then the portion that is unsecured or subordinated, to the extent Allowed, shall receive the treatment accorded to Claims in Class 3 (General Unsecured Claims), or Class 5 (Subordinated Claims), as applicable.

### 2.        Impairment and Voting.

Holders of Class 2 Secured Claims, if any, shall be Unimpaired and shall be deemed to have accepted the Plan. Out of an abundance of caution, provisional Ballots shall be distributed to Holders of Class 2 Secured Claims. In the event that the Bankruptcy Court finds that a Holder of a Class 2 Secured Claim has had its legal rights altered sufficiently to impair its Claim, then such Holder shall be entitled to vote to accept or reject the Plan.

### 3.        Negative Net Invested Capital.

Any Claim of any Holder with negative Net Invested Capital shall be disallowed and any Lien purportedly securing such Claim shall be terminated and void.

### C.        Class 3—General Unsecured Claims

Class 3 consists of the General Unsecured Claims against any Consolidated Debtor.

### 1.        Distributions.

A Holder of an Allowed Class 3 General Unsecured Claim shall be entitled to (i) a Pro Rata distribution on the Initial Distribution Date of Cash from Trust Assets net after payment or reserve for all Administrative Expenses, Priority Tax Claims, and Class 1 and Class 2 Claims; (ii) subsequent Pro Rata distributions of Trust Assets net after payment or appropriate reserve for all PCI Liquidating Trust Expenses and Disputed Claims; provided, that distributions made to the Lancelot Trustee and the Palm Beach Trustee shall be subject to the Lancelot Settlement and the PBF Settlement and PBF II Settlement, respectively; and (iii) Pro Rata distributions of BMO Litigation Trust Proceeds net after payment or reserve for all BMO Litigation Trust Expenses and Disputed Claims.

### 2.        Impairment and Voting.

Holders of Class 3 General Unsecured Claims shall be Impaired and shall be entitled to vote to accept or reject the Plan.

### 3.        Convenience.

In lieu of the treatment described above, a Holder of an Allowed Class 3 General Unsecured Claim may elect to receive a distribution on the Initial Distribution Date in Cash in an amount equivalent to 20% of its Allowed Claim up to a distribution limit of $20,000, waiving any entitlement to any further distribution under the Plan.

50

4.        **Negative Net Invested Capital.**

Any Claim with negative Net Invested Capital shall be a Disallowed Claim upon entry of the Confirmation Order, and the Holder of such Claim shall not be eligible to vote to accept or reject the Plan or receive any distributions under the Plan.

D.        **Class 4—Intercompany Claims**

Class 4 consists of Intercompany Claims, which solely for the purpose of administering the Consolidated Estates and making distributions under this Plan, shall each be collapsed and disregarded such that no distributions shall be made on account of such Claims.  Intercompany Claims may be cancelled, reinstated, or capitalized as the discretion of the PCI Liquidating Trustee in his capacity as the Debtors' chief executive officer in accordance with Section 8.3 of the Plan. .

E.        **Class 5—Subordinated Claims**

Class 5 consists of all Subordinated Claims.

1.        **Distributions.**

Holders of Subordinated Claims shall receive no distributions on account of such Claims.

2.        **Impairment and Voting.**

The Holders of Class 5 Subordinated Claims are Impaired and shall be deemed to have rejected the Plan.

F.        **Class 6--Equity Securities**

Class 6 consists of all all Equity Securities in the Debtors. Common shares shall be cancelled if and when the Debtors are dissolved in accordance with Section 8.3, underlined provided, underlined however, that any options or warrants to purchase any Equity Securities, or obligating the Debtors to issue, transfer or sell Equity Securities or any other capital stock of the Debtors, shall be canceled or extinguished on the Effective Date. Holders of Class 6 Equity Securities are Impaired, are not entitled to vote to accept or recect the Plan, and shall be deemed to have rejected the Plan. .

VII.    **COMPROMISES AND SETTLEMENTS**

A.        **Compromises and Settlements**

Pursuant to Section 1123(b)(3)(A) of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the distributions and other benefits provided under the Plan, the provisions of the Plan will constitute a good faith compromise and settlement of all Claims or controversies relating to the rights that a Holder of a Claim or Equity Security may have with respect to any Allowed Claim or Allowed Equity Security or any distribution to be made pursuant to the Plan on account of any Allowed Claim or Allowed Equity Security.

51

The Confirmation Order, subject to the occurrence of the Effective Date, shall constitute an order of the Bankruptcy Court finding and determining that the settlements provided for herein, including those set forth below, are (a) in the best interests of Creditors and the Estates, (b) fair, equitable, and reasonable, (c) made in good faith, and (d) approved by the Bankruptcy Court.

### B.     The Palm Beach and Lancelot Claims Settlements

The PBF Settlement, PBF II Settlement, and the Lancelot Settlement provide for the settlement of the PBF Claim, PBF II Claim, the Lancelot Claim, the Palm Beach Avoidance Action and the Lancelot Avoidance Action with such settlements effective as of the Effective Date. Pursuant to the PBF Settlement, PBF II Settlement, and the Lancelot Settlement:

### 1.     Settlement Payments

The Lancelot Trustee and the Palm Beach Trustee shall each make the payments set forth herein in resolution of the Lancelot Avoidance Action and the Palm Beach Avoidance Action, respectively, and for the consideration described herein and other covenants contained below which payments (the "Lancelot Payment", the "PBF Payment" and the "PBF II Payment", respectively) shall be made, at such Creditor's option, either by (x) Cash payment from such Creditor to the Estates on the Effective Date or (y) the PCI Liquidating Trustee withholding of such amount from the first distributions to be made from the PCI Liquidating Trust. The Lancelot Payment is $10,495,000.00. The PBF Payment is $8,100.00 and the PBF II Payment is $5,095,000.00.

### 2.     Allowed Lancelot Claim

The Lancelot Claim shall be Allowed in full on a Net Invested Capital basis as a Class 3 General Unsecured Claim in the amount of $764,620,000 plus the amount specified in Section 5.2(a) of the Plan on account of the Lancelot Payment, and the Lancelot Claim shall be entitled to treatment under the Plan identical to other Class 3 General Unsecured Claims; provided, further, however, that notwithstanding the substantive consolidation of Petters Capital with the other Debtors, the Lancelot Trustee may assert an additional Claim on account of Lancelot's Claims against Petters Capital, including pursuant to Section 510(a) of the Bankruptcy Code, which Claim, if Allowed, shall be entitled to treatment from the Liquidating Trusts consistent with the treatment such Claim would have received hereunder absent substantive consolidation.

### 3.     Allowed PBF Claim

The PBF Claim shall be Allowed in full on a Net Invested Capital basis as a Class 3 General Unsecured Claim in the amount of $85,987,311 plus the amount specified in Section 5.2(a) of the Plan on account of the PBF Payment, and the PBF Claim shall be entitled to treatment identical to other Class 3 General Unsecured Claims.

### 4.     Allowed PBF II Claim

The PBF II Claim shall be Allowed on a Net Invested Capital basis as a Class 3 General Unsecured Claim in the amount of $565,755,364 plus the amount specified in Section 5.2(a) of

DOCS-#4870937-v21

the Plan on account of the PBF II Payment, and the PBF II Claim shall be entitled to treatment identical to other Class 3 General Unsecured Claims.

### 5.  Withdrawal of Avoidance Actions

The Confirmation Order, upon becoming a Final Order, shall be deemed an order dismissing, withdrawing, and expunging the Palm Beach Avoidance Action and the Lancelot Avoidance Action, including any and all proofs of claim which may have been filed by the Chapter 11 Trustee in the Palm Beach and Lancelot bankruptcy cases, with prejudice, and the PCI Liquidating Trustee shall make such filings as are necessary to evidence the foregoing.

### 6.  Final Resolution of Claims

Effective upon the Effective Date, each of the Lancelot Trustee, on behalf of Lancelot, and the Palm Beach Trustee, on behalf of Palm Beach, forever knowingly and voluntarily, irrevocably, fully, and unconditionally covenants and agrees not to file or assert any claim or proof of claim (other than as otherwise allowed in Section 5.2 of the Plan) against the Estates or the Covered Parties or their predecessors (other than the Debtors), successors, or assigns, and each of the Lancelot Trustee, on behalf of Lancelot, and the Palm Beach Trustee, on behalf of Palm Beach waives any entitlement to any distribution under the Plan other than as provided under Section 5.2 of the Plan, and the Chapter 11 Trustee and the Petters Capital Chapter 7 Trustee, as representatives of their respective Estates, on the other hand, forever knowingly and voluntarily, irrevocably, fully, and unconditionally covenants and agrees not to file or assert any claim or proof of claim against the Lancelot estate, the Palm Beach estates, the Lancelot Trustee or the Palm Beach Trustee or their predecessors, successors, or assigns and waives any entitlement to any distribution from such estates other than as provided under Section 5.2 of the Plan (the covenanting parties, collectively, the "P/L Resolution Parties"). Regardless of the adequacy or inadequacy of the consideration paid, the covenant and agreement included herein are intended to settle or avoid litigation or settle the Claims and Causes of Action to which they apply and to be final and complete; provided, however, that nothing contained in this covenant and agreement shall constitute, or be deemed to constitute, a release, discharge or impairment of the right to enforce the Plan or any Claims or Causes of Action provided for in the Plan, all of which are expressly preserved; provided, further, that, for the avoidance of doubt, this covenant and agreement does not apply to the Allowed Class 3 General Unsecured Claims provided for under the Plan or with respect to any Claim arising out of or in connection with any obligation under the Plan, which Claims are expressly preserved; provided, further, that this covenant and agreement does not apply to or impair any claims that any P/L Resolution Parties may have against the Debtors or against third parties other than the Covered Parties, which Claims are expressly preserved. Further, nothing contained in this covenant and agreement shall constitute, or be deemed to constitute, a release, discharge or impairment of the right of a P/L Resolution Party to pursue any and all third parties for any and all claims or causes of action they may have against such third parties

### 7.  The Lancelot Settlement Summary

The Plan includes the following key settlement provisions that relate to the Lancelot Claims. Interested parties are directed to the specific language of the Plan attached hereto, and to

53

the extent there is a discrepancy between the summary descriptions below and the specific language of the Plan, the language of the Plan controls. The key aspects of the Lancelot Settlement, as more particularly described in section 5.2 of the Plan, are summarized as follows:

- <u>The Lancelot Payment</u>. The Lancelot Trustee shall make payment to the PCI Liquidating Trust on behalf of Lancelot in the amount of $10,495,000.00 (the "<u>Lancelot Payment</u>"). The Lancelot Trustee has the option to pay the Lancelot Payment in cash on the Effective Date of the Plan or the PCI Liquidating Trust may withhold the amount of the Lancelot Payment from the first distributions made from the PCI Liquidating Trust on the Allowed Lancelot Claim as described below.

- <u>Allowed Lancelot Claim.</u> The Lancelot Claim shall be Allowed in full on a Net Invested Capital basis as a Class 3 General Unsecured Claim in the amount of $764,620,000.00 plus the amount of the Lancelot Payment. The Lancelot Claim shall be entitled to treatment identical to other Class 3 General Unsecured Claims.

- <u>Withdrawal of Avoidance Actions</u>. The Confirmation Order, upon becoming a Final Order, shall be deemed an order dismissing, withdrawing, and expunging the Lancelot Avoidance Action, including any and all proofs of claim which may have been filed by the Chapter 11 Trustee in the Lancelot cases, with prejudice.

### 8.    Lancelot Settlement Agreement

#### (a)    Probability of success in litigation

The probability of success in litigation over the Lancelot Claims is a significant consideration that militates in favor of approval of the Lancelot Claims Settlement. The Lancelot Trustee has throughout this case expressed his high degree of certainty that the Lancelot Claims would be allowed as filed. The Chapter 11 Trustee has filed an objection to such claims and has filed proofs of claim in the Lancelot estates alleging avoidable transfer claims, but did not seek an affirmative recovery. The probability of success cannot be gauged with certainty at this stage and material risk certainly exists that the Lancelot Claim will be Allowed at least on a Net Invested Capital basis or likewise that it will be disallowed. Recognizing the uncertainty of success with respect to the objections to the Lancelot Claims, the PCI Trustee and the Lancelot Trustee negotiated an acceptable compromise at a two-day formal mediation with Ralph Mabey, a former bankruptcy judge, and negotiations which continued among the Chapter 11 Trustee and Plan Proponents over several months afterward, and which is reflected in the Settlements set forth in the Plan.

#### (b)    Collectability

Collectability is not an issue with respect to the Lancelot Claims Settlement as the Chapter 11 Trustee did not seek an affirmative recovery on the proofs of claim filed against Lancelot.

54

(c)     **Complexity of litigation and attendant expense, inconvenience and delay**

The complexity of the litigation relating to the objections to the Lancelot Claims and the expense, inconvenience and delay attendant thereto is a significant consideration that militates in favor of approval of the Lancelot Claims Settlement. Any objections to the claims asserted by the Lancelot Trustee engender a myriad of potentially sophisticated, novel and complex issues. The Chapter 11 Trustee has already incurred substantial fees and costs related to analysis of the Lancelot Claims and, in his settlement analysis, the Chapter 11 Trustee has considered the substantial anticipated attorneys fees and other costs, to pursue objections to the Lancelot Claims. Given the uncertainty associated with the potential success or lack of success of such objections and the clear intent of the Lancelot Trustee to litigate his claims and any such objections through trial and appeal and the attendant expense, inconvenience and delay that would be occasioned by such litigation, the Chapter 11 Trustee believes that the Lancelot Claims Settlement is appropriate.

(d)     **Paramount interest of Creditors**

For all the reasons discussed herein, the Settlement favorably and immediately concludes myriad and complex litigation issues that have litigation risk to the Estates and would be extremely expensive to prosecute. Thus, approval of the Settlement is in the paramount interest of the Estates.

(e)     **Integrity of Judicial System**

The Settlement also avoids the potential for continued litigation between the Chapter 11 Trustee and the Lancelot Trustee before separate bankruptcy courts in separate jurisdictions, with the potential for inconsistent rulings issued on the same or similar facts.

9.     **The Palm Beach Settlement Summary**

The Plan includes the following key settlement provisions that relate to the Palm Beach Claims. Interested parties are directed to the specific language of the Plan attached hereto, and to the extent there is a discrepancy between the summary descriptions below and the specific language of the PCI Plan, the language of the Plan controls. The key aspects of the Palm Beach Settlement, as more particularly described in section 5.2 of the Plan, are summarized as follows:

- The PBF Payments. The Palm Beach Trustee shall make payments to the PCI Liquidating Trust on behalf of PBF in the amount of $8,100.00 (the "PBF Payment") and on behalf of PBF II in the amount of $5,095,000.00 (the "PBF II Payment," collectively the "PBF Payments"). The Palm Beach Trustee has the option to pay the PBF Payments in cash on the Effective Date of the Plan or the PCI Liquidating Trust may withhold the amount of the PBF Payments from the first distributions made from the PCI Liquidating Trust on the Allowed PBF Claim and Allowed PBF II Claim described below.

55

- <u>Allowed PBF Claim</u>. The PBF Claim shall be Allowed in full on a Net Invested Capital basis as a Class 3 General Unsecured Claim in the amount of $85,987,311.00 plus the PBF Payment. The PBF Claim shall be entitled to treatment identical to other Class 3 General Unsecured Claims.

- <u>Allowed PBF II Claim</u>. The PBF II Claim shall be Allowed on a Net Invested Capital basis as a Class 3 Claim in the amount of $565,755,364.00 plus the PBF II Payment. The PBF II Claim shall be entitled to treatment identical to other Class 3 General Unsecured Claims.

- <u>Withdrawal of Avoidance Actions</u>. The Confirmation Order, upon becoming a Final Order, shall be deemed an order dismissing, withdrawing, and expunging the Palm Beach Avoidance Action, including any and all proofs of claim which may have been filed by the PCI Trustee in the Palm Beach cases, with prejudice.

### 10.    Palm Beach Settlement Agreement

#### (a)    Probability of success in litigation

The probability of success in litigation over the Palm Beach Claims is a significant consideration that militates in favor of approval of the Palm Beach Claims Settlement. The Palm Beach Trustee has throughout this case expressed his high degree of certainty that the PBF Claim and PBF II Claim would be allowed as filed. The Chapter 11 Trustee has filed an objection to such claims and has filed proofs of claim in the PBF and PBF II estates alleging avoidable transfer claims. The probability of success cannot be gauged with certainty at this stage and material risk certainly exists that the PBF Claim and PBF II Claim will be Allowed at least on a Net Invested Capital basis or likewise that such claims will be disallowed. Recognizing the uncertainty of success with respect to the objections to the Palm Beach Claims, the Chapter 11 Trustee and the Palm Beach Trustee negotiated an acceptable compromise at a two-day formal mediation with Ralph Mabey, a former bankruptcy judge, and negotiations which continued among the Chapter 11 Trustee and Plan Proponents over several months afterward, and which is reflected in the Settlements set forth in the PCI Plan.

#### (b)    Collectability

Collectability is not an issue with respect to the Palm Beach Claims Settlement as the Chapter 11 Trustee did not seek an affirmative recovery on the proofs of claim filed against Palm Beach.

#### (c)    Complexity of litigation and attendant expense, inconvenience and delay

The complexity of the litigation relating to the objections to the Palm Beach Claims and the expense, inconvenience and delay attendant thereto is a significant consideration that militates in favor of approval of the Palm Beach Claims Settlement. Any objections to the claims asserted by the Palm Beach Trustee engender a myriad of potentially sophisticated, novel and complex issues. The Chapter 11 Trustee has already incurred substantial fees and costs related to

56

analysis of the Palm Beach Claims and, in his settlement analysis, the Chapter 11 Trustee has considered the substantial anticipated attorneys fees and other costs, to pursue objections to the Palm Beach Claims.  Given the uncertainty associated with the potential success or lack of success of such objections and the clear intent of the Palm Beach Trustee to litigate his claims and any such objections through trial and appeal and the attendant expense, inconvenience and delay that would be occasioned by such litigation, the Chapter 11 Trustee believes that the Palm Beach Claims Settlement is appropriate.

### (d)    Paramount interest of Creditors

For all the reasons discussed herein, the Palm Beach Settlement favorably and immediately concludes myriad and complex litigation issues that have litigation risk to the Estates and would be extremely expensive to prosecute.  Thus, approval of the Settlement is in the paramount interest of the Estates.

### (e)    Integrity of Judicial System

The Settlement also avoids the potential for continued litigation between the Chapter 11 Trustee and the Lancelot Trustee before separate bankruptcy courts in separate jurisdictions, with the potential for inconsistent rulings issued on the same or similar facts.

### C.    The Interlachen Claims Settlement

### 1.    Allowed Interlachen Claim

The Interlachen Claim will be Allowed as a Class 3 General Unsecured Claim in the amount of $60 million, the amount of its filed proof of claim which represents the total amount PCI borrowed from Interlachen, and shall be entitled to treatment identical to other Allowed Class 3 General Unsecured Claims. Interlachen did not receive prepetition transfers from the Debtors and the Chapter 11 Trustee has determined that no basis exists to object to Interlachen's proof of claim.

### 2.    Final Resolution of Claims

Effective upon the Effective Date, Interlachen forever knowingly and voluntarily, irrevocably, fully, and unconditionally covenants and agrees not to file or assert any claim or proof of claim (other than as otherwise allowed in Section 5.3 of the Plan) against the Estates or the Covered Parties or their predecessors (other than the Debtors), successors, or assigns, and Interlachen waives any entitlement to any distribution under the Plan other than as provided under Section 5.3 of the Plan, and the Chapter 11 Trustee and the Petters Capital Chapter 7 Trustee, as representatives of their respective Estates, on the other hand, forever knowingly and voluntarily, irrevocably, fully, and unconditionally covenants and agrees not to file or assert any claim against Interlachen or its predecessors, successors, or assigns. Regardless of the adequacy or inadequacy of the consideration paid, the covenant and agreement included herein are intended to settle or avoid litigation or settle the Claims and Causes of Action to which they apply and to be final and complete; provided, however, that nothing contained in this covenant and agreement shall constitute, or be deemed to constitute, a release, discharge or impairment of the right to enforce the Plan or any Claims or Causes of Action provided for in the Plan, all of

57

which are expressly preserved; provided, further, that, for the avoidance of doubt, this covenant and agreement does not apply to the Allowed Class 3 General Unsecured Claims provided for under the Plan or with respect to any Claim arising out of or in connection with any obligation under the Plan, which Claims are expressly preserved; provided, further, that this covenant and agreement does not apply to or impair any claims that Interlachen may have against the Debtors or against third parties other than the Covered Parties, which Claims are expressly preserved. Further, nothing contained in this covenant and agreement shall constitute, or be deemed to constitute, a release, discharge or impairment of the right of Interlachen to pursue any and all third parties for any and all claims or causes of action they may have against such third parties.

### 3. Creditor Proponents Assignment of Certain Interests in the BMO Litigation Trust to Interlachen

Pursuant to an agreement among and between Creditors dated January [], 2016 (the "Inter-creditor Agreement"), Creditors Greenpond and, subject to the approval of their respective bankruptcy courts, the Lancelot Trustee and the Palm Beach Trustee, have agreed to transfer to Interlachen certain portions of contingent distributions which may be received by such Creditors attributable exclusively from BMO Litigation Trust Assets, if any. In exchange, Interlachen has agreed to waive and not assert any objections to the Plan, which objections would have been costly and time consuming to litigate, and potentially delay confirmation of the Plan. Depending on the outcome of the BMO Adversary, there may be no value to the assignment of these interests.

Greenpond, the Lancelot Trustee and the Palm Beach Trustee have entered into the Inter-creditor Agreement in furtherance of their interests as Creditor Proponents in a concerted effort to resolve as many potential disputes in advance of the Confirmation Hearing, the resolution of which inures to the benefit of the Estates and all Creditors, derivatively, including, but not limited to, Greenpond, the Lancelot Trustee and the Palm Beach Trustee.

The Chapter 11 Trustee was not involved in negotiating the Inter-creditor Agreement, is not a party to the Inter-creditor Agreement and the terms of the Inter-creditor Agreement are not incorporated into the Plan. Thus, neither the Estates nor either of the Liquidating Trusts established under the Plan are bound by its terms and the Plan Proponents are not seeking approval by the Bankruptcy Court of the Inter-creditor Agreement. However, the effectiveness of the Inter-Creditor Agreement is dependent upon the Plan becoming Effective.

In substance, the Creditor Proponents have provided personal consideration in exchange for consideration to be received by the Estates and all Creditors pro rata. For this reason, among other things, all the Plan Proponents, including the Chapter 11 Trustee, are supportive of the Inter-creditor Agreement

## VIII.   SUBSTANTIVE CONSOLIDATION

### A.   Consolidation for Certain Purposes

On and subject to the occurrence of the Effective Date, the Plan shall substantively consolidate the Petters Capital Estate and the PGW Estate with the previously substantively

consolidated PCI Estate and the PCI SPEs Estates. Resultantly, and solely for purposes of administering the Consolidated Estates and making distributions under the Plan, (a) all assets and liabilities of the Debtors shall be pooled, and (b) any and all Intercompany Claims shall be collapsed and disregarded. Accordingly, duplicative Claims Filed against the Debtors, including guaranty claims, claims sounding in tort that purport to recover the same, or substantially the same, damages as other Claims, and Claims that purport to establish joint and several liability, shall be expunged and disallowed upon the Effective Date, and the Holder of any Claims shall receive a single recovery on account of any such joint or duplicative obligations. The treatment of the Estates as if they were substantively consolidated solely for the purpose of administering the Consolidated Estates and making distributions under this Plan shall not, and shall not be deemed to, affect or constitute a waiver of the mutuality requirement for setoff under Section 553 of the Bankruptcy Code, except to the extent otherwise expressly waived by the Chapter 11 Trustee or the PCI Liquidating Trustee in writing. All Claims, Causes of Action or rights of the Chapter 11 Trustee or the Petters Capital Chapter 7 Trustee under applicable law to avoid transfers of the property of any of the Debtors are and shall be preserved under the Plan.

> **B.**    **Substantive Consolidation**

The Plan shall serve as, and shall be deemed to be, a motion for entry of an order substantively consolidating the Debtors as described above and in Section 6.1 of the Plan. Any objection to this request for substantive consolidation shall be Filed with the Bankruptcy Court and served in accordance with the Bankruptcy Rules or as otherwise ordered by the Bankruptcy Court. In the event any such objections are timely Filed, a hearing with respect thereto shall occur at the Confirmation Hearing. Entry of the Confirmation Order shall constitute approval by the Bankruptcy Court, effective as of the Effective Date, of the substantive consolidation of the Debtors for Plan purposes. The relief accorded under Section 6.1 of the Plan shall be effective retroactively as of October 11, 2008.

> **IX.    UNEXPIRED LEASES AND EXECUTORY CONTRACTS**

> **A.    Rejection of Prepetition Executory Contracts and Unexpired Leases**

Any and all pre-petition Executory Contracts and Unexpired Leases not previously rejected by the Chapter 11 Trustee or the Debtors, unless specifically assumed pursuant to orders of the Bankruptcy Court prior to the Confirmation Date or the subject of a motion to assume or assume and assign pending on the Confirmation Date, shall be deemed rejected pursuant to Section 365 of the Bankruptcy Code by the Debtors on the Confirmation Date. Each such contract and lease will be rejected only to the extent that any such contract or lease constitutes an Executory Contract or Unexpired Lease. To the extent that any loan agreement to which any Debtor is lender or security agreement to which any Debtor is a beneficiary is deemed to be an Executory Contract, rejection of such agreement, shall not, by itself, eliminate the borrower's obligations thereunder or cause any of the Debtors' Liens or ownership rights or benefits to be released, terminated, discharged, impaired or otherwise rendered unenforceable. The Confirmation Order will constitute an order of the Bankruptcy Court approving such rejections, pursuant to Section 365 of the Bankruptcy Code, as of the Confirmation Date.

**B.      Bar Date for Rejection Damage Claims.**

Any and all proofs of claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases shall, unless another order of the Bankruptcy Court provides for an earlier date, be Filed within thirty (30) days after the Filing of notice of entry of the Confirmation Order. Any proof of Claim arising from the rejection of an Executory Contract or Unexpired Lease that is not timely Filed shall be disallowed automatically and forever barred, estopped and enjoined from assertion and shall not be enforceable against the Debtors, the Estates or the Liquidating Trusts or their respective Property, without the need for any objection or any further notice to or action, order or approval of the Bankruptcy Court, and any Claim arising out the rejection of the Unexpired Lease or Executory Contract or shall be deemed fully satisfied and released notwithstanding anything in the Schedules or a proof of claim to the contrary. All Allowed Claims arising from the rejection of an Unexpired Lease or Executory Contract shall be treated as Class 3 General Unsecured Claims for purposes of a distribution pursuant to the Plan.

**C.      Insurance.**

For the avoidance of doubt, the Debtors' rights with respect to all insurance policies under which any of the Debtors may be a beneficiary (including all insurance policies that may have expired prior to the Petition Date, all insurance policies entered into by any of the Debtors or Estates after the Petition Date, and all insurance policies under which any of the Debtors or Estates hold rights to make, amend, prosecute or benefit from claims), are retained and will be transferred and assigned to the PCI Liquidating Trust pursuant to the Plan. The provisions of the Plan shall not diminish or impair in any manner the enforceability of coverage of any insurance policy.

## X.      IMPLEMENTATION OF THE PLAN

Liquidating Trusts shall be established on the Effective Date and shall be administered pursuant to the Liquidating Trust Agreements for the purpose of administering Trust Assets, including prosecuting and monetizing Trust Claims, resolving all Disputed Claims, making distributions to Holders of Allowed Claims in accordance with the terms of the Plan, and otherwise implementing the Plan.

**A.      PCI Liquidating Trust Agreement**

Without any further action of any Entity, the PCI Liquidating Trust Agreement shall become effective on the Effective Date. The PCI Liquidating Trust Agreement shall govern the PCI Liquidating Trust. A copy of the PCI Liquidating Trust Agreement is attached as Exhibit B to the Plan.

**1.      PCI Liquidating Trust**

The PCI Liquidating Trust shall be established on the Effective Date and shall be administered pursuant to the PCI Liquidating Trust Agreement for the purpose of administering the Trust Assets, including prosecuting and monetizing the Trust Claims, resolving all Disputed

Claims, and making distributions to Holders of Allowed Class 3 General Unsecured Claims in accordance with the terms of the Plan and otherwise implementing the Plan.

## 2. Retained Assets and Dissolution

Upon the Effective Date, the PCI Liquidating Trustee shall be appointed as the Debtors' chief executive officer and charged with administering and monetizing the Retained Assets and transferring the proceeds of the Retained Assets to the PCI Liquidating Trust, subject to the approval or at the direction of the PCI Liquidating Trust Committee. Except as otherwise provided in the Plan or as determined otherwise by the PCI Liquidating Trustee, the existence of the Debtors may, but is not required to, be terminated by merger, consolidation or dissolution or as otherwise permitted by applicable law, all at such time and on such terms as the PCI Liquidating Trustee determines to be necessary or appropriate to implement the Plan and all without further order of the Bankruptcy Court. In order to effectuate such terminations in accordance with applicable law, the PCI Liquidating Trustee may, without further order of the Bankruptcy Court, execute and file with the applicable governmental authorities such certificates of merger, consolidation or dissolution or similar instruments as the PCI Liquidating Trustee determines to be necessary or appropriate. The PCI Liquidating Trustee shall be authorized to file the Debtors' tax returns as necessary and appropriate in accordance with applicable law.

## 3. PCI Liquidating Trustee

On the Effective Date, the Chapter 11 Trustee, not in his individual capacity but solely as trustee, shall be appointed the PCI Liquidating Trustee as representative of the Consolidated Estates in accordance with Section 1123(b)(3) of the Bankruptcy Code and 26 U.S.C. § 6012(b)(3), subject to oversight by the PCI Liquidating Trust Committee as provided for herein and in the PCI Liquidating Trust Agreement.

## 4. PCI Liquidating Trust Committee

### (a) Membership

The PCI Liquidating Trust Committee shall be formed and constituted on the Effective Date and consist of five (5) members. Each of the Lancelot Trustee, the Palm Beach Trustee, and Greenpond, in their capacities as Creditor Proponents, shall be entitled to appoint one member of the PCI Liquidating Trust Committee, and shall have the continuing right to replace such member for any reason in such Person's respective sole discretion. The PCI Liquidating Trust Committee shall consist of the following five (5) initial members: the Lancelot Trustee, the Palm Beach Trustee, Michael Stern, Lance Breiland, and an independent member to be selected by the Creditor Proponents prior to the Confirmation Hearing (the "Independent Member"). Each member shall be entitled to a single vote of equivalent power and weight. In the event a member appointed by a Creditor Proponent (i.e., the Lancelot Trustee, the Palm Beach Trustee, or Michael Stern) ceases to be a member of the PCI Liquidating Trust Committee for any reason and the applicable Creditor Proponent fails to name a replacement within twenty (20) Business Days after such Person ceased to be a member of the PCI Liquidating Trust Committee, or if Lance Breiland or the Independent Member ceases to be a member of the PCI Liquidating Trust Committee, the other members of the PCI Liquidating Trust Committee shall agree on a

61

replacement member. If no agreement is reached by the remaining members within twenty (20) Business Days thereafter, the PCI Liquidating Trustee shall select promptly the replacement member from the nominees of the four (4) continuing members (even if only one nominee is identified), and if no nominees have been identified by the continuing members within twenty (20) Business Days after the PCI Liquidating Trustee has requested the continuing members to each identify the name of a nominee, the PCI Liquidating Trustee shall select promptly a replacement member of the PCI Liquidating Trustee's choosing.

### (b)      Common Interest Privilege

Communications among and between the PCI Liquidating Trustee and the PCI Liquidating Trust Committee, or their respective advisors, relating to any Trust Claims shall be deemed privileged and confidential and without waiver of any privileges, including without limitation the attorney-client privilege, work-product privilege or other privilege or immunity attaching to any such documents or information (whether written or oral).

### 5.      PCI Liquidating Trust Committee Chair

The Lancelot Trustee shall serve as the initial chair of the PCI Liquidating Trust Committee. Replacement of the PCI Liquidating Trust Committee chair shall be in accordance with the PCI Liquidating Trust Agreement.

### 6.      Counsel to the PCI Liquidating Trust and PCI Liquidating Trust Committee

In addition to PCI Liquidating Trustee General Counsel, the PCI Liquidating Trustee shall retain any such other firms as may be matter-appropriate at the direction of the PCI Liquidating Trust Committee, in accordance with the terms of the Plan and the PCI Liquidating Trust Agreement. Counsel to the PCI Liquidating Trust Committee shall be any firms as may be appropriate as determined by the PCI Liquidating Trust Committee in its sole discretion.

### 7.      Trust Assets

### (a)      Effective Date Asset Contributions and Transfers

The Asset Contribution to the PCI Liquidating Trust shall occur on the Effective Date. The Trust Claims shall be deemed to be transferred and assigned to the PCI Liquidating Trust on the Effective Date. The Chapter 11 Trustee, the Petters Capital Chapter 7 Trustee, and the Debtors are authorized to take such steps as may be necessary or desirable to confirm such contribution, transfer and assignment. Standing to prosecute all Trust Claims pending on the Effective Date shall transfer to the PCI Liquidating Trustee automatically on the Effective Date in accord with Section 1123(b)(3)(B) of the Bankruptcy Code. Standing to commence and prosecute all Trust Claims which are not pending on the Effective Date shall transfer automatically on the Effective Date to the PCI Liquidating Trustee in accord with Section 1123(b)(3)(B) of the Bankruptcy Code, for commencement upon the approval of the PCI Liquidating Trust Committee as provided for herein or by the PCI Liquidating Trust Agreement. A nonexclusive schedule of Claims and Causes of Action brought or that may be brought by the Chapter 11 Trustee is attached as Exhibit A to the Plan. In accordance with and subject to any

62

applicable law, the inclusion or failure to include any Claim or Cause of Action on Exhibit Ashall not be deemed an admission, denial or waiver of any Claim or Cause of Action that any Debtor or Estate may hold against any Entity.

For the avoidance of doubt, unless a Claim or Cause of Action against any Entity is expressly waived, relinquished, released, compromised or settled in the Plan or any Final Order (including the Confirmation Order), the Chapter 11 Trustee or the Petters Capital Chapter 7 Trustee, as applicable, expressly reserves such Causes of Action to be transferred to the PCI Liquidating Trust pursuant to the Plan for prosecution by the PCI Liquidating Trustee and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppels (judicial, equitable or otherwise) or laches shall apply to such Causes of Action upon or after the entry of the Confirmation Order or Effective Date based on the Plan or the Confirmation Order, except where such Causes of Action have been expressly released in the Plan or any Final Order (including the Confirmation).

### (b)     Creditor Direct Claims Not Included

The Chapter 11 Trustee has determined that many Creditors hold direct claims sounding in various theories of contract or tort (defined in the Plan as "Creditor Direct Claims"), such as the Claims asserted in *Mukamal v. General Electric Capital Corporation*, Adv. Case No. 12-01979-PGH (Bankr. D. Fla.). The Creditor Direct Claims are not Claims or Causes of Action belonging to or derived from property of the Estate and are not fraudulent transfer or other avoiding power claims and, as such, do not constitute property of the Estates under Section 541 of the Bankruptcy Code. These Claims and Causes of Action are not transferred to the PCI Liquidating Trust as Trust Assets.

### (c)     Disputed Liens

Until the validity of asserted Disputed Liens on certain assets held by the Debtors has been determined by Final Order, any Cash or other proceeds from such assets shall be segregated by the PCI Liquidating Trustee to reserve for the Claims underlying such Disputed Liens.

### (d)     Liquidation of Assets

The net proceeds of the liquidation of the Trust Assets shall be distributed by the PCI Liquidating Trustee to Holders of Allowed Claims in accordance with the Plan.

### (e)     Semi-annual distributions

Distributions to Holders of Allowed Claims shall be made at least every six (6) months following the Effective Date when Trust Assets available for distribution exceed $2 million, subject to reserves for PCI Liquidating Trust Expenses and Disputed Claims and subject to the PCI Liquidating Trust Committee determining otherwise.

### 8.     Powers of the PCI Liquidating Trustee

Subject to the terms hereof and of the PCI Liquidating Trust Agreement, the PCI Liquidating Trustee shall have authority to take all steps necessary to administer the Trust

Assets, including the duty and obligation to make distributions to Creditors holding Allowed Claims, to review and maintain objections to Claims, and to pursue Trust Claims. The PCI Liquidating Trustee shall have and perform all of the duties, responsibilities, rights, authority and obligations set forth in the Plan and the PCI Liquidating Trust Agreement.

The PCI Liquidating Trustee shall chair regular status meetings with the PCI Liquidating Trust Committee, in person or by telephone as determined by the PCI Liquidating Trust Committee to be held with such frequency and at such place as the PCI Trust Committee may reasonably determine, but in no event shall such meetings be held less frequently than one time during each calendar quarter. Written status reports shall be provided by the PCI Liquidating Trustee to the PCI Liquidating Trust Committee at least 3 Business Days prior to any such meeting, which status reports shall identify the Professionals assigned to each matter as well as each of their assigned tasks and immediate and longer term deliverables.

### (a)    Powers

Without the necessity of further Bankruptcy Court approval (except as otherwise specified herein), and in every case subject to consultation with the PCI Liquidating Trust Committee and the restrictions imposed herein, the PCI Liquidating Trustee shall have the power and authority to take all actions necessary and appropriate to effectuate the Plan and the PCI Liquidating Trust Agreement (and for all purposes will act in the capacity as the PCI Liquidating Trustee and not in his individual capacity), including:

**i)**    Receive, hold legal title, investigate and administer the Trust Assets, all in accordance with the Plan and the PCI Liquidating Trust Agreement;

**ii)**    Prosecute any Trust Claims and raise defenses to any counterclaims adverse to the PCI Liquidating Trust;

**iii)**    Execute, deliver, file or record such contracts, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and implement the provisions of the Plan and the PCI Liquidating Trust Agreement and certify or attest to any of the foregoing actions;

**iv)**    File and prosecute objections to Claims (that are not Allowed Claims);

**v)**    With respect to Claims to be allowed in an amount equal to or less than $1 million, compromise, and/or resolve Claims in accordance with, but subject to the limitations set forth in, the Plan;

**vi)**    Make distributions, pay taxes, and pay other obligations owed by the Debtors, the Estates, or the PCI Liquidating Trust;

**vii)**    Open and maintain bank accounts on behalf of and in the name of the PCI Liquidating Trust;

64

**viii)**     Establish funds, reserves, accounts, and sub-accounts within the PCI Liquidating Trust, as deemed by the PCI Liquidating Trustee, in its reasonable discretion and in consultation with the PCI Trust Committee, as may be necessary, appropriate, or desirable in carrying out the purposes of the PCI Liquidating Trust;

**ix)**     Determine the manner of ascertainment of income and principal of the Trust Assets, and the apportionment of income and principal among such assets; and

**x)**     File, if required, any and all tax information returns with respect to the PCI Liquidating Trust and pay taxes payable by the PCI Liquidating Trust, if any.

**(b)     Powers of the PCI Liquidating Trustee Subject to Approval or at the Direction of the PCI Liquidating Trust Committee**

Without the necessity of further Bankruptcy Court approval (except as otherwise specified herein), and in every case subject to the restrictions imposed herein, the following power and authority of the PCI Liquidating Trustee are subject to prior approval of the PCI Liquidating Trust Committee or shall only be taken at the direction of the PCI Liquidating Trust Committee (and for all purposes hereunder the PCI Liquidating Trustee shall act in the capacity as PCI Liquidating Trustee and not in his individual capacity):

**i)**     Sell, convey, transfer, assign, liquidate, or abandon Trust Assets, or any part thereof or any interest therein;

**ii)**     Protect and enforce the rights to the Trust Claims and other Trust Assets by any method deemed appropriate including, without limitation, by judicial proceedings or pursuant to any applicable bankruptcy, insolvency, moratorium or similar law and general principles of equity;

**iii)**     Settle, compromise, withdraw, or abandon any Trust Claims;

**iv)**     Commence and prosecute any Trust Claims that are not pending on the Effective Date, and raise defenses to any counterclaims adverse to the PCI Liquidating Trust;

**v)**     With respect to Claims to be allowed in an amount greater than $1 million, compromise and/or resolve Claims in accordance with, but subject to the limitations set forth in, the Plan (including the Filing of any objections to such Claims).

**vi)**     Endorse the payment of notes or other obligations of any Person or to make contracts with respect thereto;

**vii)**     Borrow sums of money, at any time and from time to time, for purposes as may be deemed advisable;

DOCS-#4870937-v21

**viii)**    Other than PCI Liquidating Trustee General Counsel, retain and approve the fees of Professionals, including law firms, independent accounting firms, and financial advisors as determined necessary to perform the functions of the PCI Liquidating Trust; and

**ix)**    Administer and monetize the Retained Assets and transfer the proceeds of the Retained Assets to the PCI Liquidating Trust.

## 9.    Powers of the PCI Liquidating Trust Committee

Without the necessity of further Bankruptcy Court approval (except as otherwise specified herein), the PCI Liquidating Trust Committee shall have the following exclusive powers under the Plan and the PCI Liquidating Trust Agreement (each by majority vote):

(a).    To confer and consult with counsel to the PCI Liquidating Trustee with respect to Trust Claims and all material litigation strategies and decisions.

(b).    To determine the basis on which any Trust Claims will be settled, compromised, abandoned, or withdrawn.

(c).    Prosecute any Trust Claims, and prosecute any objections to Claims (that are not allowed, in each case that are not pending on the Effective Date that the PCI Liquidating Trustee unreasonably refuses to assert and raise defenses to any counterclaims adverse to the PCI Liquidating Trustee.

(d).    To make all strategic and business determinations with respect to the PCI Liquidating Trust's interest in Polaroid Corporation, and bankruptcy case numbers 08-46617(GFK), 08-46621(GFK), 08-46620(GFK), 08-46623(GFK), 08-46624(GFK), 08-46625(GFK), 08-46626(GFK), 08-46627(GFK), 08-46628(GFK), 08-46629(GFK).

(e).    To approve the retention and fee arrangements of all Professionals representing the PCI Liquidating Trustee, other than retention of PCI Liquidating Trustee General Counsel, including the retention of special counsel and such other consulting Professionals related to any Trust Claims asserted against or related to Opportunity Finance, LLC; Opportunity Finance Securitization, LLC; Opportunity Finance Securitization II, LLC; Opportunity Finance Securitization III, LLC; International Investment Opportunities, LLC; Sabes Family Foundation; Sabes Minnesota Limited Partnership; Robert W. Sabes; Janet F. Sabes; Jon R. Sabes; or Steven Sabes.

(f).    Other than as specifically provided for herein, to determine the roles of any and all Professionals, including terminating any and all Professionals.

(g).    To have exclusive oversight over the payment of any and all Professionals' fees.

(h).    To determine the amounts and timing of supplemental distributions, if any, other than the regular semiannual distributions provided for herein and to establish appropriate reserves for all distributions.

## 10.    Debtors' Books and Records

Upon the occurrence of the Effective Date, the Chapter 11 Trustee shall be deemed to have transferred to the PCI Liquidating Trustee all possession, custody, and control of all books and records of the Debtors pertaining to the Trust Assets, including, all books and records necessary to the making of distributions, prosecution of objections to Claims, prosecution of Causes of Action, and the analysis, recovery and disposition of the Trust Assets. All such books and records shall be preserved for so long as may be necessary for the prosecution or defense of any Trust Claims, or any Claim objection Filed by the PCI Liquidating Trustee, after which the PCI Liquidating Trustee, upon any legally required notice, shall be authorized and empowered to abandon or destroy such books and records without further order of the Bankruptcy Court, in the PCI Liquidating Trustee's discretion upon consent of the PCI Liquidating Trust Committee.

The transfer of any and all Trust Assets to the PCI Liquidating Trust, including documents and other information gathered, and relevant work product developed, in connection with pending Claims and Causes of Action shall be without waiver of any evidentiary privileges, including without limitation the attorney-client privilege, work-product privilege, or any other privilege or immunity attaching to any such documents or information (whether written or oral). Any and all attorney-client privilege, work-product privilege, or other privilege or immunity attaching to any documents or communications (whether written or oral) pertaining to the Claims and Causes of Action shall be transferred to the PCI Liquidating Trust and shall vest in the PCI Liquidating Trustee and his representatives, and such transfer shall be without waiver in recognition of the joint and/or successorship interest in prosecuting claims on behalf of the Debtors' Estates.

## 11.    Resignation of PCI Liquidating Trustee

The PCI Liquidating Trustee may resign by giving not less than thirty (30) days' prior written notice thereof to the PCI Liquidating Trust Committee. The resignation will be effective on the latest of: (a) the date specified in the notice; (b) the date that is thirty (30) days after the date the notice is delivered; and (c) the date the successor PCI Liquidating Trustee accepts his or her appointment as such. If a successor trustee is not appointed or does not accept his or her appointment within thirty (30) days following delivery of such notice of resignation, the PCI Liquidating Trustee may file a motion with the Bankruptcy Court, upon notice and hearing, for the appointment of a successor trustee.

## 12.    Removal of PCI Liquidating Trustee

The PCI Liquidating Trustee may be removed (i) by unanimous vote of the PCI Liquidating Trust Committee for any reason or (ii) by the Bankruptcy Court, as determined by a Final Order after an opportunity for hearing, (a) for a material breach of the Plan or of the Liquidating Trust Agreement or (b) for cause, as that term is construed under Section 324(a) of the Bankruptcy Code.

Appointment of any subsequent PCI Liquidating Trustee, whether following resignation or removal or for any other reason, shall be determined by majority vote of the PCI Liquidating Trust Committee.

### 13.     Termination of the PCI Liquidating Trust

Upon final resolution and liquidation of all Trust Assets, reconciliation of all Claims, distribution of all Cash and proceeds of Trust Assets, and any other action necessary under the Plan to wind down, terminate or dissolve the PCI Liquidating Trust, as determined by the PCI Liquidating Trustee and the PCI Liquidating Trust Committee, the PCI Liquidating Trustee and the PCI Liquidating Trust Committee shall be relieved of further responsibility.

### 14.     Indemnification

The PCI Liquidating Trust Agreement shall provide for reasonable and customary indemnification of, and appropriate insurance for, the PCI Liquidating Trustee and the PCI Liquidating Trust Committee and its members.

### 15.     Fees and Expenses of the PCI Liquidating Trust

The PCI Liquidating Trust Expenses shall be paid from the Trust Assets in accordance with the Plan and the PCI Liquidating Trust Agreement.

### 16.     Compensation of the PCI Liquidating Trustee and PCI Liquidating Trust Professionals

The PCI Liquidating Trustee, and the Professionals representing the PCI Liquidating Trustee or the PCI Liquidating Trust Committee, shall be paid on a monthly basis at regular hourly rates, and may negotiate and agree upon contingency fee arrangements, in each case subject to the approval of the PCI Liquidating Trust Committee, without further order of the Bankruptcy Court. The PCI Liquidating Trustee, and the Professionals representing the PCI Liquidating Trustee or the PCI Liquidating Trust Committee, shall provide advance quarterly budgets, with monthly detail, to the PCI Liquidating Trust Committee for its review and approval. Detailed invoices shall be issued to the PCI Liquidating Trustee and PCI Liquidating Trust Committee on a monthly basis. Any variances greater than 10%, relative to the quarterly budgets shall be declared to the PCI Liquidating Trust Committee as soon as reasonably possible, and shall be subject to the objection of the PCI Liquidating Trust Committee. Any portion of monthly invoices not subject to an objection by the PCI Liquidating Trust Committee within 10 Business Days shall be paid promptly. Fee applications may be Filed with the Bankruptcy Court solely to address any unresolved objections of the PCI Liquidating Trust Committee to any portions of monthly invoices. Members of the PCI Liquidating Trust Committee, other than the Independent Member, shall receive no compensation, but shall be entitled to reimbursement for reasonable travel expenses and other reasonable out-of-pocket expenses. The Independent Member shall be entitled to compensation and reimbursement for reasonable travel expenses and other reasonable out-of-pocket expenses, subject to the same terms as and conditions set forth in Section 8.17 of the Plan that are applicable to the PCI

Liquidating Trustee and Professionals representing the PCI Liquidating Trustee and the PCI Liquidating Trust Committee.

### 17.    Tax Treatment

The PCI Liquidating Trust generally is intended to be treated, for federal income tax purposes, in part as a liquidating trust within the meaning of Treasury Regulations section 301.7701-4(d), for the benefit of the Holders of Allowed Claims entitled to distributions of Pending Payments, and otherwise as one or more disputed ownership funds within the meaning of Treasury Regulations section 1.468B- 9(b)(1), as more specifically provided for under the PCI Liquidating Trust Agreement. Accordingly, for all federal income tax purposes the transfer of Trust Assets to the PCI Liquidating Trust will be treated as: (a) to the extent of Pending Payments, a transfer of the Pending Payments directly from the Debtors to the Holders of such Allowed Claims followed by the transfer of such Pending Payments by the Holders of Allowed Claims to the PCI Liquidating Trust in exchange for rights to Distributions from the PCI Liquidating Trust; and (b) to the extent of amounts that are not Pending Payments, as a transfer to one or more disputed ownership funds. The Holders of Allowed Claims entitled to Distributions of Pending Payments will be treated for federal income tax purposes as the grantors and deemed owners of their respective shares of the Trust Assets in the amounts of the Pending Payments and any earnings thereon. The PCI Liquidating Trustee will be required by the PCI Liquidating Trust Agreement to file federal tax returns for the PCI Liquidating Trust as a grantor trust with respect to any Pending Payments and as one or more disputed ownership funds with respect to all other funds or other property held by the PCI Liquidating Trust pursuant to applicable Treasury Regulations, and any income of the PCI Liquidating Trust will be treated as subject to tax on a current basis. The PCI Liquidating Trust Agreement will provide that the PCI Liquidating Trustee will pay such taxes from the Trust Assets and the assets and properties of the liquidating Debtors. In addition, the PCI Liquidating Trust Agreement will require consistent valuation by the PCI Liquidating Trustee and the Beneficiaries (as defined in the PCI Liquidating Trust Agreement), for all federal income tax purposes, of any property held by the PCI Liquidating Trust. The PCI Liquidating Trust Agreement will provide that termination of the trust will occur no later than five (5) years after the Effective Date, unless before termination the Bankruptcy Court approves an extension based upon a finding that such an extension is necessary for the PCI Liquidating Trust to complete its Claims resolution and liquidating purpose. The PCI Liquidating Trust Agreement also will limit the investment powers of the PCI Liquidating Trustee in accordance with IRS Rev. Proc. 94-45 and will require the PCI Liquidating Trust to distribute at least annually to the Beneficiaries (as such may have been determined at such time) its net income (net of any payment of or provision for Taxes), except for amounts retained as reasonably necessary to maintain the value of the Trust Assets or to meet Claims and contingent liabilities (including Disputed Claims).

### B.    BMO Litigation Trust Agreement

Without any further action of any Entity, the BMO Litigation Trust Agreement shall become effective on the Effective Date. The BMO Litigation Trust Agreement shall govern the BMO Litigation Trust. A copy of the BMO Litigation Trust Agreement is attached as Exhibit C to the Plan.

### 1.    BMO Litigation Trust

The BMO Litigation Trust shall be established on the Effective Date and shall be administered pursuant to the BMO Litigation Trust Agreement for the purpose of administering the BMO Litigation Trust Assets, including prosecuting and monetizing the BMO Litigation Trust Assets, making distributions to Holders of Allowed Class 3 General Unsecured Claims in accordance with the terms of the Plan and otherwise implementing the Plan.

### 2.    BMO Litigation Trustee

On the Effective Date, the Chapter 11 Trustee, not in his individual capacity but solely as trustee, shall be appointed the BMO Litigation Trustee as representative of the Estates in accordance with Section 1123(b)(3) of the Bankruptcy Code and 26 U.S.C. § 6012(b)(3), subject to oversight by the BMO Litigation Trust Committee as provided for herein and in the BMO Litigation Trust Agreement.

### 3.    BMO Litigation Trust Committee

#### (a)    Membership

The BMO Litigation Trust Committee shall be formed and constituted on the Effective Date. The BMO Litigation Trust Committee shall consist of three (3) members. Two of the members of the BMO Litigation Trust Committee shall be selected by Holders of Allowed Class 3 General Unsecured Claims by a majority in amount of those voting and the third member of the BMO Litigation Trust Committee shall be selected by the other two members of the BMO Litigation Trust Committee. Each member shall be entitled to a single vote of equivalent power and weight. In the event a member ceases to be a member of the BMO Litigation Trust Committee for any reason, the remaining members shall agree on a replacement member. If no agreement is reached by the remaining members within twenty (20) Business Days after a Person ceased to be a member of the BMO Litigation Trust Committee, the BMO Litigation Trustee shall select promptly the replacement member from the nominees of the two continuing members (even if only one nominee is identified), and if no nominees have been identified by the continuing members within twenty (20) Business Days after the BMO Litigation Trustee has requested the continuing members to each identify the name of a nominee, the BMO Litigation Trustee shall select promptly a replacement member of the BMO Litigation Trustee's choosing.

#### (b)    Common Interest Privilege

Communications among and between the BMO Litigation Trustee and the BMO Litigation Trust Committee, or their respective advisors, relating to any Trust Claims shall be deemed privileged and confidential and without waiver of any privileges, including without limitation the attorney-client privilege, work-product privilege or other privilege or immunity attaching to any such documents or information (whether written or oral).

DOCS-#4870937-v21

4.      **Counsel to the BMO Litigation Trust and BMO Litigation Trust Committee**

The BMO Litigation Trustee shall retain such legal counsel as may be matter-appropriate at the direction of the BMO Litigation Trust Committee, in accordance with the terms of the Plan and the BMO Litigation Trust Agreement. Counsel to the BMO Litigation Trust Committee shall be any firms as may be appropriate as determined by the BMO Litigation Trust Committee in its sole discretion.

5.      **BMO Litigation Trust Assets**

(a)      **Effective Date Asset Contributions and Transfers**

The BMO Litigation Trust Assets shall be deemed to be transferred and assigned to the BMO Litigation Trust on the Effective Date. Standing to prosecute all BMO Litigation Trust Assets pending on the Effective Date and to commence and prosecute all Causes of Actions that are BMO Litigation Trust Assets and that are not pending on the Effective Date shall transfer to the BMO Litigation Trustee automatically on the Effective Date in accord with Section 1123(b)(3)(B) of the Bankruptcy Code. For the avoidance of doubt, the BMO Litigation Trust Assets include, but are not limited to, the BMO Adversary Proceeding, which is currently pending.

For the avoidance of doubt, unless a Claim or Cause of Action against any Entity that is a BMO Litigation Trust Asset is expressly waived, relinquished, released, compromised or settled in the Plan or any Final Order (including the Confirmation Order), the Chapter 11 Trustee expressly reserves such Causes of Action to be transferred to the BMO Litigation Trust pursuant to the Plan for prosecution by the BMO Litigation Trustee, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppels (judicial, equitable or otherwise) or laches shall apply to such Causes of Action upon or after the entry of the Confirmation Order or Effective Date based on the Plan or the Confirmation Order, except where such Causes of Action have been expressly released in the Plan or any Final Order (including the Confirmation).

(b)      **Liquidation of Assets**

The net proceeds of the liquidation of the BMO Litigation Trust Assets shall be distributed by the BMO Litigation Trustee to Holders of Allowed Class 3 General Unsecured Claims in accordance with the Plan.

6.      **Powers of the BMO Litigation Trustee**

Subject to the terms hereof and of the BMO Litigation Trust Agreement, the BMO Litigation Trustee shall have authority to take all steps necessary to administer the BMO Litigation Trust Assets, including the duty and obligation to make distributions to Holders of Allowed Class 3 General Unsecured Claims in accordance with the Plan and the BMO Litigation Trust Agreement and to pursue Claims and Causes of Action that are BMO Litigation Trust Assets. The BMO Litigation Trustee shall have and perform all of the duties, responsibilities, rights and obligations set forth in the Plan and the BMO Litigation Trust Agreement.

71

The BMO Liquidating Trustee shall chair regular status meetings with the BMO Liquidating Trust Committee, in person or by telephone as determined by the BMO Liquidating Trust Committee to be held with such frequency and at such place as the BMO Trust Committee may reasonably determine, but in no event shall such meetings be held less frequently than one time during each calendar quarter. Written status reports shall be provided by the BMO Liquidating Trustee to the BMO Liquidating Trust Committee at least 3 Business Days prior to any such meeting, which status reports shall identify the Professionals assigned to each matter as well as each of their assigned tasks and immediate and longer term deliverables.

### (a)     Powers

Without the necessity of further Bankruptcy Court approval (except as otherwise specified herein), and in every case subject to consultation with the BMO Litigation Trust Committee and the restrictions imposed herein, the BMO Litigation Trustee shall have the following power and authority to take all actions necessary and appropriate to effectuate the Plan and the BMO Litigation Trust Agreement (and for all purposes will act in the capacity as BMO Litigation Trustee and not in his individual capacity), including:

**i)**     Receive, hold legal title to, investigate and administer the BMO Litigation Trust Assets, all in accordance with the Plan and the BMO Litigation Trust Agreement.

**ii)**     Prosecute the BMO Litigation Trust Assets and raise defenses to any counterclaims adverse to the BMO Litigation Trust.

**iii)**     Make distributions, pay taxes, and pay other obligations owed by the BMO Litigation Trust, including the payment of expenses of the BMO Litigation Trust, including the cost of pursuing the BMO Litigation Trust Assets.

**iv)**     Open and maintain bank accounts on behalf of and in the name of the BMO Litigation Trust.

**v)**     Establish funds, reserves, accounts, and sub-accounts within the BMO Litigation Trust, as deemed by the BMO Litigation Trustee, in its reasonable discretion and in consultation with the BMO Litigation Trust Committee, as may be necessary, appropriate, or desirable in carrying out the purposes of the BMO Litigation Trust.

**vi)**     Determine the manner of ascertainment of income and principal of the BMO Litigation Trust Assets, and the apportionment of income and principal among such assets.

**vii)**     File, if required by law, any and all tax information returns with respect to the BMO Litigation Trust and pay taxes payable by the BMO Litigation Trust, if any.

72

**(b)**     **Powers of the BMO Litigation Trustee Subject to Approval or at the Direction of the BMO Litigation Trust Committee**

Without the necessity of further Bankruptcy Court approval (except as otherwise specified herein), and in every case subject to the restrictions imposed herein, the following power and authority of the BMO Litigation Trustee are subject to prior approval of the BMO Litigation Trust Committee or shall only be taken at the direction of the BMO Litigation Trust Committee (and for all purposes hereunder, the BMO Litigation Trustee shall be acting in the capacity as the BMO Liquidating Trustee and not individually):

**i)**     Sell, convey, transfer, assign, liquidate, or abandon BMO Litigation Trust Assets, or any part thereof or any interest therein.

**ii)**     Protect and enforce the rights to the BMO Litigation Trust Assets by any method deemed appropriate including by judicial proceedings or pursuant to any applicable bankruptcy, insolvency, moratorium or similar law and general principles of equity.

**iii)**     Settle, compromise, withdraw, or abandon BMO Litigation Trust Assets.

**iv)**     Borrow sums of money, at any time and from time to time, for purposes as may be deemed advisable.

**v)**     Retain and approve the fees of Professionals, including law firms, independent accounting firms, and financial advisors as determined necessary to perform the functions of the BMO Litigation Trust, and to negotiate and approve any alternative fee arrangements with such Professionals as may be beneficial to the BMO Litigation Trust.

**vi)**     Prosecute any Causes of Action that are BMO Litigation Trust Assets and that are not pending on the Effective Date, and raise defenses to any counterclaims adverse to the BMO Litigation Trust.

**vii)**     Endorse the payment of notes or other obligations of any Person or to make contracts with respect thereto.

**7.**     **Powers of the BMO Litigation Trust Committee**

Without the necessity of further Bankruptcy Court approval (except as otherwise specified herein), the BMO Litigation Trust Committee shall have the following exclusive powers under the Plan and the BMO Litigation Trust Agreement (each by majority vote):

(a).     To confer and consult with counsel to the BMO Litigation Trustee with respect to BMO Litigation Trust Assets and all material litigation strategies and decisions.

(b).     To determine the basis on which any BMO Litigation Trust Assets will be settled, compromised, abandoned, or withdrawn.

73

(c).   To approve the retention and fee arrangements of all Professionals representing the BMO Litigation Trustee.

(d).   To have exclusive oversight over the payment of any and all BMO Litigation Trust Expenses and BMO Litigation Trust Litigation Fees and Expenses.

(e).   To determine the amounts and timing of distributions and to establish appropriate reserves for all distributions from the BMO Litigation Trust.

(f).   Prosecute any Causes of Action that are BMO Litigation Trust Assets and that are not pending on the Effective Date, and raise defenses to any counterclaims adverse to the BMO Litigation Trust, and direct the BMO Litigation Trustee to do the same.

(g).   To determine the roles of any and all Professionals representing the BMO Litigation Trust, including terminating any and all such Professionals.

### 8.    Debtors' Books and Records

Upon the occurrence of the Effective Date, the Chapter 11 Trustee shall be deemed to have transferred to the BMO Litigation Trustee all possession, custody, and control of all books and records of the Debtors pertaining to the BMO Litigation Trust Assets of the Debtors. All such books and records shall be preserved for so long as may be necessary for the prosecution or defense of any BMO Litigation Trust Assets, after which the BMO Litigation Trustee, upon any legally required notice, shall be authorized and empowered to abandon or destroy such books and records without further order of the Bankruptcy Court, in the BMO Litigation Trustee's discretion upon consent of the BMO Litigation Trust Committee.

The transfer of any and all BMO Litigation Trust Assets to the BMO Litigation Trust, including documents and other information gathered, and relevant work product developed, in connection with pending Claims and Causes of Action that are BMO Litigation Trust Assets shall be without waiver of any evidentiary privileges, including without limitation the attorney-client privilege, work-product privilege, or any other privilege or immunity attaching to any such documents or information (whether written or oral). Any and all attorney-client privilege, work-product privilege, or other privilege or immunity attaching to any documents or communications (whether written or oral) pertaining to the Claims and Causes of Action that are BMO Litigation Trust Assets shall be transferred to the BMO Litigation Trust and shall vest in the BMO Litigation Trustee, and the BMO Litigation Trust's receipt of transferred privileges shall be without waiver in recognition of the joint and/or successorship interest in prosecuting claims on behalf of the Debtors' Estates.

### 9.    Resignation of BMO Litigation Trustee

The BMO Litigation Trustee may resign by giving not less than thirty (30) days' prior written notice thereof to the BMO Litigation Trust Committee. The resignation will be effective on the latest of: (a) the date specified in the notice; (b) the date that is thirty (30) days after the date the notice is delivered; and (c) the date the successor BMO Liquidating Trustee accepts his

74

or her appointment as such. If a successor trustee is not appointed or does not accept its appointment within thirty (30) days following delivery of such notice of resignation, the BMO Litigation Trustee may file a motion with the Bankruptcy Court, upon notice and hearing, for the appointment of a successor trustee.

### 10.    Removal of BMO Litigation Trustee

The BMO Litigation Trustee may be removed (i) by unanimous vote of the BMO Litigation Trust Committee for any reason, or (ii) by the Bankruptcy Court, as determined by a Final Order after an opportunity for hearing, (a) for a material breach of the Plan or of the BMO Liquidating Trust Agreement, or (b) for cause, as that term is construed under Section 324(a) of the Bankruptcy Code.

Appointment of any subsequent BMO Litigation Trustees, shall be determined by majority vote of the BMO Litigation Trust Committee.

### 11.    Termination of the BMO Litigation Trust

Upon final resolution and liquidation of all BMO Litigation Trust Assets, reconciliation of all Claims, distribution of all Cash and proceeds of BMO Litigation Trust Assets, and any other action necessary under the Plan to wind down, terminate or dissolve the BMO Litigation Trust, as determined by the BMO Litigation Trustee and the BMO Litigation Trust Committee, the BMO Litigation Trustee and the BMO Litigation Trust Committee shall be relieved of further responsibility.

### 12.    Indemnification

The BMO Litigation Trust Agreement shall provide for reasonable and customary indemnification of, and appropriate insurance for, the BMO Litigation Trustee and the BMO Litigation Trust Committee and their members.

### 13.    Fees and Expenses of the BMO Litigation Trust

The BMO Litigation Trust Expenses and BMO Litigation Trust Litigation Fees and Expenses shall be paid from the BMO Litigation Trust Assets in accordance with the BMO Litigation Trust Agreement.

On the Effective Date, the Consolidated Debtors shall transfer to the BMO Litigation Trust $100,000 solely for payment of the BMO Litigation Trust Expenses. In the event that such $100,000 is exhausted, the PCI Liquidating Trust shall loan the BMO Litigation Trust, from time to time on an as needed basis, solely for the payment of BMO Litigation Trust Expenses, up to an aggregate of $150,000, at an interest rate of 7% per annum, to be repaid from the proceeds of BMO Litigation Trust Assets prior to any payment to Holders on account of their Allowed Class 3 General Unsecured Claims and on such other terms and conditions as mutually agreed to by the PCI Liquidating Trust and the BMO Litigation Trust. Members of the BMO Litigation Trust Committee shall receive no compensation, but shall be entitled to reimbursement for reasonable travel expenses and other reasonable out-of-pocket expenses.

### 14.    The Tax Treatment of BMO Litigation Trust

The BMO Litigation Trust generally is intended to be treated, for federal income Tax purposes, in part as a liquidating trust within the meaning of Treasury Regulations section 301.7701-4(d), for the benefit of the Holders of Allowed Class 3 General Unsecured Claims entitled to distributions of Pending Payments under the Plan and the BMO Litigation Trust Agreement, and otherwise as one or more disputed ownership funds within the meaning of Treasury Regulations section 1.468B- 9(b)(1), as more specifically provided for under the BMO Litigation Trust Agreement. Accordingly, for all federal income tax purposes the transfer of Trust Assets to the BMO Litigation Trust will be treated as: (a) to the extent of Pending Payments, a transfer of the Pending Payments directly from the Debtors to the Holders of such Allowed Class 3 General Unsecured Claims followed by the transfer of such Pending Payments by the Holders of Allowed Class 3 General Unsecured Claims to the BMO Litigation Trust in exchange for rights to Distributions from the BMO Litigation Trust; and (b) to the extent of amounts that are not Pending Payments, as a transfer to one or more disputed ownership funds. The Holders of Allowed Class 3 General Unsecured Claims entitled to Distributions of Pending Payments will be treated for federal income tax purposes as the grantors and deemed owners of their respective shares of the Trust Assets in the amounts of the Pending Payments and any earnings thereon. The BMO Litigation Trustee will be required by the BMO Litigation Trust Agreement to file federal tax returns for the BMO Litigation Trust as a grantor trust with respect to any Pending Payments and as one or more disputed ownership funds with respect to all other funds or other property held by the BMO Litigation Trust pursuant to applicable Treasury Regulations, and any income of the BMO Litigation Trust will be treated as subject to Tax on a current basis. The BMO Litigation Trust Agreement will provide that the BMO Litigation Trustee will pay such taxes from the BMO Litigation Trust Assets. In addition, the BMO Litigation Trust Agreement will require consistent valuation by the BMO Litigation Trustee and the Beneficiaries (as defined in the BMO Litigation Trust Agreement), for all federal income Tax purposes, of any property held by the BMO Litigation Trust. The BMO Litigation Trust Agreement will provide that termination of the trust will occur no later than five years after the Effective Date, unless before termination the Bankruptcy Court approves an extension based upon a finding that such an extension is necessary for the BMO Litigation Trust to complete its Claims resolution and liquidating purpose. The BMO Litigation Trust Agreement also will limit the investment powers of the BMO Litigation Trustee in accordance with IRS Rev. Proc. 94-45 and will require the BMO Litigation Trust to distribute at least annually to the Beneficiaries (as such may have been determined at such time) its net income (net of any payment of or provision for Taxes), except for amounts retained as reasonably necessary to maintain the value of the BMO Litigation Trust Assets or to meet Claims and contingent liabilities (including Disputed Claims).

### 15.    Third Party Litigation Support

#### (a)    Authority to Assist Creditors

The PCI Liquidating Trustee and PCI Liquidating Trust Committee and their advisors may, or at the direction of the PCI Liquidating Trust Committee shall, make reasonable efforts to assist a Creditor holding an Allowed Claim and prosecuting a Creditor Direct Claim. Such assistance shall be afforded solely upon the request of the Creditor and at such Creditor's sole

expense. The PCI Liquidating Trustee shall respond to any such request for access to documents or advisors within five (5) business days.

### (b)    Nature of Cooperation

The assistance authorized under Section 8.34(a) of the Plan shall include, but not be limited to (i) being available by telephone to answer questions either a Creditor holding an Allowed Claim and prosecuting a Creditor Direct Claim or their counsel may have and/or meeting on reasonable notice; (ii) promptly turning over to each other or their counsel any nonprivileged, nonconfidential documents or other materials that may related to any matter in which they are engaged; (iii) appearing for depositions, hearings or trials.

### (c)    Limitations on Assistance

The PCI Liquidating Trustee or the PCI Liquidating Trust Committee may reject any such request for assistance if in its judgment it would (i) impair or create a conflict with respect to Trust Claims currently being or to be brought for the benefit of the PCI Liquidating Trust or (ii) result in a waiver or breach of any applicable privileges or confidentiality obligation with any third party, (iii) require the PCI Liquidating Trustee to take a position in connection with a matter that is inconsistent with a position taken by the Chapter 11 Trustee in other proceedings, or (iv) prevent the PCI Liquidating Trustee, the PCI Liquidating Trust beneficiaries or the PCI Liquidating Trust Committee from complying with applicable law. Pursuit of litigation by a Creditor against a non-Debtor also being pursued for the benefit of the PCI Liquidating Trust shall not itself be considered a *per se* conflict unless such target is believed to have insufficient resources to satisfy both claims, in which case the PCI Liquidating Trust Committee may, in its sole discretion, require a proceeds sharing or cooperation agreement with such Creditor prior to provision of information, or reject the request for cooperation.

### (d)    Common Interest

Creditors provided assistance pursuant to the Plan, the LT Trustees, and the Liquidating Trust Committees have a common interest in such litigation, and communications among and between them and among and between their respective advisers relating to such litigation against non-Debtors shall be deemed privileged and confidential and without waiver of any evidentiary privileges, including without limitation the attorney-client privilege, work-product privilege or other privilege or immunity attaching to any such documents or information (whether written or oral).

## XI.    PROVISIONS REGARDING VOTING AND DISTRIBUTIONS UNDER THE PLAN

### A.    Nonconsensual Confirmation

If any Impaired Class of Claims entitled to vote shall not accept the Plan by the requisite statutory majorities provided in Section 1126(c) of the Bankruptcy Code, then the Plan Proponents reserve the right to amend the Plan or to undertake to have the Bankruptcy Court confirm the Plan under Section 1129(b) of the Bankruptcy Code, or both.

### B.      Disallowance of Claims

EXCEPT AS OTHERWISE AGREED, ANY AND ALL PROOFS OF CLAIM FILED AFTER THE APPLICABLE DEADLINE FOR FILING SUCH PROOFS OF CLAIM SHALL BE DEEMED DISALLOWED AND EXPUNGED AS OF THE EFFECTIVE DATE WITHOUT ANY FURTHER NOTICE TO, OR ACTION, ORDER OR APPROVAL OF THE BANKRUPTCY COURT, AND HOLDERS OF SUCH CLAIMS MAY NOT RECEIVE ANY DISTRIBUTIONS ON ACCOUNT OF SUCH CLAIMS, UNLESS SUCH LATE PROOF OF CLAIM IS DEEMED TIMELY FILED BY A FINAL ORDER OF THE BANKRUPTCY COURT. Nothing herein shall in any way alter, impair or abridge the legal effect of the Bar Date or the rights of the Debtors or the PCI Liquidating Trustee to object to Claims (except to the extent such claims are Allowed Claims) on the grounds that they are time barred or otherwise subject to disallowance, subordination or modification.

### C.      Deadline to Object to Claims

From and after the Effective Date, the PCI Liquidating Trustee shall have the exclusive right, subject to conferring with the PCI Liquidating Trust Committee, and to Section 8.10(c) of the Plan, to object to any Claims that are not Allowed Claims. Objections to Claims shall be Filed and served upon each affected Creditor no later than one hundred-eighty (180) days after the Effective Date; provided, however, that this deadline may be extended by the Bankruptcy Court upon motion of the PCI Liquidating Trustee Filed with the Bankruptcy Court before such date, with notice to the United States Trustee, the PCI Liquidating Trust Committee and each affected Creditor.

### D.      Litigation of Claims

Subject to the terms of the Plan, objections to Claims may be litigated to judgment, settled, or withdrawn.

### E.      Distributions for Claims Allowed as of the Effective Date

Except as otherwise provided in the Plan, distributions to be made on the Initial Distribution Date to Holders of Claims that are Allowed Claims as of the Effective Date shall be deemed made on the Effective Date if made on the Effective Date or as promptly thereafter as practicable, but in any event no later than 60 days after the Effective Date. Creditors holding Disputed Claims as of the Effective Date shall be entitled to no distributions on the Initial Distribution Date.

### F.      Distribution of Disputed Claims

Distributions with respect to and on account of Disputed Claims will be made from the PCI Liquidating Trust, and from the BMO Litigation Trust subject to monetization of BMO Litigation Trust Assets, as soon as practicable after an order, judgment, decree or settlement agreement with respect to such Claim becomes a Final Order and such Claim becomes an Allowed Claim, and the applicable Creditor shall not receive interest on its Allowed Claim. Any Claim that is disallowed by order of the Bankruptcy Court prior to the Effective Date shall be deemed expunged (to the extent not already expunged) as of the Effective Date without the

78

necessity for further Bankruptcy Court approval and the Holder of any such Claim shall not be entitled to any distribution under the Plan.

### G.    Disputed Claims Reserve

The LT Trustees shall reserve amounts (the "Disputed Claims Reserve"), to be determined by the PCI Liquidating Trust Committee, from the Cash on hand on the Effective Date equal to the aggregate amounts that would have been distributed to the Holders of Disputed Claims, had their Disputed Claims been deemed Allowed Claims on the Effective Date or on the Administrative Claims Bar Date, as applicable, or such other amount as may be approved by the Bankruptcy Court upon motion of the Chapter 11 Trustee or PCI Liquidating Trustee. For effectuating the provisions of this Section, the Chapter 11 Trustee, the PCI Liquidating Trustee, the Creditors' Committee, or the PCI Liquidating Trust Committee, as applicable, may at any time request that the Bankruptcy Court estimate, set, fix, or liquidate the amount of the Disputed Claims pursuant to Section 502(c) of the Bankruptcy Code, in which event the amounts so estimated, fixed, or liquidated shall be deemed the amounts of the Disputed Claims for purposes of the amount of the Disputed Claims Reserve.

With respect to any Disputed Class 3 General Unsecured Claims, the BMO Litigation Trustee shall maintain a Disputed Claims Reserve consistent with the Disputed Claims Reserve maintained by the PCI Liquidating Trustee for such Disputed Class 3 General Unsecured Claims.

With respect to such Disputed Claims, if, when, and to the extent any such Disputed Claim becomes an Allowed Claim by Final Order, the relevant portion of the Cash reserved for the Disputed Claims Reserve shall be distributed by the PCI Liquidating Trustee to the Claim Holder in accordance with the Plan, and, if such Claim is a Class 3 General Unsecured Claim, from the BMO Litigation Trust subject to monetization of BMO Litigation Trust Assets, and the Disputed Claims Reserve for such Claim shall be released.

### H.    Distribution Record Date

The Effective Date shall serve as the record date for distributions from the PCI Liquidating Trust. The interests of Holders of Allowed Claims in the Liquidating Trusts shall not be transferrable except as and to the extent permitted in the PCI Liquidating Trust Agreement. The LT Trustees shall have no obligation to recognize any transfer of any Claim or Equity Security occurring after the Effective Date and not permitted under the PCI Liquidating Trust Agreement but shall make reasonable efforts to recognize any such transfer that is permitted under the PCI Liquidating Trust Agreement. The LT Trustees shall be entitled to recognize and deal for all purposes under the Plan and the PCI Liquidating Trust Agreement only with those record Holders stated on the ledgers or other applicable books and records of the Debtors and the PCI Liquidation Trust.

### I.    Means of Cash Payments

Except as otherwise specified herein, cash payments made pursuant to the Plan to Holders of Claims shall be in U.S. currency by checks drawn on a domestic bank selected by the

respective LT Trustee, or, at the option of the respective LT Trustee, by wire transfer from a domestic bank.

### J.    Reserve for Professional Fee Claims

On the Effective Date, the PCI Liquidating Trustee, in consultation with the PCI Liquidating Trust Committee, shall establish and maintain reserves for payment of estimated unpaid Professional Fee Claims ("Professional Fee Reserve"). For purposes of establishing the Professional Fee Reserve, Cash will be set aside from the Cash on hand on the Effective Date in an amount equal to the amount that the Chapter 11 Trustee and Creditors' Committee anticipate will be incurred for fees and expenses by Professionals retained in the Bankruptcy Cases up to and including the Effective Date. If, when, and to the extent any such Professional Fee Claims become Allowed Claims by Final Order, the relevant portion of the Cash held in reserve therefor shall be distributed by the PCI Liquidating Trustee to the Professional or as set forth in such Final Order approving the Professional Fee Claim. To the extent that the Professional Fee Reserve is not sufficient to satisfy the Allowed Professional Fee Claims, such Claims will be satisfied from Trust Assets. No payments or distributions shall be made with respect to a Professional Fee Claim until such Professional Fee Claim is Allowed by Final Order..

### K.    Estimation of Claims

The PCI Liquidating Trustee may, at any time, request that the Bankruptcy Court estimate any contingent or unliquidated Claim pursuant to Section 502(c) of the Bankruptcy Code regardless of whether an objection has been Filed with respect to such Claim. If the Bankruptcy Court estimates any contingent or unliquidated Claim, the estimated amount will constitute either the Allowed Claim for such Claim or a maximum limitation on such Claim, at the option of the PCI Liquidating Trustee, after consultation with the PCI Liquidating Trust Committee. If the estimated amount constitutes a maximum limitation on such Claim, the PCI Liquidating Trustee may elect to pursue any supplemental proceedings to object to the allowance and ultimate distribution on such Claim. Unless otherwise ordered by the Bankruptcy Court, resolution or compromise of estimated Claims shall be done pursuant to the Plan. All Claims objection, estimation and resolution procedures are cumulative and not exclusive of one another.

### L.    Delivery of Distributions

Subject to Bankruptcy Rule 9010, all distributions to any Holder of an Allowed Claim shall be made at the address of such Holder as set forth in the Schedules, on the books and records of the Debtors or their agents, or in a letter of transmittal, unless the Debtors or the respective LT Trustee, as the case may be, have been notified in writing by the applicable Holder of a change of address, including by the Filing of a proof of claim by such Holder different from the address reflected on the Schedules for such Holder.

### M.    Unclaimed Distributions

#### 1.    Undeliverable Distributions

In the event that any distribution to any Holder of an Allowed Claim is returned as undeliverable, no further distributions shall be made to such Holder unless and until the

80

respective LT Trustee is notified of such Holder's then-current address. If any Holder of an Allowed Claim does not assert a claim pursuant to the Plan for an undeliverable or unclaimed distribution for a period of ninety (90) days after it has been delivered (or attempted to be delivered) in accordance with the Plan to the Holder of an Allowed Claim entitled thereto, such unclaimed property shall be deemed to be forfeited by such Holder, whereupon all right, title and interest in and to the unclaimed property shall be held by the respective LT Trustee for the benefit of its respective trust beneficiaries, and any Holder thereof shall be forever barred, estopped and enjoined from asserting any such Claim against the Debtors, the Estates, the Property, the Liquidation Trusts or the respective LT Trustee. In such cases, any Cash or other property otherwise reserved for undeliverable or unclaimed distributions shall become Property of the respective Liquidating Trust free and clear of any restrictions thereon and notwithstanding any federal or state escheatment laws to the contrary and shall be distributed in accordance with the terms of the respective Liquidating Trust Agreement and the Plan to the other Holders of Allowed Class 3 General Unsecured Claims on a Pro Rata basis (subject to the terms and conditions of the Plan and the respective Liquidating Trust Agreement with respect to minimum distributions or otherwise). Nothing contained in the Plan or otherwise shall require any of the Debtors, the Chapter 11 Trustee or an LT Trustee to attempt to locate any Holder of an Allowed Claim.

### 2.        Time Bar to Cash Payments

In the event that any distribution to any Holder of an Allowed Claim made by check is not cashed within sixty (60) days after issuance thereof, a stop payment order shall be given with respect to such check rendering the check null and void. Requests for reissuance of any check subject to a stop payment order shall be made in writing to the respective LT Trustee by the Holder of such Allowed Claim to whom such check originally was issued. Any claim in respect of such voided check shall be made on or before thirty (30) days after the sixty (60) day period following the date of issuance of such check. If any Holder of an Allowed Claim does not assert a claim pursuant to the Plan for reissuance of a voided check within such period, the amount represented by such voided check shall be deemed to be forfeited by such Holder, whereupon all right, title and interest in and to such amount shall be held by the respective LT Trustee, and any Holder thereof shall be forever barred, estopped and enjoined from asserting any such Claim against the Debtors, the Estates, the Property, the Liquidation Trusts or the respective LT Trustee. In such cases, any Cash or other Property otherwise reserved for such distributions shall become Property of the Liquidating Trust free and clear of any restrictions thereon and notwithstanding any federal or state escheatment laws to the contrary and shall be distributed in accordance with the terms of the Liquidating Trust Agreement and the Plan to the other Holders of Allowed Class 3 General Unsecured Claims on a Pro Rata basis (subject to the terms and conditions of the Plan and the respective Liquidating Trust Agreement with respect to minimum distributions or otherwise).

### N.        Withholding Taxes

(a).        Any federal, state, or local withholding taxes or other amounts required to be withheld under applicable law shall be deducted from distributions hereunder. All Holders of Allowed Claims or Allowed Equity Securities shall be required to provide any information necessary to effect the withholding of such taxes. To the

81

extent that any Claim Holder or Equity Security Holder fails to submit appropriate certifications required by an LT Trustee or to comply with any other mechanism established by the respective LT Trustee to comply with Tax withholding requirements, such Claim Holder's or Equity Security Holder's distribution may, in the exercise of the respective LT Trustee's reasonable discretion, be deemed undeliverable.

(b).    Notwithstanding any other provision of the Plan, each Entity receiving a distribution pursuant to the Plan shall have sole and exclusive responsibility for the satisfaction and payment of any Tax obligations imposed on it by any governmental unit on account of such distribution, including income, withholding and other Tax obligations.

(c).    In connection with the Plan, an LT Trustee may allocate and make distributions in compliance with applicable wage garnishment, alimony, child support and similar domestic relations orders.

## O.    Fractional Cents

Any other provision of the Plan to the contrary notwithstanding, no payment of fractions of cents will be made. Whenever any payment of a fraction of a cent would otherwise be called for, the actual payment shall reflect a rounding down of such fraction to the nearest whole cent.

## P.    De Minimis Distributions

The LT Trustee shall not be required to make any payment of less than twenty-five dollars ($25.00) with respect to any Allowed Claim. To the extent that any interim distribution is not paid to an Allowed General Unsecured Creditor on the grounds that it amounts to less than twenty-five dollars ($25.00), the amount of such withheld distribution shall be reserved for addition to any future distribution or as the final distribution to such Creditor, and may be made at that time if the total distribution is at least twenty-five dollars ($25.00).

## Q.    Setoffs

Nothing in the Plan shall expand or enhance a Creditor's right of setoff, which shall be determined as of the applicable Petition Date. Nothing in the Plan is intended to, or shall be interpreted to, approve any Creditor's effectuation of a post-petition setoff without the consent of the Debtors unless prior Bankruptcy Court approval has been obtained. Except as otherwise provided for herein with respect to Causes of Action released by or on behalf of the Estates pursuant to the Plan and the Confirmation Order, an LT Trustee may, but shall not be required to, set off, pursuant to Section 553 of the Bankruptcy Code or applicable nonbankruptcy law, against any Claim and the payments to be made pursuant to the Plan in respect of such Claim, Causes of Action of any nature whatsoever that the Estates may have against the Holder of such Claim, but neither the failure to do so nor the allowance of a Claim shall constitute a waiver or release by the Debtors or their Estates of any Claim it may have against the Creditor.

82

## XII.    CONFIRMATION AND EFFECTIVENESS OF THE PLAN

### A.    Confirmation of the Plan

The Plan can be confirmed under Section 1129(a) of the Bankruptcy Code, or in a non-consensual manner under Section 1129(b) of the Bankruptcy Code.

### B.    Conditions to Confirmation

The following shall be conditions to Confirmation unless such conditions shall have been duly waived pursuant to Section 10.4 of the Plan:

1.    The Bankruptcy Court shall have entered the Confirmation Order in form and substance satisfactory to the Plan Proponents and, with respect to matters affecting its treatment hereunder, Interlachen.

2.    All exhibits to the Plan are in the form and substance reasonably satisfactory to the Plan Proponents and, with respect to matters affecting its treatment hereunder, Interlachen.

### C.    Conditions to the Effective Date

The following shall be conditions precedent to the Effective Date unless such conditions shall have been duly waived pursuant to Section 10.4 of the Plan:

1.    The Liquidating Trust Agreements shall have been executed.

2.    All documents to be executed, delivered, or Filed pursuant to the Plan, shall have been executed, delivered, or Filed, as the case may be.

3.    All actions, authorizations, filings, consents and regulatory approvals required (if any) shall have been obtained, effected or executed in a manner acceptable to the Plan Proponents and, with respect to matters affecting its treatment hereunder, Interlachen, and shall remain in full force and effect.

### D.    Waiver of Conditions

The Plan Proponents, acting unanimously and in writing, may at any time, without notice or authorization of the Bankruptcy Court, waive one or more of the conditions set forth in Sections [10.2 and 10.3] of the Plan.

### E.    Effect of Failure of Conditions

In the event that the conditions specified in Section 10.3 of the Plan have not occurred or been waived in accordance with Section 10.4 of the Plan on or before thirty (30) days after the Confirmation Date, upon written notification submitted by all of the Plan Proponents to the Bankruptcy Court in their sole discretion: (i) the Confirmation Order shall be vacated; (ii) no distributions under the Plan shall be made; (iii) the Debtors and all Holders of Claims and Equity

83

Securities shall be restored to the *status quo ante* as of the day immediately preceding the Confirmation Date as though the Confirmation Date had never occurred; (iv) the Estates' obligations with respect to the Claims and Equity Securities shall remain unchanged; and (v) nothing contained in the Plan shall constitute or be deemed to be an admission with respect to any matter set forth herein or a waiver or release of any Claims or Equity Securities by or against the Debtors, or any other Person, to prejudice in any manner the rights of the Debtors, the Estates or any Entity in any further proceedings involving the Debtors.

### F.    Limitation of Rights; Injunction

Pursuant to Sections 1123(b)(3) and 1141(d)(3) of the Bankruptcy Code, confirmation will not discharge Claims against the Debtors; provided, however, that no Holder of a Claim against or Equity Interest in the Debtors may, on account of such Claim or Equity Security, seek or receive any payment or other distribution from, or seek recourse against the Released Parties, the Retained Assets, or the Trust Assets, except for distributions under the Plan. ***Accordingly, except as otherwise specifically provided in the Plan or the Confirmation Order, all Entities who have held, hold, or may hold Claims, rights or Causes of Action against or Equity Securities in the Debtors, other than governmental entities and agencies exercising their police or regulatory powers, are precluded and permanently enjoined from taking any of the following actions against the Covered Parties, the Estates, the Retained Assets, the Liquidating Trusts, or any Trust Assets on account of any such Claims or Equity Securities, whether or not such Person is the Holder of a Claim that is Impaired or Allowed and whether or not such Person has affirmatively voted to accept the Plan: (A) commencing or continuing, in any manner or in any place, any claim, action or other proceeding of any kind (whether directly, indirectly, derivatively or otherwise); (B) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order; (C) creating, perfecting, or enforcing any Lien or encumbrance of any kind; (D) the assertion of any Claims released in or by the Plan; and (E) commencing or continuing in any manner or in any place, any action that does not comply with or is inconsistent with the provisions of the Plan***; provided, however, that (x) nothing contained herein shall preclude such Persons from exercising their rights pursuant to and consistent with the terms of the Plan, and (y) any rights of setoff or recoupment, to the extent valid, are preserved, and (z) except as otherwise provided in the Plan, no Holder of any Claim or Equity Security shall be deemed to have released the Debtors in any way for accepting the terms of the Plan or accepting distributions pursuant to the Plan.

### G.    Binding Effect

On and after the Effective Date, the provisions of the Plan shall bind any current or former Holder of a Claim against, or Equity Security in, any of the Debtors and their respective heirs, successors and assigns, whether or not the Claim or Equity Security of such Holder is Impaired or allowed and whether or not such Holder has affirmatively voted to accept the Plan.

### H.    Substantial Consummation

On the Effective Date and upon the transfer of the Contributed Assets to the Liquidating Trusts, the Plan shall be deemed to be substantially consummated under Section 1101 and Section 1127(b) of the Bankruptcy Code.

### I.        Notice of Effective Date

On the Effective Date, or as soon thereafter as is reasonably practicable, the PCI Liquidating Trustee shall File with the Bankruptcy Court a "Notice of Effective Date" in a form reasonably acceptable to the  Plan Proponents, which notice shall constitute appropriate and adequate notice that the Plan has become effective. Failure to timely file the notice shall not in any way affect the effectiveness of the Plan.

### J.        Request for Waiver of Stay of Confirmation Order

The Plan shall serve as a motion seeking a waiver of the stay of the Confirmation Order imposed by Bankruptcy Rule 3020(e). Any objection to this request for waiver shall be Filed with the Bankruptcy Court and served in accordance with the Bankruptcy Rules or as otherwise ordered by the Bankruptcy Court. In the event any such objections are timely Filed, a hearing with respect thereto shall occur at the Confirmation Hearing.

## XIII.    RETENTION OF JURISDICTION

Following the Confirmation Date and until such time as all payments and distributions required to be made and all other obligations required to be performed under the Plan have been made and performed by the LT Trustee or the Liquidating Trust Committees or the Plan Proponents, the Bankruptcy Cases will remain open pending final order of the Bankruptcy Court closing the case and the Bankruptcy Court shall retain jurisdiction to the fullest extent as is legally permissible, including jurisdiction for the following purposes:

(a).    Claims and Equity Securities. To hear and determine the allowance, classification, priority, estimation or subordination of Claims or Equity Securities, including the resolution of any and all objections by the Chapter 11 Trustee or the PCI Liquidating Trustee or any other party in interest;

(b).    Causes of Action. To hear, determine and adjudicate on *a non-exclusive basis*, any and all Trust Claims and BMO Litigation Trust Assets;

(c).    Injunction. To issue injunctions or take such other actions or make such other orders as may be necessary or appropriate to restrain interference with the Plan or its execution or implementation by any Person, to construe and to take any other action to enforce and execute the Plan, the Confirmation Order, or any other order of the Bankruptcy Court, to issue such orders as may be necessary for the implementation, execution, performance and consummation of the Plan and all matters referred to herein, and to determine all matters that may be pending before the Bankruptcy Court in the Bankruptcy Cases on or before the Effective Date with respect to any Entity;

(d).    Professional Fees. To hear and determine any and all applications for allowance of compensation and expense reimbursement of Professionals for periods before the entry of the Confirmation Order, and to resolve disputes concerning Liquidating Trust Expenses, as provided for in the Plan;

85

(e).    <u>Certain Priority Claims.</u> To hear and determine the allowance and classification of any Priority Tax Claims, Administrative Claims or any request for payment of an Administrative Claim;

(f).    <u>Dispute Resolution.</u> To hear and resolve any dispute arising under or related to the implementation, execution, consummation, interpretation or enforcement of the Plan, Confirmation Order, or Liquidating Trust Agreements and the making of distributions hereunder and thereunder or any agreement, instrument or other document governing or relating to any of the foregoing;

(g).    <u>Executory Contracts and Unexpired Leases.</u> To hear and determine any and all motions for the rejection, assumption, or assignment of Executory Contracts or Unexpired Leases, and to determine the allowance of any Claims resulting from the rejection of Executory Contracts and Unexpired Leases;

(h).    <u>Actions.</u> To hear determine all applications, motions, adversary proceedings (including the Avoidance Actions), contested matters, actions, and any other litigated matters instituted in the Bankruptcy Cases on behalf of the Debtors, including, but not limited to, the Causes of Action commenced by the Chapter 11 Trustee or an LT Trustee, and any remands;

(i).    <u>General Matters.</u> To hear and determine such other matters, and for such other purposes, as may be provided in the Confirmation Order or as may be authorized under provisions of the Bankruptcy Code;

(j).    <u>Plan Modification.</u> To modify the Plan under Section 1127 of the Bankruptcy Code, remedy any defect, cure any omission, or reconcile any inconsistency in the Plan or the Confirmation Order so as to carry out its intent and purposes;

(k).    <u>Aid Consummation.</u> To issue such orders in aid of consummation of the Plan and the Confirmation Order notwithstanding any otherwise applicable non-bankruptcy law, with respect to any Entity, to the full extent authorized by the Bankruptcy Code;

(l).    <u>Settlements</u>. To hear and determine any matters concerning the enforcement of the provisions of Article [V] of the Plan and any other releases, exculpations, limitations of liability or injunctions set forth in and contemplated by the Plan or settlements entered into by the Chapter 11 Trustee and any Person in the Bankruptcy Cases;

(m).    <u>Protect Property.</u> To protect the Property of the Estates and Property transferred to the PCI Liquidating Trust pursuant to the Plan from adverse Claims or interference inconsistent with the Plan, including to hear actions to quiet or otherwise clear title to such property based upon the terms and provisions of the Plan or to determine a purchaser's exclusive ownership of Claims and Causes of actions retained and preserved under the Plan;

(n).  <u>Abandonment of Property.</u> To hear and determine matters pertaining to abandonment of Property of the Estates or the PCI Liquidating Trust;

(o).  <u>Taxes</u>. To hear and determine matters concerning state, local and federal taxes in accordance with Sections 346, 505 and 1146 of the Bankruptcy Code, including any Disputed Claims for taxes and matters with respect to any taxes payable by the Debtors, the Liquidating Trusts or any other trust or reserve as may be established in furtherance of the Plan or the Liquidating Trust Agreements;

(p).  <u>Implementation of Confirmation Order.</u> To enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified or vacated;

(q).  <u>Liquidating Trustee's Exercise of Power.</u> To enter and implement such orders as may be appropriate to enforce the terms of the Plan or the Liquidating Trust Agreements in order to resolve any disagreement between an LT Trustee and the relevant Liquidating Trust Committee over any exercise of powers;

(r).  <u>Other Matters</u>. To determine any other matters contemplated by the Plan to the Bankruptcy Court after the Effective Date; and

(s).  <u>Close the Bankruptcy Cases</u>. To enter any Final Order closing the Bankruptcy Cases.

## XIV.   MISCELLANEOUS PROVISIONS

### A.   Dissolution of Creditors' Committee

On the Effective Date, the Creditors' Committee, except as set forth below, will dissolve and the voting and non-voting members thereof will be released and discharged from all duties and obligations arising from or related to the Bankruptcy Cases. Notwithstanding the foregoing, other than with respect to the incurrence of PCI Liquidating Trust Expenses, (a) the Professionals retained by the Creditors' Committee will not be entitled to assert Professional Fee Claims for services rendered or expenses incurred after the Effective Date, except for fees for time spent and expenses incurred (i) in connection with any application for allowance of compensation and reimbursement of expenses pending on the Effective Date or Filed and served after the Effective Date pursuant to Section 3.5 of the Plan, and (ii) in connection with any appeal of the Confirmation Order or any other appeal pending as of the Effective Date; and (b) all obligations arising under confidentiality agreements, joint or common interest agreements and protective orders entered during the Chapter 11 Cases shall remain in full force and effect according to their terms.

### B.   Termination of Trustees' Service

On the Effective Date, the service of the Chapter 11 Trustee in each of the Chapter 11 Cases and for each of the PCI and PGW Estates, solely in his capacity as such, and the service of Randall L. Seaver, solely in his capacity as Chapter 7 Trustee for the Petters Capital Estate, shall terminate.

87

### C. Fee Claims of the Chapter 11 Trustee, the Chapter 7 Trustee, and Professionals Retained by Either of Them

#### 1. Pre-Effective Date Fees; Deemed Distribution

The Cash contribution from the Estates to the PCI Liquidating Trust pursuant to the Plan shall be deemed to be a distribution to Creditors for purposes of Section 326 of the Bankruptcy Code. The Chapter 11 Trustee shall submit a final fee application for review by the Creditor Proponents prior to submission to the Court. If the Chapter 11 Trustee and the Creditor Proponents are unable to agree on the final fee application, the Chapter 11 Trustee may seek Court approval, disclosing the objection of the Creditor Proponents in the application.

#### 2. Post-Effective Date Fees

Other than with respect to the incurrence of PCI Liquidating Trust Expenses, the Chapter 11 Trustee, solely in his capacity as such, the Chapter 7 Trustee, solely in his capacity as such, and Professionals retained by the Chapter 11 Trustee or by the Chapter 7 Trustee will not be entitled to assert any Professional Fee Claims for any services rendered or expenses incurred after the Effective Date, except for fees for time spent and expenses incurred (a) in connection with preparing and filing any application for allowance of compensation and reimbursement of expenses pending on the Effective Date or Filed and served after the Effective Date pursuant to Section 3.5 of the Plan, (b) in connection with any appeal of the Confirmation Order or any other appeal pending as of the Effective Date and (c) at the request of the Liquidating Trust Committees.

### D. Pre-Confirmation Modification

On notice to and with an opportunity to be heard by the United States Trustee, the Plan may be altered, amended or modified by the Plan Proponents before the Confirmation Date as provided in Section 1127 of the Bankruptcy Code; provided, however, that any alteration, amendment or modification shall be subject to the unanimous written consent of each of the Plan Proponents.

### E. Post-Confirmation Immaterial Modification

With the approval of the Bankruptcy Court and on notice to and an opportunity to be heard by the United States Trustee or the PCI Liquidating Trust Committee and without notice to all Holders of Claims and Equity Securities, the Plan Proponents or the PCI Liquidating Trustee or PCI Liquidating Trust Committee may, insofar as it does not materially and adversely affect the interest of Holders of Claims, correct any defect, omission or inconsistency in the Plan in such manner and to such extent as may be necessary to expedite consummation of the Plan.

### F. Post-Confirmation Material Modification

On notice to and with an opportunity to be heard by the United States Trustee and the PCI Liquidating Trust Committee, the Plan may be altered or amended after the Confirmation Date by the Plan Proponents, the PCI Liquidating Trustee, or PCI Liquidating Trust Committee in a manner which, in the opinion of the Bankruptcy Court, materially and adversely affects

DOCS-#4870937-v21

Holders of Claims; provided, however, that such alteration or modification is made after a hearing and otherwise meets the requirements of Section 1127 of the Bankruptcy Code; provided, further, however, that any alteration or amendment by the Plan Proponents or the PC Liquidating Trustee shall be subject to the unanimous written consent of each of the Plan Proponents and the PCI Liquidating Trustee.

## G.    Modifications Generally

Any references to any change, option, consent, waiver, right, reservation or action that may be required or may be taken with respect to the Plan by the Plan Proponents (including those contained in Sections 10.2, 10.4,, 12.4, 12.5, 12.6, 12.7,  and 12.23 of the Plan) shall require the unanimous written consent of each Entity that is a Plan Proponent. Any immaterial effectuating provision of the Plan may be interpreted by the applicable LT Trustee in a manner that is consistent with the overall purpose and intent of the Plan without further order of the Bankruptcy Court.

## H.    Withdrawal or Revocation of the Plan

The Plan Proponents, acting together and unanimously, reserve the right to revoke or withdraw the Plan prior to the Confirmation Date. If the Plan Proponents revoke or withdraw the Plan, or if the Plan is not Confirmed, then the Plan shall be deemed null and void, and shall be deemed an offer of settlement inadmissible as evidence on any issue proposed to be compromised in the Plan and nothing contained in the Plan will: (1) constitute a waiver or release of any Claims by or against, or any Equity Securities in, the Debtors or constitute or be deemed an admission with respect to any claim or defense or any matter set forth herein; or (2) prejudice in any manner the rights of any party.

## I.    Payment of Statutory Fees

All fees payable pursuant to Section 1930 of Title 28 of the United States Code shall be paid by the Chapter 11 Trustee on the Effective Date (if due) or when otherwise due out of the reserve set aside on the Effective Date by the PCI Liquidating Trustee to fund PCI Liquidating Trust Expenses.

## J.    Successors and Assigns

The rights, benefits and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of, the heirs, executors, administrators, successors and/or assigns of such Entities.

## K.    Term of Injunctions or Stays

Unless otherwise provided in the Plan, all injunctions or stays arising under or entered during the Bankruptcy Cases under Sections 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Bankruptcy Cases are closed; provided; however, that, with respect to Claims of the Promissory Note Lenders sounding in fraudulent transfer under state law, for so long as such stay is extended and applicable to such Claims, the applicable statute of limitations for such Claims shall continue

89

to be tolled to the fullest extent permitted pursuant to applicable state law; _provided_, _further_, _however_, that, if any Avoidance Actions pursued by the PCI Liquidating Trustee are dismissed pursuant to a Final Order or withdrawn, all injunctions or stays arising under or entered during the Bankruptcy Cases under Sections 105 or 362 of the Bankruptcy Code, shall be deemed to have been lifted with respect thereto and such claims may be pursued by Promissory Note Lenders directly without further order of the Bankruptcy Court.

### L.    Termination of Cases

In connection with the substantive consolidation provided for herein, the Petters Capital Chapter 7 Case shall be terminated on the Effective Date. The Petters Capital Chapter 7 Trustee shall have an Allowed Administrative Expense Claim in an amount agreed upon with the Plan Proponents, which amount shall be based on the Petters Capital Chapter 7 Trustee's contribution to the Estates. The Plan will serve as the motion for allowance of such Allowed Administrative Expense Claim. See Section 3.5 of the Plan.

Solely for administrative convenience, and in view of the substantive consolidation provided for hereunder, upon the Effective Date, pursuant to Sections 105(a) and 350(a) of the Bankruptcy Code, all of the Chapter 11 Cases other than PCI's and PGW's Chapter 11 Case (the "Terminated Cases") shall be closed without any substantive or procedural effect; _provided_, _however_, that, any filings that would otherwise be made in the Terminated Cases shall be made in PCI's Chapter 11 Case as if the Terminated Cases remained open. The foregoing shall not restrict an LT Trustee's ability to terminate PCI's and PGW's Chapter 11 Case when the Bankruptcy Cases are fully administered, with the consent of the PCI Liquidating Trust Committee.

### M.    Exculpation

**As of the Effective Date, the Covered Parties shall neither have nor incur any liability for any Covered Claims to any Entity, including any Holder of a Claim or Equity Security, the Debtors, or their former shareholders, members, directors, officers, employees, agents, and professionals, the Liquidating Trusts, an LT Trustee, the Liquidating Trust Committees or any other party in interest; _provided_, _however_, that the foregoing provisions of Section 12.13 of the Plan shall have no effect on the liability of any Covered Party that would otherwise result from (a) the failure to perform or pay any obligation or liability under the Plan or any contract, instrument, release or other agreement or document to be entered into or delivered in connection with the Plan; or (b) any such act or omission to the extent that such act or omission is determined in a Final Order to have constituted willful misconduct.**

### N.    Releases by the Estates

**Without limiting any other applicable provisions of, or releases contained in, the Plan, as of the Effective Date the Debtors, on behalf of themselves and their affiliates, the Estates and their respective successors and assigns and any and all Entities who may purport to claim through them, shall forever release, waive and discharge all Covered Claims whether known or unknown, foreseen or unforeseen, existing or hereafter arising,**

in law, equity or otherwise that the Debtors or the Estates, would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of any Holder of any Claim or other Entity, that they have, had or may have against any Covered Party; provided, however, that the foregoing provisions of Section 12.14 of the Plan shall have no effect on the liability of any Covered Party that would otherwise result from (a) the failure to perform or pay any obligation or liability under the Plan or any contract, instrument, release or other agreement or document to be entered into or delivered in connection with the Plan; or (b) any such act or omission to the extent that such act or omission is determined in a Final Order to have constituted willful misconduct.

### O.      Preservation of Rights

Nothing in the Plan releases or is intended to release any of the Debtors, or any Person who at any time before September 24, 2008 was a shareholder, member, director, officer, employee, agent, or professional of any of the Debtors or any joint or consecutive tortfeasors, and no provision of the Plan shall be deemed or implied to release any such persons or entities from any Claims, Causes of Action, or obligations of any kind or nature whatsoever, including any Creditor Direct Claims. The Plan specifically contemplates that any Creditor may prosecute or continue to prosecute without limitation all Creditor Direct Claims against any parties, subject to the limitations provided in Sections 12.13 or 12.14 of the Plan.

### P.      Extinguishment of Liens

On the Effective Date, all Liens against any property of the Debtors, except to the extent provided in the Plan or the Confirmation Order, shall be deemed forever extinguished, released and discharged.

### Q.      Substantial Contribution

In light of the time, effort, and expense the Lancelot Trustee, Palm Beach Trustee, Interlachen, and Greenpond have expended in drafting and prosecuting the Plan and related documents for the benefit of the Estates, each shall be afforded an Allowed Administrative Expense Claim, not to exceed $300,000 each, for the amount of its reasonable costs and expenses incurred in connection solely with the foregoing activities, as a substantial contribution pursuant to section 503(b)(3)(D) and 503(b)(4) of the Bankruptcy Code.

### R.      Consent to Transfer

On the Effective Date, the prior transfer of the Claims of Asset Based Resource Group, LLC, Acorn Capital Group, LLC *et al.*, Allowed by the Bankruptcy Court's order dated February 9, 2011, to Greenpond is deemed consented to by the Chapter 11 Trustee.

### S.      Governing Law

Except to the extent that the Bankruptcy Code is applicable, the rights and obligations arising under the Plan shall be governed by and construed and enforced in accordance with the laws of the State of Minnesota, without reference to Minnesota's conflict of laws rules that would result in the application of law of another jurisdiction.

**T.      Notices**

Any notice required or permitted to be provided under the Plan shall be in writing and served by either (a) first class mail, (b) hand delivery, or (c) reputable overnight delivery or courier service, freight prepaid, to be addressed as follows:

**If to the Chapter 11 Trustee, the PCI Liquidating Trustee, the BMO Litigation Trustee, or the Estates:**

Douglas A. Kelley
431 South Seventh Street
Suite 2530
Minneapolis, MN 55414

with a copy to:

James A. Lodoen
George H. Singer
Lindquist & Vennum LLP
4200 IDS Center
80 S 8th Street
Minneapolis, MN 55402

**If to the Petters Capital Chapter 7 Trustee:**
Randall L. Seaver
12400 Portland Avenue South
Suite 132
Burnsville, MN 55337

with a copy to:

Jennifer Lurken
Gislason & Hunter LLP
Landkamer Building, Suite 200
124 East Walnut Street
P.O. Box 4157
Mankato, MN 56002-4157

**If to the Creditors' Committee,    the PCI Liquidating Trust Committee, or the Lancelot Trustee:**

Ronald R. Peterson
Jenner & Block LLP
353 N. Clark Street
Chicago, IL 60654-3456

with a copy to:

Richard Levin
Jenner and Block LLP
919 Third Avenue
New York, NY 10022-3908

**If to the Palm Beach Trustee:**

Barry E. Mukamal
One SE 3rd Avenue, Suite 2150
Miami, FL 33131

with a copy to:

Michael S. Budwick
Solomon B. Genet
Peter D. Russin
Meland Russin & Budwick, P.A.
3200 Southeast Financial Center
200 South Biscayne Blvd
Miami, FL 33131

**If to Greenpond:**

Michael L. Stern
Stonehill Capital Management LLC
885 Third Avenue
30th Floor
New York, NY 10022-4834

with a copy to:

Benjamin I. Finestone
Quinn Emanuel Urquhart & Sullivan LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010

93

### U.      Saturday, Sunday or Legal Holiday

If any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

### V.      Section 1146 Exemption

Pursuant to Section 1146(a) of the Bankruptcy Code, the transfer of any Property under the Plan or the making or delivery of any instrument of transfer pursuant to, in implementation of, or as contemplated by, the Plan or the revesting, transfer or sale of any real or personal property of the Debtors pursuant to, in implementation of, or as contemplated by, the Plan shall not be taxed under any state or local law imposing a stamp tax, transfer tax or similar tax or fee.

### W.      Severability

If any term or provision of the Plan is held by the Bankruptcy Court prior to or at the time of Confirmation to be invalid, void or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as so altered or interpreted. In the event of any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan may, at the Plan Proponents' joint and unanimous option remain in full force and effect and not be deemed affected. However, the Plan shall not to proceed to Confirmation or consummation if any such ruling occurs unless each of the Plan Proponents consents. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its term..

### X.      Service of Certain Exhibits

Certain exhibits are not being Filed or served with copies of the Plan. The Plan Proponents shall File such exhibits no later than seven (7) days before the deadline to object to Confirmation.

## XV.    ALTERNATIVES TO THE PLAN

The Plan Proponents have determined that the Plan is the most practical means of providing maximum recoveries to Creditors in these Cases. Consideration of these alternatives has led the Plan Proponents to conclude that the Plan, in comparison, will provide a greater recovery to Creditors on a more expeditions timetable and in a manner which minimizes inherent risks that any other course of action available.

### A.      Conversion to Chapter 7 of the Bankruptcy Code

If the Plan or any other Chapter 11 plan cannot be confirmed, these cases may be converted to cases under Chapter 7 of the Bankruptcy Code, in which event a trustee would be

94

elected or appointed to liquidate any remaining assets, and prosecute the remaining Avoidance Actions, of the Debtors, for distribution to Creditors pursuant to Chapter 7 of the Bankruptcy Code. If a Chapter 7 trustee is appointed, all Creditors holding allowed administrative Expense Claims, Allowed Priority Tax Claims and Allowed Other Priority Claims that may receive distributions would likely have to wait a longer period of time to receive distributions on their claims than they would under the Plan. A Chapter 7 Trustee, who would lack the Chapter 11 Trustee's, Creditor's Committee's and their respective advisors' and professionals' historical knowledge of the Debtors' affairs, would be required to invest substantial time and resources to investigate the facts underlying the Avoidance Actions, potential Causes of Action, and any Claims filed against the Estates.

### B.      Alternative Chapter 11 Plan

If the Plan is not confirmed, the Chapter 11 Trustee or any other party-in-interest could attempt to formulate an alternative Chapter 11 Plan. However, because there are no operations to reorganize or restructure, and since substantially all of the Debtors' assets are Causes of Action, including the Avoidance Actions) and thus litigation claims, the Plan Proponents believe that any alternative Chapter 11 Plan will necessarily be substantially similar to the Plan. The Plan Proponents further believe that any alternative Chapter 11 Plan would necessarily delay Creditors' receipt of distributions yet to be made and would likely decrease such distribution as a result of, among other things, increased Administrative Expenses.

### C.      Dismissal of Chapter 11 Cases.

If the Plan is not confirmed, Chapter 11 Cases could be dismissed, leaving Claim Holders to pursue available non-bankruptcy remedies. If the Chapter 11 Case is dismissed, Creditors would be free to pursue non-bankruptcy remedies in their attempts to satisfy claims against the Debtors. However, in that event, Creditors would be faced with the costs, difficulties, and inter-creditor competition of attempting, each on its own, to pursue litigation to seek to satisfy their claims.

### D.      Certain Risk Factors

**ALL HOLDERS OF IMPAIRED CLAIMS INTERESTS SHOULD READ AND CAREFULLY CONSIDER THE RISK FACTORS SET FORTH BELOW AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT (AND THE EXHIBITS HERETO) PRIOR TO DETERMINING WHETHER AND HOW TO VOTE ON THE PLAN.**

**BEFORE DETERMINING WHETHER AND HOW TO VOTE ON THE PLAN, YOU SHOULD CAREFULLY CONSIDER ALL OF THE INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT AND, IN PARTICULAR, THE RISKS DESCRIBED BELOW. IF ANY OF THE FOLLOWING RISKS ACTUALLY OCCURS, CREDITOR RECOVERIES COULD BE LOWER THAN OTHERWISE DESCRIBED HEREIN. THE RISKS AND UNCERTAINTIES BELOW ARE NOT THE ONLY ONES THE ESTATES FACE, BUT REPRESENT THE RISKS THAT THE CHAPTER 11 TRUSTEE BELIEVES ARE MATERIAL. HOWEVER, THERE MAY BE ADDITIONAL**

95

**RISKS THAT THE CHAPTER 11 TRUSTEE CURRENTLY CONSIDERS NOT TO BE MATERIAL OR OF WHICH THE CHAPTER 11 TRUSTEE IS CURRENTLY UNAWARE, AND ANY OF THESE RISKS COULD HAVE THE EFFECTS SET FORTH ABOVE.**

### 1.    Risk of Decreased Distributions

#### (a)    Higher Actual Amounts of Allowed Unclassified Claims

If the total amount of Allowed Administrative Expense Claims, Allowed Priority Tax Claims, Allowed Other Priority Tax claims exceed the estimates set forth in this Disclosure Statement or otherwise, the amount of Cash available for distribution to Holders of Allowed Claims in Class 1, Class 2, and Class 3 would decrease.

#### (b)    Material Disputed Claims

There may be Disputed Claims that prove to be material. Depending on the resolution of such Disputed Claims, the actual total amount of all Allowed Claims may exceed the total amount of such Claims estimated by the Plan Proponents in the development of the Plan, as well as the estimates thereof set forth in this Disclosure Statement. Accordingly, the distribution that will ultimately be received by any particular Holder of an Allowed Claim may be affected by the aggregate amount of all such Allowed Claims.

#### (c)    The Causes of Action

After the Effective Date, the additional assets that may be distributed from Liquidation Trust Assets pursuant to the Plan consist almost entirely of proceeds actually obtained in connection with the Causes of Action, including the Avoidance Actions. The ability of the Chapter 11 Trustee (prior to the Effective Date) and the Liquidation Trustees (after the Effective Date) to collect significant proceeds from the Causes of Action is speculative. Although no specific amount of the Causes of Action was expressly considered by the Plan Proponents in determining the potential distribution to Holders of Allowed Claims, the potential for any increased recovery for Holders of Allowed Claims would decline in the event that the Chapter 11 Trustee or the Liquidation Trustee was not able to collect significant proceeds from the Causes of Action for any reason.

### 2.    Risk of Non-Confirmation; Feasibility

There can be no assurance that the requisite acceptances to confirm the Plan will be received. Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan. Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation and requires, among other things, a finding by the Bankruptcy Court that confirmation of the Plan is not likely to be followed by a liquidation or need for further financial reorganization, and that the value of the distributions to non-accepting Claim and Equity Security Holders will not be less than the value of the distributions that such Claim or Equity Security Holders would receive if the Debtor were liquidated under chapter 7 of the Bankruptcy Code. Although the Debtor believes that these requirements will be satisfied, there can be no assurance that the Bankruptcy Court will concur.

96

If the Plan is not confirmed and consummated, there can be no assurances that these Cases will continue rather than be converted to a liquidation under Chapter 7 of the Bankruptcy Code, or that any alternative plan of reorganization would be on terms a favorable to Holders of the various Allowed Claims as the terms of the Plan. If a liquidation under Chapter 7 were to occur, the Plan Proponents believe that distributions to Holders of Allowed Claims under the plan would be reduced and/or delayed. Additionally, in a liquidation under Chapter 7, before Holders of allowed Claims receive any distributions, additional administrative expenses of a Chapter 7 trustee such as trustee's attorneys, accounts, or other professionals would likely cause a substantial diminution in the value of the Estates.

### 3.    Non-Consensual Confirmation

Because Class 4, Class 5 and Class 6 are deemed to reject the Plan, the Plan Proponents will (i) seek confirmation of the Plan from the Bankruptcy Court under the "cramdown" provisions set forth in section 1129(b) of the Bankruptcy Code and/or (ii) modify the Plan in accordance with Section 12.4 of the Plan. In order to confirm the Plan under Section 1129(b) of the Bankruptcy Code, the Bankruptcy Court must determine that, in addition to satisfying all other requirements for confirmation, the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to each impaired Class that has not accepted the Plan. The Plan Proponents reserve the right to amend, modify, supplement, revoke or withdraw the plan, including to amend or modify the Plan or any exhibits to schedules thereto in order to satisfy the requirements of section 1129(b) of the Bankruptcy Code, if necessary. Such amendments may include, but are not limited to, the alteration or elimination of distributions to various Classes.

### E.    Certain Federal Income Tax Consequences of the Plan

### 1.    In General

A summary description of certain U.S. federal income tax consequences of the Plan is provided below. The description of tax consequences below is for informational purposes only and is subject to significant uncertainties. Only the principal consequences of the Plan for the Debtor and for the Holders of Claims who are entitled to vote to confirm or reject the Plan are described below. No opinion of counsel has been sought or obtained with respect to any tax consequences of the Plan, and no tax opinion is being given in this Disclosure Statement. No rulings or determinations of the Internal Revenue Service ("IRS") or any other tax authorities have been obtained or sought with respect to the Plan, and the description below is not binding upon the IRS or such other authorities.

The following discussion of U.S. federal income tax consequences is based on the Internal Revenue Code of 1986, as amended (the "Tax Code"), regulations promulgated and proposed thereunder and judicial decisions and administrative rulings and pronouncements of the IRS as in effect on the date hereof. Legislative, judicial or administrative changes or interpretations enacted or promulgated in the future could alter or modify the analyses and conclusions set forth below. It cannot be predicted at this time whether any tax legislation will be enacted or, if enacted, whether any tax law changes contained therein would affect the tax consequences to Holders. Any such changes or interpretations may be retroactive and could significantly affect the U.S. federal income tax consequences discussed below.

97

**THIS DISCUSSION DOES NOT ADDRESS FOREIGN, STATE OR LOCAL TAX CONSEQUENCES OF THE PLAN, NOR DOES IT PURPORT TO ADDRESS THE U.S. FEDERAL TAX CONSEQUENCES OF THE PLAN TO SPECIAL CLASSES OF TAXPAYERS (SUCH AS FOREIGN ENTITIES, NONRESIDENT ALIEN INDIVIDUALS, PASS-THROUGH ENTITIES SUCH AS PARTNERSHIPS AND HOLDERS THROUGH SUCH PASS-THROUGH ENTITIES, S CORPS AND CORPORATIONS, MUTUAL FUNDS, INSURANCE COMPANIES, FINANCIAL INSTITUTIONS, SMALL BUSINESS INVESTMENT COMPANIES, REGULATED INVESTMENT COMPANIES, CERTAIN SECURITIES TRADERS, BROKER-DEALERS AND TAX-EXEMPT ORGANIZATIONS). FURTHERMORE, ESTATE AND GIFT TAX ISSUES ARE NOT ADDRESSED HEREIN AND TAX CONSEQUENCES RELATING TO THE ALTERNATIVE MINIMUM TAX ARE GENERALLY NOT DISCUSSED HEREIN.**

**THE DISCUSSION CONTAINED IN THIS DISCLOSURE STATEMENT AS TO FEDERAL TAX CONSIDERATIONS IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, FOR THE PURPOSE OF AVOIDING PENALTIES.**

**NO REPRESENTATIONS ARE MADE REGARDING THE PARTICULAR TAX CONSEQUENCES OF THE PLAN TO ANY HOLDER OF A CLAIM OR EQUITY INTEREST. EACH HOLDER OF A CLAIM OR EQUITY INTEREST IS STRONGLY URGED TO CONSULT ITS OWN TAX ADVISOR REGARDING THE U.S. FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES OF THE TRANSACTIONS DESCRIBED HEREIN AND IN THE PLAN.**

### 2.    Federal Income Tax Treatment of the Liquidating Trusts

It is intended that each of the Liquidating Trusts will be treated as a "grantor trust" for U.S. federal income tax purposes. In general, a grantor trust is not a separate taxable entity. The IRS, in Revenue Procedure 94-45, 1994-2 C.B. 684, set forth the general criteria for obtaining a IRS ruling as to the grantor trust status of a liquidating trust under a chapter 11 plan. The Liquidating Trust has been structured with the intention of complying with such general criteria. Assuming the Liquidating Trust is classified as a grantor trust, for U.S. federal income tax purposes, (i) the Debtors and each Beneficiary will treat the transfer of the assets to the Liquidating Trust as a transfer of such assets to the Beneficiaries and a transfer by the Beneficiaries of such assets to the Liquidating Trust and (ii) each Beneficiary will be treated as the grantor and deemed owner and obligor of its allocable share of the assets and liabilities, respectively, of the Liquidating Trust.

The Liquidating Trust Agreements generally provide that the Beneficiaries of the Liquidating Trusts must value the assets of the Liquidating Trusts consistently with the values determined by the Liquidating Trustees for U.S. federal, state, local and foreign income tax purposes. As soon as possible after the Effective Date, but in no event later than sixty (60) days thereafter, the Liquidating Trustees, based upon a good faith determination after consultation with counsel and the Liquidating Trust Committee, shall inform the Beneficiaries in writing solely as to the estimate of the value of the assets transferred to the Liquidating Trusts.

The foregoing discussion assumes that the Liquidating Trusts will be respected as grantor trusts for U.S. federal income tax purposes. If the IRS were to challenge successfully such classification, the U.S. federal income tax consequences to the Liquidating Trusts and the Beneficiaries could vary from those discussed herein (including the potential for an entity level tax to be imposed on any income of the Liquidating Trusts).

The Liquidating Trust Agreements require each Beneficiary to report on its U.S. federal income tax return its allocable share of the Liquidating Trusts' income. Therefore, a Beneficiary may incur a U.S. federal income tax liability with respect to its allocable share of the income of the Liquidating Trusts whether or not the Liquidating Trusts have made any concurrent distribution to such Beneficiary. The character of items of income, deduction, and credit to any Beneficiary and the ability of such Holder to benefit from any deduction or losses will depend on the particular situation of such Holder.

In general, other than in respect of distributions attributable to a reduction in the Disputed Claims Reserve's interest in the Liquidating Trusts, a distribution of underlying assets from a Liquidating Trust to a Beneficiary will generally not be taxable to such Holder because such Holders are already regarded for U.S. federal income tax purposes as owning such assets. Beneficiaries are urged to consult their tax advisors regarding the appropriate U.S. federal income tax treatment of distributions from the Liquidating Trusts.

The Liquidating Trustees will file with the IRS tax returns for the Liquidating Trusts as grantor trusts pursuant to Treasury Regulation section 1.671-4(a) and will also send to each Beneficiary a separate statement setting forth such Holder's share of items of income, gain, loss, deduction, or credit. Each such Holder will be required to report such items on its U.S. federal income tax return.

### 3.    Disputed Claims Reserve

Until such time as all of the beneficial interests in the Liquidating Trusts (and the proceeds thereof) can be distributed to the Holders in accordance with the terms of the Plan, the Disputed Claims Reserve will be treated as owning a portion of the assets in the Liquidating Trusts. Distributions from the Disputed Claims Reserve will be made to Holders of Disputed Claims when such Claims are subsequently Allowed and to other Beneficiaries when any Disputed Claims are subsequently disallowed. The Liquidating Trusts shall file all income tax returns with respect to any income attributable to the Disputed Claims Reserve and shall pay the federal, state and local income taxes attributable to the Disputed Claims Reserve, based on the items of income, deduction, credit or loss allocable thereto.

Beneficiaries should note the tax treatment of the Liquidating Trusts and the Disputed Claims Reserve is unclear and should consult their tax advisors.

### 4.    Federal Income Tax Consequences to Holders of Claims

Holders of Claims should generally recognize gain (or loss) to the extent the amount realized under the Plan (generally the amount of cash received) in respect of their Claims exceeds (or is exceeded by) their respective tax bases in their Claims. The tax treatment of

99

Holders of Claims and the character and amount of income, gain or loss recognized as a consequence of the Plan and the distributions provided for by the Plan will depend upon, among other things, (a) the nature and origin of the Claim, (b) the manner in which a Holder acquired a Claim, (c) the length of time a Claim has been held, (d) whether the Claim was acquired at a discount, (e) whether the Holder has taken a bad debt deduction in the current or prior years, (f) whether the Holder has previously included in income accrued but unpaid interest with respect to a Claim, (g) the method of tax accounting of a Holder, and (h) whether a Claim is an installment obligation for U.S. federal income tax purposes. **Therefore, Holders of Claims should consult their own tax advisors for information that may be relevant to their particular situations and circumstances and the particular tax consequence to such Holders as a result thereof**.

The tax treatment of a Holder of a Claim that receives distributions in different taxable years is uncertain. If such a Holder treats the transaction as closed in the taxable year it first receives (or is deemed to have received) a distribution of cash and/or property, it should recognize gain or loss for such tax year in an amount equal to the cash and the value of other property actually (and deemed) received in such tax year (other than that received in respect of accrued interest) with respect to its Claim (other than any portion of the Claim that is attributable to accrued interest) plus the estimated value of future distributions (if any) less its tax basis in its Claim (except to the extent its Claim is for accrued interest). A Holder should then subsequently recognize additional income or loss when additional property distributions are actually received in an amount equal to the cash and/or value of such other property (other than that received in respect of accrued interest) less the Holder's allocable tax basis in its Claim with respect to such subsequent distribution. A Holder may have to treat a portion of any such subsequent distribution as imputed interest recognizable as ordinary income in accordance with the Holder's method of tax accounting. If instead the open transaction doctrine applies as a result of the value of the Subsequent Distributions that a Holder may receive not being ascertainable on the Effective Date, such Holder should not recognize gain (except to the extent the value of the cash and/or other property already received exceeds such Holder's adjusted tax basis in its Claim (other than any Claim for accrued interest)) or loss with respect to its Claim until it receives the final distribution thereon (which may not be until the Final Distribution Date). It is the position of the IRS that the open transaction doctrine only applies in rare and extraordinary cases. **Holders of Claims are urged to consult their own tax advisors regarding the application of the open transaction doctrine and how it may apply to their particular situations, whether any gain recognition may be deferred under the installment method, whether any loss may be disallowed or deferred under the related party rules and the tax treatment of amounts that certain Holders of Claims may be treated as paying to other Holders of Claims**.

Holders of Allowed Claims will be treated as receiving a payment of interest (in addition to any imputed interest as discussed in the preceding paragraph) includible in income in accordance with the Holder's method of accounting for tax purposes, to the extent that any cash and/or other property received pursuant to the Plan is attributable to accrued but unpaid interest, if any, on such Allowed Claims. The extent to which the receipt of cash and/or other property should be attributable to accrued but unpaid interest is unclear. Each Holder should consult its own tax advisor regarding the determination of the amount of consideration received under the Plan that is attributable to interest (if any). A Holder generally will be entitled to recognize a loss to the extent any accrued interest was previously included in its gross income and is not paid in full.

DOCS-#4870937-v21

### 5. Holders of Disputed Claims

Although not free from doubt, Holders of Disputed Claims should not recognize any gain or loss on the date that the assets are transferred to the Disputed Claims Reserve, but should recognize gain or loss in an amount equal to: (a) the amount of cash and the fair market value of any other property actually distributed to such claimant (other than any amounts attributable to accrued and unpaid interest) less (b) the adjusted tax basis of its Claim (other than for accrued and unpaid interest). **Holders of Disputed Claims are urged to consult their own tax advisors regarding the taxation of their Disputed Claims and the timing and amount of income or loss recognized relating to the Disputed Claims Reserve.**

### 6. Information Reporting and Backup Withholding

Certain payments, including the payments of Claims pursuant to the Plan, are generally subject to information reporting by the payor to the IRS. Moreover, such reportable payments are subject to backup withholding under certain circumstances. Under the backup withholding rules, a Holder of a Claim may be subject to backup withholding at the applicable tax rate with respect to distributions or payments made pursuant to the Plan, unless the Holder: (a) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates this fact or (b) provides a correct taxpayer identification number and certifies under penalty of perjury as to the correctness of its taxpayer identification number and certain other tax matters. Backup withholding is not an additional tax. Rather, the U.S. federal income tax liability of persons subject to backup withholding will be reduced by the amount of tax withheld. If withholding results in an overpayment of U.S. federal income taxes, a Holder may obtain a refund of any excess amounts withheld under the backup withholding rules by timely filing the appropriate claim for refund with the IRS.

The Liquidating Trustees will report annually to each Holder of an Allowed Claim or Interest and to the IRS the Holder's share of any income, gains and losses of the Liquidating Trusts during the calendar year to the extent required by law.

### 7. Importance of Obtaining Professional Tax Assistance

**THE FOREGOING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. THE ABOVE DISCUSSION IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT TAX ADVICE. THE TAX CONSEQUENCES OF THE PLAN ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A HOLDER'S INDIVIDUAL CIRCUMSTANCES. ACCORDINGLY, HOLDERS ARE URGED TO CONSULT WITH THEIR OWN TAX ADVISORS ABOUT THE U.S. FEDERAL, STATE, LOCAL AND FOREIGN INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN.**

## XVI.   RECOMMENDATION AND CONCLUSION

The Plan Proponents have explored various alternative scenarios and believe that the Plan enables the Holders of Claims and Equity Interests to realize the maximum recovery under the circumstances. The Plan Proponents believe that the Plan is in the best interests of the Estates and Holders of Allowed Claims, and other parties in interest and believe that the Plan will provide for a more valuable distribution to Holders of Allowed Claims than all other alternatives. Any alternative to Confirmation of the Plan could result in extensive delays and increased administrative expenses resulting in potentially diminished distributions to the Holders of Allowed Claims.

***************Remainder of page left intentionally left blank************************

Accordingly, the Plan Proponents (i) recommend Confirmation of the Plan, and (ii) urge all Holders of Claims entitled to vote to accept the Plan and to indicate acceptance by returning their Ballot so as to be received by the Clerk of Bankruptcy Court no later than _____ __, 2016 at 5:00 p.m. (prevailing Central time).

Dated January 15, 2016          Respectfully submitted,

                                Douglas A Kelley, Chapter 11 Trustee


                                _____
                                Douglas A Kelley

103

## EXHIBITS TO DISCLOSURE STATEMENT

| Exhibit "A" | Chapter 11 Plan of Liquidation |
|---|---|
| Exhibit "B" | Chapter 11 Trustee's Professionals |
| Exhibit "C" | Petters Capital Chapter 7 Trustee's Professionals |

DOCS-#4870937-v21